IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GENTEX CORPORATION

          Plaintiff,

v.

GALVION LTD. and GALVION INC.,

          Defendants.

**Redacted - Public Version**

C.A. No.  19-921-MN



**LETTER TO HONORABLE MARYELLEN NOREIKA
<u>REQUESTING LEAVE TO FILE MOTIONS FOR SUMMARY JUDGMENT</u>**

OF COUNSEL:
Michael A. Albert
John L. Strand
Jason W. Balich
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02210-2206
(617) 646-8000


Dated: January 7, 2022

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendants*

Dear Judge Noreika:

Pursuant to your Honor's order dated Dec. 16, 2021 (D.I. 163), Defendants Galvion Ltd. and Galvion Inc. ("Galvion") respectfully request leave to file motions for summary judgment that would resolve the case *in its entirety*.

Unlike in most patent cases, here Galvion is *licensed* to use the accused patents to make and sell the accused helmet systems. This case thus turns primarily on a matter of contract interpretation for the Court. Whether the license is valid and whether Gentex is a proper assignee are *pure legal issues* that the Court will need to resolve regardless of whether the case proceeds to trial or not. It would be more efficient to resolve them now, and doing so will resolve all the claims and defenses, avoiding the need for the parties and the Court to expend resources on a trial.[1]

Additionally, two of the licensed patents are design patents. It is undisputed that Galvion's designs are, in *Gentex's own expert's words, "obviously dissimilar"* from the claimed designs. Accordingly, summary judgment of noninfringement of the design patents is proper.

### 1.   Galvion's Sales Are Licensed.

There is no dispute that the original patent owner (Artisent) granted Galvion a license. *See* Ex. 1.[2] To resolve this summary judgment motion, the Court need only address three legal issues: (a) whether Gentex has standing to assert that Galvion breached the license, (b) whether the scope of the license extends to the asserted patents, and (c) whether the term "halo system," as defined in the license agreement, includes the accused products as a matter of law.

#### a.   Gentex Lacks Standing to Challenge the Agreement.

Gentex is not a party to the license. It thus lacks standing to allege breach. *Johnson v. U.S. Bancorp*, No. 10-cv-1072, 2012 WL 1133689, at *3 (D. Del. Mar. 30, 2012) ("Plaintiff is not a party to a contract with Defendant and, thus, has no standing to raise a breach of contract claim.").

Gentex is also not an assignee, because Galvion undisputedly never consented to an assignment as the license *expressly required*. Ex. 1 at ¶ 16. The consent requirement has an exception in cases of "sale of control" of Artisent; but that undisputedly never occurred. "Sale of control," as a matter of Quebec law (under which the license is to be construed), means the sale of "a number of shares as carries with it the right to a majority of the votes in the election of the board of directors." Ex. 2 (*Duha Printers (Western) Ltd. v. Canada*, [1998] 1 SCR 795) at 815. Gentex purchased only certain Artisent *assets*—it never acquired *any* of its *stock*, let alone a

---

[1] Five of the six accused patents are licensed; as to the sixth, as discussed below, Gentex's expert has *admitted* facts amounting to non-infringement. (And as to that patent, less than $5,000 is at stake).

[2] Revision Eyewear Inc., the name used in the license, has since been renamed Galvion Inc.

controlling share. Indeed, Artisent undisputedly continued to exist after the asset purchase, under its original ownership.

Determining the substance of foreign law is "a question of law appropriate for resolution at the summary judgment stage." *Sanofi-Aventis U.S. LLC v. Merck Sharp & Dohme Corp*., No. 16-cv-812-RGA, 2018 WL 2272773, at *4 (D. Del. May 17, 2018). Inasmuch as a resolution can avoid any need for trial, it would be most efficient to decide it now.

### b.    The License Extends to the Continuation Patents.

The license that Artisent granted to Galvion was broad, covering not just the '517 and '667 patents, but expressly including all "continuations, … improvements or additions or modifications thereto." Ex. 1 at ¶¶ 1 and 4.  It is undisputed that the '294, '846, and '847 patents cover the originally-licensed technology or are continuations, improvements, additions, or modifications thereto.  *Rowe Int'l Corp. v. Ecast, Inc*., 500 F. Supp. 2d 887, 890 (N.D. Ill. 2007) (recitation of "or improvements" in an assignment agreement included future continuations-in-part); *Gerber Sci. Int'l, Inc. v. Satisloh AG*, No. 7-cv-1382, 2009 WL 2869705 (D. Conn. 2009) (same).  The license thus covers five of the six asserted patents (and Gentex's expert admits that the sixth patent is not infringed).

### c.    The Term "Halo System" Includes the Accused Products.

The license covers ***all*** the accused products. It expressly allows Galvion to use the licensed technology for the "manufacture, use, sale and/or distribution of 'halo systems,'" their components, and helmets having halo systems. Ex. 1 at ¶ 4. The license defines "halo system" as "a system for attaching units on or to helmets, which have components that are fixed ***or applied to more than just the sides*** of the helmet." *Id.* at ¶ 5. And the license allows for the sale of "replacement parts," even if sold separately.  *Id*. All of the accused products fall within this definition of "halo system" or their "replacement parts." Indeed, Gentex's technical expert, Nicholas Shewchenko, ***admitted*** that this definition applies to all the accused helmets and rails, whether interlocking or not.[3]

### 2.    <u>The Sixth Patent is Admittedly Not Infringed.</u>

The sole asserted claim of the '807 patent (claim 17) requires a "shroud mount … ***coupled to the component by fasteners***…."  Gentex's expert identified at his deposition what he considers to be the "shroud mount" and the "component" of the accused products. Ex. 3 at 203-205. He admitted that the "shroud mount" is coupled to the "component" ***<u>without any fastener</u>***,

---

[3] As to helmets with interlocking rails, he made this admission in his reply expert report at ¶ 21. As to helmets with non-interlocking rails, he admitted at his deposition that the "system for attaching accessories" includes components that are undisputedly applied to more than just the sides of the helmet. Ex. 3 at 104:7-22, 112:18-113:20.  As to the parts kits Galvion sells, Mr. Shewchenko admitted at his deposition that the kits could be (*id*., 193:7-14) and in fact are (*id*., 195:6-13), sold and used as replacement parts. They thus fall under the "replacement parts" portion of the license.

because a part of the "shroud mount" is molded out of the same unitary plastic piece as the "component." *Id.* The accused products thus do not infringe claim 17 of the '807 patent.

### 3. The Accused Products Do Not Infringe the Design Patents.

"Summary judgments of non-infringement are particularly appropriate in design patent infringement cases because of the very limited scope of protection afforded to design patents." *Ethicon Endo-Surgery, Inc. v. Covidien, Inc*., No. 11-cv-871, 2014 WL 10212172, at *3 (S.D. Ohio Jan. 22, 2014), *aff'd in relevant part*, 796 F.3d 1312 (Fed. Cir. 2015). An accused product that is "plainly dissimilar from the [claimed] ornamental design" does not infringe as a matter of law. *Ethicon,* 796 F.3d at 1315; *see also Egyptian Goddess, Inc. v. Swisa, Inc*., 543 F.3d 665, 678 (Fed. Cir. 2008) (setting forth the "plainly dissimilar" test).

Here, the claimed designs are plainly dissimilar from the designs of the accused products. Gentex's own expert admitted that certain accused products are "obviously dissimilar" from the claimed design. Ex. 3 at 181:17-182:3.  And Gentex's Chief Industrial Designer and Rule 30(b)(6) corporate representative, who is also the first named inventor on the design patents, admitted that there were numerous differences between *all* the accused and claimed designs. Ex. 4 at 167:12-168:22, 172:3-11, 174:24-175:8. Moreover, Gentex's expert admitted at his deposition that key elements of the designs were ***functional*** (Ex. 3 at 54-92), and thus not appropriate for consideration in a design patent infringement analysis. *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1343 (Fed. Cir. 2020) (court must "factor out the functional aspects of various design elements.").

Gentex's proffered design expert, Timothy Fletcher, is unqualified to offer an opinion, as set forth in Galvion's letter (filed today) seeking leave to file a *Daubert* motion.  But even if Mr. Fletcher's testimony were admitted, it would not alter the outcome. "[E]xpert testimony cannot create a triable issue of fact where an accused design is clearly distinguishable from the patented design." *Ethicon*, 2014 WL 10212172 at *10.  On the undisputed record, summary judgment is appropriate, as the accused designs are plainly dissimilar from the claimed designs.

### Conclusion

For the foregoing reasons, Galvion respectfully requests leave to file the above-described motions for summary judgment that, if granted, would dispose of this case in its entirety.

Respectfully submitted,

*/s/ Andrew E. Russell*

Andrew E. Russell (No. 5382)

cc: Clerk of the Court (by CM/ECF)
    All counsel of record (by CM/ECF and email)

3

# EXHIBIT 1 REDACTED IN ITS ENTIRETY

# EXHIBIT 2

1998 CanLII 827 (SCC)

**Duha Printers (Western) Ltd.**  *Appellant*

*v.*

**Her Majesty The Queen**  *Respondent*

INDEXED AS: DUHA PRINTERS (WESTERN) LTD. *v.* CANADA

File No.: 25513.

1998: March 17; 1998: May 28.

Present: L'Heureux-Dubé, Gonthier, McLachlin, Iacobucci, Major, Bastarache and Binnie JJ.

ON APPEAL FROM THE FEDERAL COURT OF APPEAL

*Income tax — Deductions from income — Non-capital losses — Amalgamation of corporations — Predecessor corporation — Meaning of "control" — Corporation acquiring shares of inactive company in order to take advantage of its accumulated non-capital losses — Corporation amalgamating with inactive company — Whether change in control prevented corporation from deducting inactive company's non-capital losses — Whether unanimous shareholder agreement to be considered in assessing who has de jure control of corporation — Income Tax Act, R.S.C. 1952, c. 148, ss. 87(2.1), 111(1), (5).*

A predecessor of the appellant corporation decided to acquire the shares of an inactive company ("Outdoor") in order to take advantage of the substantial non-capital losses it had accumulated. The company which owned the shares of Outdoor ("Marr's") subscribed for a sufficient number of shares in the appellant's predecessor to give it a majority of the voting shares. An agreement was entered into among all the shareholders of the appellant's predecessor pursuant to which its affairs were to be managed by a board of directors, elected by the shareholders from a list of nominees specified in the agreement. The agreement also restricted the transfer of shares so that no shares could be transferred without the consent of the majority of the directors. The appellant's predecessor purchased all the outstanding shares of Outdoor from Marr's for $1. It then amalgamated with Outdoor, thereby creating the appellant.

In its 1985 tax return the appellant deducted from its income non-capital losses which had been incurred by

**Duha Printers (Western) Ltd.**  *Appelante*

*c.*

**Sa Majesté la Reine**  *Intimée*

RÉPERTORIÉ: DUHA PRINTERS (WESTERN) LTD. *c.* CANADA

Nᵒ du greffe: 25513.

1998: 17 mars; 1998: 28 mai.

Présents: Les juges L'Heureux-Dubé, Gonthier, McLachlin, Iacobucci, Major, Bastarache et Binnie.

EN APPEL DE LA COUR D'APPEL FÉDÉRALE

*Impôt sur le revenu — Déductions du revenu — Pertes autres qu'en capital — Fusion de sociétés — Société remplacée — Sens du mot «contrôle» — Société achetant les actions d'une compagnie inactive dans le but de tirer profit des pertes autres qu'en capital que cette dernière avait accumulées — Société fusionnant avec la compagnie inactive — Le changement de contrôle empêchait-il la société de déduire les pertes autres qu'en capital de la compagnie inactive? — Faut-il tenir compte d'une convention unanime des actionnaires pour déterminer qui détient le contrôle de jure d'une société? — Loi de l'impôt sur le revenu, S.R.C. 1952, ch. 148, art. 87(2.1), 111(1), (5).*

Une société remplacée par la société appelante a décidé d'acquérir les actions d'une compagnie inactive («Outdoor») dans le but de tirer profit des importantes pertes autres qu'en capital que cette dernière avait accumulées. La compagnie qui détenait les actions de Outdoor («Marr's») a souscrit un nombre suffisant d'actions de la société remplacée par l'appelante pour obtenir la majorité des actions avec droit de vote. Tous les actionnaires de la société remplacée par l'appelante ont conclu une convention aux termes de laquelle les affaires internes de la société remplacée seraient gérées par un conseil d'administration élu par les actionnaires à partir d'une liste de candidats figurant dans la convention. La convention restreignait aussi le transfert d'actions, de sorte qu'aucune action ne pouvait être transférée sans le consentement de la majorité des administrateurs. La société remplacée par l'appelante a acheté à Marr's, pour un dollar, toutes les actions en circulation de Outdoor. Elle a ensuite fusionnée avec Outdoor, créant ainsi la société appelante.

Dans sa déclaration de revenus de 1985, l'appelante a déduit de son revenu des pertes autres qu'en capital que

Outdoor in previous years, pursuant to s. 111(1) of the *Income Tax Act* ("*ITA*"). Section 87(2.1) of the *ITA* provides that where there has been an amalgamation of two or more corporations, the new corporation is deemed to be the same corporation as each predecessor corporation for the purposes of determining the non-capital losses of the new corporation. Under s. 111(5), however, where "control" of a corporation has been acquired by another person (the "purchaser"), that corporation's non-capital losses from the carrying on of a business are only deductible by the purchaser in a subsequent taxation year if, throughout that year, the business in question was carried on by the purchaser with a reasonable expectation of profit — that is, as a going concern. The Minister of National Revenue disallowed the deduction on the basis that Marr's did not control the appellant's predecessor prior to its amalgamation with Outdoor. The Tax Court of Canada allowed the appellant's appeal, but that decision was overturned by the Federal Court of Appeal.

*Held*: The appeal should be allowed.

Under the *ITA*, "control" of a corporation normally refers to *de jure*, not *de facto*, control. The general test is whether the majority shareholder enjoys "effective control" over the affairs and fortunes of the corporation, as manifested in the ownership of such a number of shares as carries with it the right to a majority of the votes in the election of the board of directors (the *Buckerfield's* test). While the general approach to the determination of control has been to examine the share register of the corporation to ascertain which shareholder, if any, possesses the ability to elect a majority of the board of directors, it is entirely proper to look beyond the share register when the constating documents provide for something unusual which alters the control of the company. Although "ordinary" shareholder agreements and other external documents generally should not be considered in assessing *de jure* control, a unanimous shareholder agreement ("USA") is a constating document and as such must be considered for the purposes of this analysis. The USA is a corporate law hybrid, part contractual and part constitutional in nature. It can result in a fundamental change in the management of the company, since under s. 140(5) of the Manitoba *Corporations Act* (the "*Corporations Act*") the shareholders who are parties to the USA assume all the rights, powers, duties and liabilities of the directors which are removed by the agreement, and the directors are relieved of their duties and liabilities to the same extent. The fact that the USA has supplanted the long-standing principle of share-

Outdoor avait subies au cours des années antérieures, conformément au par. 111(1) de la *Loi de l'impôt sur le revenu* («*LIR*»). Le paragraphe 87(2.1) de la *LIR* prévoit que, lorsqu'il y a eu fusion de deux ou plusieurs sociétés ou corporations, la nouvelle société est réputée être la même que chacune des sociétés remplacées aux fins de déterminer les pertes autres qu'en capital de la nouvelle société. Toutefois, le par. 111(5) prévoit que, lorsque le «contrôle» d'une société a été acquis par une autre personne (l'«acheteur»), les pertes autres qu'en capital subies par cette société dans l'exploitation d'une entreprise ne sont déductibles par l'acheteur, au cours d'une année d'imposition subséquente, que si, tout au long de cette année, l'entreprise en question était exploitée par l'acheteur dans une expectative raisonnable de profit — c'est-à-dire en tant qu'entreprise en activité. Le ministre du Revenu national a refusé la déduction pour le motif que Marr's ne contrôlait pas la société remplacée par l'appelante avant sa fusion avec Outdoor. La Cour canadienne de l'impôt a accueilli l'appel de l'appelante, mais cette décision a été infirmée par la Cour d'appel fédérale.

*Arrêt*: Le pourvoi est accueilli.

Sous le régime de la *LIR*, le «contrôle» d'une société s'entend normalement du contrôle *de jure* et non du contrôle *de facto*. Le critère général consiste à décider si l'actionnaire majoritaire exerce un «contrôle effectif» sur les affaires et les destinées de la société, contrôle qui ressort de la propriété d'un nombre d'actions conférant la majorité des voix pour l'élection du conseil d'administration (critère de l'arrêt *Buckerfield's*). Bien que la façon générale de déterminer où se situe le contrôle consiste à examiner le registre des actionnaires de la société pour vérifier quel actionnaire, s'il en est, est en mesure d'élire la majorité des membres du conseil d'administration, il est parfaitement légitime d'aller au-delà du registre des actionnaires quand les actes constitutifs comprennent une disposition inusitée qui modifie le contrôle de la société. Alors que les conventions «ordinaires» des actionnaires et les autres documents externes ne devraient pas, en général, être pris en considération pour évaluer le contrôle *de jure*, une convention unanime des actionnaires («CUA») est un acte constitutif et doit, à ce titre, être prise en compte dans cette analyse. La CUA est une création hybride du droit des sociétés, qui est en partie contractuelle et qui tient en partie d'un acte constitutif. Elle peut entraîner un changement fondamental dans la gestion de la société, car le par. 140(5) de la *Loi sur les corporations* du Manitoba (la «*Loi sur les corporations*») prévoit que les actionnaires qui sont parties à la CUA assument tous les droits, pouvoirs et obligations des administrateurs révoqués par la convention, et

holder non-interference with the directors' powers to manage the corporation, an otherwise exclusive right which is granted by the statute and the corporate constitution, clearly indicates that it is at least as important as the articles and by-laws in assessing *de jure* control.

Under s. 140(2) of the *Corporations Act*, to be valid a USA must restrict, in whole or in part, the powers of the directors to manage the business and affairs of the corporation. The agreement in this case constituted a USA within the meaning of s. 140(2). Article 4.4 of the agreement, which prevented the corporation from issuing further shares "without the written consent of all of the Shareholders", imposed a clear restriction upon the directors' statutory powers of management. However, the mere existence of a USA does not necessarily alter the *de jure* control of a corporation. Rather, it is possible to determine whether *de jure* control has been lost as a result of a USA by asking whether the USA leaves any way for the majority shareholder to exercise effective control over the affairs and fortunes of the corporation in a way analogous or equivalent to the power to elect the majority of the board of directors.

The provisions in the USA at issue in this case did not in fact result in the loss of *de jure* control by Marr's. The inability to issue new shares without unanimous shareholder approval, while surely a restriction on the powers of the directors to manage the business and affairs of the appellant's predecessor, was not so severe a restriction that Marr's could be said to have lost the ability to exercise effective control over the affairs and fortunes of the company through its majority shareholdings. Marr's, by virtue of its ability to elect the majority of the board of directors, enjoyed *de jure* control over the appellant's predecessor immediately prior to its amalgamation with Outdoor. Nothing in the constating documents, including the USA, served to alter this state of affairs. Accordingly, there was no change in control occasioned by the amalgamation, which means that s. 111(5) of the *ITA* did not prevent the appellant from deducting from its 1985 taxable income the non-capital losses accumulated in previous years by Outdoor, regardless of whether or not the business of Outdoor

encourent toutes leurs responsabilités, et que les administrateurs sont déchargés de leurs obligations et responsabilités dans la même mesure. Le fait que la CUA a supplanté le principe de longue date selon lequel les actionnaires ne doivent pas entraver les pouvoirs des administrateurs de gérer la société, qui représentent un droit par ailleurs exclusif conféré par la loi et les actes constitutifs de la société, indique clairement que la CUA est au moins aussi importante que les statuts et les règlements administratifs pour apprécier le contrôle *de jure*.

Aux termes du par. 140(2) de la *Loi sur les corporations*, une CUA doit, pour être valide, restreindre en totalité ou en partie les pouvoirs des administrateurs de gérer l'entreprise et les affaires internes de la société. La convention, en l'espèce, était une CUA au sens du par. 140(2). L'article 4.4 de la convention, qui empêchait la société d'émettre de nouvelles actions «sans le consentement écrit de tous les actionnaires», imposait une restriction claire aux pouvoirs de gestion conférés aux administrateurs par la Loi. Cependant, la simple existence d'une CUA ne modifie pas nécessairement le contrôle *de jure* d'une société. Au contraire, il est possible de déterminer si le contrôle *de jure* a été perdu par suite d'une CUA en se demandant si cette CUA laisse à l'actionnaire majoritaire quelque moyen d'exercer un contrôle effectif sur les affaires et les destinées de la société, d'une manière analogue ou équivalente au pouvoir d'élire la majorité des membres du conseil d'administration.

Les dispositions de la CUA en cause dans le présent pourvoi n'ont pas entraîné, en réalité, la perte du contrôle *de jure* par Marr's. Même si elle constituait sûrement une restriction des pouvoirs des administrateurs de gérer l'entreprise et les affaires internes de la société remplacée par l'appelante, l'incapacité d'émettre de nouvelles actions sans le consentement unanime des actionnaires n'était pas une restriction grave au point de pouvoir dire que Marr's avait perdu la capacité d'exercer un contrôle effectif sur les affaires et les destinées de la société grâce à sa participation majoritaire. En raison de sa capacité d'élire la majorité des membres du conseil d'administration, Marr's détenait le contrôle *de jure* de la société remplacée par l'appelante, immédiatement avant la fusion de cette dernière avec Outdoor. Rien dans les actes constitutifs, y compris la CUA, n'a contribué à changer cette situation. Par conséquent, aucun changement de contrôle n'a résulté de la fusion, ce qui signifie que le par. 111(5) de la *LIR* n'empêchait pas l'appelante de déduire de son revenu imposable de 1985 les pertes autres qu'en capital accumulées par Outdoor au cours des années antérieures, peu importe que l'appelante ait eu l'intention d'exploiter Outdoor, ou qu'elle

was intended to be or was actually carried on by the appellant as a going concern.

l'ait effectivement exploitée, en tant qu'entreprise en activité.

## Cases Cited

**Distinguished:** *Oakfield Developments (Toronto) Ltd. v. Minister of National Revenue*, [1971] S.C.R. 1032; *Minister of National Revenue v. Consolidated Holding Co.*, [1974] S.C.R. 419; *The Queen v. Lusita Holdings Ltd.*, 84 D.T.C. 6346; *Alteco Inc. v. Canada*, [1993] 2 C.T.C. 2087; **referred to:** *Buckerfield's Ltd. v. Minister of National Revenue*, [1964] C.T.C. 504; *Minister of National Revenue v. Dworkin Furs (Pembroke) Ltd.*, [1967] S.C.R. 223; *Canada v. Antosko*, [1994] 2 S.C.R. 312; *International Iron & Metal Co. v. Minister of National Revenue*, [1974] S.C.R. 898, aff'g [1969] C.T.C. 668; *Vina-Rug (Canada) Ltd. v. Minister of National Revenue*, [1968] S.C.R. 193; *British American Tobacco Co. v. Inland Revenue Commissioners*, [1943] 1 All E.R. 13; *Donald Applicators Ltd. v. Minister of National Revenue*, 69 D.T.C. 5122, aff'd 71 D.T.C. 5202; *The Queen v. Imperial General Properties Ltd.*, [1985] 2 S.C.R. 288; *Harvard International Resources Ltd. v. Provincial Treasurer of Alberta*, 93 D.T.C. 5254; *Motherwell v. Schoof*, [1949] 4 D.L.R. 812; *Atlas Development Co. v. Calof* (1963), 41 W.W.R. 575; *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536.

## Statutes and Regulations Cited

*Canada Business Corporations Act*, R.S.C., 1985, c. C-44.
*Corporations Act*, R.S.M. 1987, c. C225, ss. 1(1) "affairs", "business", 6(3), (4), 20(1), 25(1), 97(1), 98(1), 116, 129(5), 140(2), (5), 207(1)(b), 240.
*Income Tax Act*, R.S.C. 1952, c. 148 [am. 1970-71-72, c. 63], ss. 87(2.1) [ad. 1977-78, c. 1, s. 42; am. 1984, c. 1, s. 38], 111(1) [rep. & sub. 1984, c. 1, s. 54], (5) [rep. & sub. 1980-81-82-83, c. 140, s. 70; rep. & sub. 1984, c. 1, s. 54], 251(2)(c), 256(5.1) [ad. 1988, c. 55, s. 192], (7)(a)(i) [ad. 1977-78, c. 1, s. 99; am. 1980-81-82-83, c. 48, s. 112, c. 140, s. 131].

## Authors Cited

*Concise Oxford Dictionary of Current English*, 9th ed. Oxford: Clarendon Press, 1995, "affairs".
Dickerson, Robert W. V., John L. Howard and Leon Getz. *Proposals for a New Business Corporations*

## Jurisprudence

**Distinction d'avec les arrêts:** *Oakfield Developments (Toronto) Ltd. c. Ministre du Revenu national*, [1971] R.C.S. 1032; *Ministre du Revenu national c. Consolidated Holding Co.*, [1974] R.C.S. 419; *La Reine c. Lusita Holdings Ltd.*, 84 D.T.C. 6346; *Alteco Inc. c. Canada*, [1993] 2 C.T.C. 2087; **arrêts mentionnés:** *Buckerfield's Ltd. c. Minister of National Revenue*, [1964] C.T.C. 504; *Minister of National Revenue c. Dworkin Furs (Pembroke) Ltd.*, [1967] R.C.S. 223; *Canada c. Antosko*, [1994] 2 R.C.S. 312; *International Iron & Metal Co. c. Ministre du Revenu national*, [1974] R.C.S. 898, conf. [1969] C.T.C. 668; *Vina-Rug (Canada) Ltd. c. Minister of National Revenue*, [1968] R.C.S. 193; *British American Tobacco Co. c. Inland Revenue Commissioners*, [1943] 1 All E.R. 13; *Donald Applicators Ltd. c. Minister of National Revenue*, 69 D.T.C. 5122, conf. par 71 D.T.C. 5202; *La Reine c. Imperial General Properties Ltd.*, [1985] 2 R.C.S. 288; *Harvard International Resources Ltd. c. Provincial Treasurer of Alberta*, 93 D.T.C. 5254; *Motherwell c. Schoof*, [1949] 4 D.L.R. 812; *Atlas Development Co. c. Calof* (1963), 41 W.W.R. 575; *Stubart Investments Ltd. c. La Reine*, [1984] 1 R.C.S. 536.

## Lois et règlements cités

*Loi canadienne sur les sociétés par actions*, L.R.C. (1985), ch. C-44.
*Loi de l'impôt sur le revenu*, S.R.C. 1952, ch. 148 [mod. 1970-71-72, ch. 63], art. 87(2.1) [aj. 1977-78, ch. 1, art. 42; mod. 1980-81-82-83, ch. 47, art. 53 (Item 12); mod. 1984, ch. 1, art. 38], 111(1) [abr. & rempl. 1984, ch. 1, art. 54], (5) [abr. & rempl. 1980-81-82-83, ch. 140, art. 70; abr. & rempl. 1984, ch. 1, art. 54], 251(2)c), 256(5.1) [aj. 1988, ch. 55, art. 192], (7)a)(i) [aj. 1977-78, ch. 1, art. 99; mod. 1980-81-82-83, ch. 48, art. 112, ch. 140, art. 131].
*Loi sur les corporations*, L.R.M. 1987, ch. C225, art. 1(1) «affaires internes», «entreprise», 6(3), (4), 20(1), 25(1), 97(1), 98(1), 116, 129(5), 140(2), (5), 207(1)b), 240.

## Doctrine citée

*Concise Oxford Dictionary of Current English*, 9th ed. Oxford: Clarendon Press, 1995, «affairs».
Dickerson, Robert W. V., John L. Howard et Leon Getz. *Propositions pour un nouveau droit des corporations*

*Law for Canada*, vol. 1. Ottawa: Information Canada, 1971.

Iacobucci, Frank. "Canadian Corporation Law: Some Recent Shareholder Developments". In Nancy E. Eastham and Boris Krivy, eds., *The Cambridge Lectures 1981: Selected Papers Based upon Lectures Delivered at the Conference of the Canadian Institute for Advanced Legal Studies, 1981, held at Cambridge University, England, and l'Université Catholique de Louvain, Louvain-la-Neuve, Belgium*. Toronto: Butterworths, 1982, 88.

Iacobucci, Frank, and David L. Johnston. "The Private or Closely-held Corporation". In Jacob S. Ziegel, ed., *Studies in Canadian Company Law*, vol. 2. Toronto: Butterworths, 1973, 68.

Welling, Bruce. *Corporate Law in Canada: The Governing Principles*, 2nd ed. Toronto: Butterworths, 1991.

*commerciales canadiennes*, vol. 1. Ottawa: Information Canada, 1971.

Iacobucci, Frank. «Canadian Corporation Law: Some Recent Shareholder Developments». In Nancy E. Eastham and Boris Krivy, eds., *The Cambridge Lectures 1981: Selected Papers Based upon Lectures Delivered at the Conference of the Canadian Institute for Advanced Legal Studies, 1981, held at Cambridge University, England, and l'Université Catholique de Louvain, Louvain-la-Neuve, Belgium*. Toronto: Butterworths, 1982, 88.

Iacobucci, Frank, and David L. Johnston. «The Private or Closely-held Corporation». In Jacob S. Ziegel, ed., *Studies in Canadian Company Law*, vol. 2. Toronto: Butterworths, 1973, 68.

Welling, Bruce. *Corporate Law in Canada: The Governing Principles*, 2nd ed. Toronto: Butterworths, 1991.

APPEAL from a judgment of the Federal Court of Appeal, [1996] 3 F.C. 78, 198 N.R. 359, 27 B.L.R. (2d) 89, [1996] 3 C.T.C. 19, 96 D.T.C. 6323, [1996] F.C.J. No. 738 (QL), reversing a judgment of the Tax Court of Canada, [1995] 1 C.T.C. 2481, 95 D.T.C. 828, [1994] T.C.J. No. 1140 (QL), ordering a reassessment. Appeal allowed.

POURVOI contre un arrêt de la Cour d'appel fédérale, [1996] 3 C.F. 78, 198 N.R. 359, 27 B.L.R. (2d) 89, [1996] 3 C.T.C. 19, 96 D.T.C. 6323, [1996] A.C.F. nº 738 (QL), infirmant un jugement la Cour canadienne de l'impôt, [1995] 1 C.T.C. 2481, 95 D.T.C. 828, [1994] A.C.I. nº 1140 (QL), ordonnant une nouvelle cotisation. Pourvoi accueilli.

*Joel Weinstein* and *Jonathan Kroft*, for the appellant.

*Joel Weinstein* et *Jonathan Kroft*, pour l'appelante.

*Robert Gosman*, *Sean D. Shore* and *Roger Taylor*, for the respondent.

*Robert Gosman*, *Sean D. Shore* et *Roger Taylor*, pour l'intimée.

The judgment of the Court was delivered by

Version française du jugement de la Cour rendu par

IACOBUCCI J. — In this appeal, this Court is required to examine the definition of "control" for the purposes of s. 111(5) of the *Income Tax Act*, R.S.C. 1952, c. 148, as amended, in order to determine whether the appellant corporation was entitled to deduct from its 1985 taxable income certain non-capital losses incurred by a predecessor corporation in an amalgamation. In this regard, it will be necessary to consider which of various factors may properly be considered in assessing the *de jure* control of a corporation, and in particular, whether a unanimous shareholder agreement, as contemplated by the Manitoba *Corporations Act*,

LE JUGE IACOBUCCI — Dans le présent pourvoi, notre Cour est appelée à examiner la définition du mot «contrôle» pour l'application du par. 111(5) de la *Loi de l'impôt sur le revenu*, S.R.C. 1952, ch. 148 et ses modifications, afin de décider si la société appelante avait le droit de déduire de son revenu imposable de 1985 des pertes autres qu'en capital subies par une société remplacée à la suite d'une fusion. À cet égard, il sera nécessaire d'examiner lesquels parmi divers facteurs peuvent à bon droit être pris en considération pour évaluer le contrôle *de jure* de la société, et en particulier, si une convention unanime des actionnaires, au sens de la

R.S.M. 1987, c. C225 (the "*Corporations Act*") (and by other statutes modelled after the *Canada Business Corporations Act*, R.S.C., 1985, c. C-44 (the "*CBCA*")), is to be considered a constating document for the purposes of the *de jure* control inquiry.

## I. Facts

2    This case proceeded on an agreed statement of facts, and therefore the facts are not in dispute. Duha Printers (Western) Ltd. ("Duha No. 1"), incorporated in Manitoba in 1963, carried on business as a specialty printer. Prior to and as at February 7, 1984, all of the voting shares of Duha No. 1 were held either directly or indirectly by Emeric Duha, his wife, Gwendolyn Duha, and their three children.

3    Outdoor Leisureland of Manitoba Ltd. ("Outdoor"), incorporated in Manitoba in 1971, carried on business as a retailer of recreational vehicles. As at February 8, 1984, the shares of Outdoor were held by Marr's Leisure Holdings Inc. ("Marr's"), of which William Marr and his wife, Norah Marr, owned 62.16 percent of the voting shares. On that date, and as early as 1983, Outdoor was inactive and had accumulated non-capital losses in the amount of $541,044.

4    On December 3, 1983, the directors of Duha No. 1 authorized the president of the corporation, Emeric Duha, to proceed at his discretion to acquire the shares of Outdoor in order to attempt to take advantage of the substantial non-capital losses which the latter had accumulated, so long as the losses could be purchased advantageously and if the related costs did not exceed $10,000. This set into motion the chain of events which ultimately gave rise to this litigation.

5    On February 7, 1984, Duha No. 1 amalgamated with 64457 Manitoba Ltd., a wholly owned subsidiary of Duha No. 1, to form Duha Printers Western Ltd. ("Duha No. 2"). This caused a deemed year-end, permitting Duha No.1 to take advantage of a small business deduction, and the shareholders of Duha No. 2 received the same number of shares as

*Loi sur les corporations* du Manitoba, L.R.M. 1987, ch. C225 (la «*Loi sur les corporations*») (et d'autres lois inspirées de la *Loi canadienne sur les sociétés par actions*, L.R.C. (1985), ch. C-44 (la «*LCSA*»)), peut être considérée comme un acte constitutif aux fins de l'examen du contrôle *de jure*.

## I. Les faits

Un exposé conjoint des faits ayant servi de base à l'instruction de la présente affaire, les faits ne sont pas contestés. Duha Printers (Western) Ltd. («Duha nº 1»), une société constituée au Manitoba en 1963, exploitait une imprimerie spécialisée. Le 7 février 1984 et avant cette date, Emeric Duha, son épouse, Gwendolyn Duha, et leurs trois enfants détenaient, directement ou indirectement, toutes les actions avec droit de vote de Duha nº 1.

Outdoor Leisureland of Manitoba Ltd. («Outdoor»), une société constituée au Manitoba en 1971, était un détaillant de véhicules de plaisance. Le 8 février 1984, les actions de Outdoor étaient détenues par Marr's Leisure Holdings Inc. («Marr's»), dont William Marr et son épouse, Norah Marr, détenaient 62,16 pour 100 des actions avec droit de vote. À cette date, et dès 1983, Outdoor était inactive et avait accumulé des pertes autres qu'en capital de 541 044 $.

Le 3 décembre 1983, les administrateurs de Duha nº 1 ont autorisé le président de la société, Emeric Duha, à acquérir, à son gré, les actions de Outdoor dans le but de tenter de tirer profit des importantes pertes autres qu'en capital que cette dernière avait accumulées, à la condition que ces pertes puissent être achetées avantageusement et que les coûts connexes ne dépassent pas 10 000 $. Voilà ce qui a déclenché la suite d'événements à l'origine du présent litige.

Le 7 février 1984, Duha nº 1 a fusionné avec 64457 Manitoba Ltd., une filiale en propriété exclusive de Duha nº 1, formant Duha Printers Western Ltd. («Duha nº 2»). Il en est résulté une fin d'exercice présumée qui a permis à Duha nº 1 de profiter d'une déduction accordée aux petites entreprises, et les actionnaires de Duha nº 2 ont

they had previously owned in Duha No. 1. On February 8, 1984, the articles of Duha No. 2 were amended to increase the authorized capital of the company by creating an unlimited number of Class "C" preferred shares. These shares entitled their holders to non-cumulative dividends equal to nine percent of the redemption price (the stated capital for each share). Each share also carried with it the right to one vote, which was to cease either upon the transfer of the share or upon the death of its holder. The Class "C" shares were redeemable by Duha No. 2 with the consent of the holder, or without the consent of the holder in the event that the shares were transferred.

Marr's subscribed for 2,000 Class "C" shares at a price of one dollar each, for a total of $2,000, on February 8, 1984. Consequently, Marr's then held a 55.71 percent majority of the voting shares in Duha No. 2. It is worth noting that, for the period ending December 31, 1983, Duha No. 1 had net income of $182,223 and retained earnings of $296,486. For the period ending January 2, 1985, it had net income of $630,115 and retained earnings of $571,543.

Also on February 8, 1984, an agreement was entered into among all of the shareholders of the new corporation, Duha No. 2 (the "Agreement"). Aside from describing itself in Article 3.1 as a "unanimous shareholders agreement", the Agreement stated that it dealt with the operation and management of the company's business and affairs. According to Article 2 of the Agreement, the affairs of Duha No. 2 were to be managed by a board of directors elected by the shareholders and composed of any three of Emeric Duha, Gwendolyn Duha, William Marr and Paul Quinton. Although Mr. Quinton was a close friend of both Emeric Duha and William Marr, and had served as a director of Duha No. 1 since 1974, it is common ground that he, Emeric Duha, and William Marr were not "related to each other"

reçu le même nombre d'actions que celui qu'ils détenaient antérieurement dans Duha n° 1. Le 8 février 1984, les statuts de Duha n° 2 ont été modifiés de manière à augmenter son capital autorisé, par la création d'un nombre illimité d'actions privilégiées de catégorie «C». Ces actions donnaient à leurs détenteurs droit à des dividendes non cumulatifs équivalant à neuf pour cent de leur valeur de rachat (soit le capital déclaré de chaque action). Chaque action donnait également droit à un seul vote, lequel droit s'éteindrait soit au transfert de l'action, soit au décès de son détenteur. Les actions de catégorie «C» pouvaient être rachetées par Duha n° 2 avec le consentement de leur détenteur, ou sans le consentement de ce dernier si elles étaient transférées.

6

Le 8 février 1984, Marr's a souscrit 2 000 actions de catégorie «C» au prix d'un dollar l'action, ce qui représentait une somme totale de 2 000 $. Marr's détenait désormais une majorité de 55,71 pour 100 des actions avec droit de vote de Duha n° 2. Il vaut la peine de noter que, pour l'exercice ayant pris fin le 31 décembre 1983, Duha n° 1 avait eu un revenu net de 182 223 $ et des bénéfices non distribués de 296 486 $. Pour l'exercice ayant pris fin le 2 janvier 1985, elle avait eu un revenu net de 630 115 $ et des bénéfices non distribués de 571 543 $.

7

Également le 8 février 1984, tous les actionnaires de la nouvelle société Duha n° 2 ont conclu une convention (la «Convention»). En plus de stipuler à l'article 3.1 qu'elle constituait une [TRADUCTION] «convention unanime des actionnaires», la Convention précisait qu'elle concernait l'exploitation et la gestion de l'entreprise et des affaires internes de la société. Aux termes de l'article 2 de la Convention, les affaires internes de Duha n° 2 devaient être gérées par un conseil d'administration élu par les actionnaires et composé de trois des personnes suivantes: Emeric Duha, Gwendolyn Duha, William Marr et Paul Quinton. Bien que M. Quinton ait été un ami intime à la fois de Emeric Duha et de William Marr, et qu'il ait été un administrateur de Duha n° 1 depuis 1974, tous s'entendent pour dire que lui, Emeric Duha et

within the meaning of s. 251 of the *Income Tax Act*.

8    The Agreement also restricted the transfer of shares so that no shares could be transferred without the consent of the majority of the directors (Article 4.1); prohibited any shareholder from selling, assigning, transferring, or otherwise encumbering its shares in any manner (Article 4.3); and provided that new shares could only be issued with the unanimous consent of the existing shareholders (Article 4.4). Further, in Article 6.1, the Agreement provided that shareholder disputes regarding the business, accounts, or transactions of Duha No. 2 were to be resolved by arbitration.

9    On February 9, 1984, Duha No. 2 purchased all of the outstanding shares of Outdoor from Marr's for $1. On the same date, 64099 Manitoba Ltd., a wholly owned subsidiary of Duha No. 2, purchased from Marr's Leisure Products (1977) Ltd. ("Marr's Leisure"), a wholly owned subsidiary of Marr's, a receivable in the amount of $441,253 owed by Outdoor to Marr's Leisure. Half of the total purchase price of $34,559 was payable on June 1, 1984, and the balance was payable upon the redemption of the 2,000 Class "C" shares of Duha No. 2 held by Marr's.

10    On February 10, 1984, Duha No. 2 and Outdoor effected a statutory amalgamation under the *Corporations Act* to form Duha Printers (Western) Limited ("Duha No. 3"). The shares of Outdoor were cancelled and the shareholders of Duha No. 3 received the same number and class of shares as they had previously owned in Duha No. 2. On March 12, 1984, the shareholders of Duha No. 3 elected Emeric Duha, Gwendolyn Duha and Paul Quinton as the three directors of Duha No. 3.

11    On January 4, 1985, Duha No. 3, with the consent of Marr's, redeemed the 2,000 Class "C" shares owned by Marr's for a redemption price of $2,000. On February 15, 1985, the Agreement was terminated and Paul Quinton resigned as a director of Duha No. 3.

William Marr n'étaient pas «liés entre eux» au sens de l'art. 251 de la *Loi de l'impôt sur le revenu*.

La Convention restreignait aussi le transfert d'actions, de sorte qu'aucune action ne pouvait être transférée sans le consentement de la majorité des administrateurs (article 4.1), elle interdisait aux actionnaires de vendre, céder, transférer ou autrement grever leurs actions de quelque manière (article 4.3), et elle prévoyait que l'émission de nouvelles actions était assujettie au consentement unanime des actionnaires existants (article 4.4). De plus, l'article 6.1 de la Convention stipulait que tout différend des actionnaires concernant l'entreprise, les comptes ou les opérations de Duha nº 2 serait soumis à l'arbitrage.

Le 9 février 1984, Duha nº 2 a acheté à Marr's, pour un dollar, toutes les actions en circulation de Outdoor. Le même jour, 64099 Manitoba Ltd., une filiale en propriété exclusive de Duha nº 2, a acheté à Marr's Leisure Products (1977) Ltd. («Marr's Leisure»), une filiale en propriété exclusive de Marr's, une créance de 441 253 $ que Marr's Leisure avait sur Outdoor. La moitié du prix d'achat total de la créance, fixé à 34 559 $, devait être payée le 1er juin 1984, le solde étant payable lors du rachat des 2 000 actions de catégorie «C» de Duha nº 2 détenues par Marr's.

Le 10 février 1984, Duha nº 2 et Outdoor ont fusionné sous le régime de la *Loi sur les corporations* pour former la société Duha Printers (Western) Limited («Duha nº 3»). Les actions de Outdoor ont été annulées et les actionnaires de Duha nº 3 ont reçu les mêmes actions que celles qu'ils détenaient auparavant dans Duha nº 2. Le 12 mars 1984, les actionnaires de Duha nº 3 ont élu les trois administrateurs de Duha nº 3, soit Emeric Duha, Gwendolyn Duha et Paul Quinton.

Le 4 janvier 1985, Duha nº 3, avec le consentement de Marr's, a racheté au prix de 2 000 $ les 2 000 actions de catégorie «C» détenues par Marr's. Le 15 février 1985, la Convention a été résiliée et Paul Quinton a résigné ses fonctions d'administrateur de Duha nº 3.

In its corporate tax return filed on June 28, 1985, Duha No. 3 deducted from its income non-capital losses in the amount of $463,820, of which $460,786 had been incurred by Outdoor in previous years. The Minister of National Revenue disallowed the deduction on the basis that Marr's did not control Duha No. 2 prior to its amalgamation with Outdoor, and that the transactions at issue were artificial and a sham. The Tax Court of Canada allowed Duha No. 3's appeal, but this decision was overturned on appeal to the Federal Court of Appeal.

Dans sa déclaration de revenus produite le 28 juin 1985, Duha nº 3 a déduit de son revenu des pertes autres qu'en capital de 463 820 $, dont 460 786 $ représentaient des pertes subies par Outdoor au cours des années antérieures. Le ministre du Revenu national a refusé la déduction pour le motif que Marr's ne contrôlait pas Duha nº 2 avant sa fusion avec Outdoor et que les opérations en cause étaient factices et constituaient un trompe-l'œil. La Cour canadienne de l'impôt a accueilli l'appel de Duha nº 3, mais cette décision a été infirmée par la Cour d'appel fédérale.

12

## II. Relevant Statutory Provisions

*Income Tax Act*, R.S.C. 1952, c. 148, as amended

**87.** . . .

(2.1) Where there has been an amalgamation of two or more corporations, for the purposes only of

(*a*) determining the new corporation's non-capital loss, net capital loss, restricted farm loss or farm loss, as the case may be, for any taxation year, and

(*b*) determining the extent to which subsections 111(3) to (5.4) apply to restrict the deductibility by the new corporation of any non-capital loss, net capital loss, restricted farm loss or farm loss, as the case may be,

the new corporation shall be deemed to be the same corporation as, and a continuation of, each predecessor corporation, except that this subsection shall in no respect affect the determination of

(*c*) the fiscal period of the new corporation or any of its predecessors,

(*d*) the income of the new corporation or any of its predecessors, or

(*e*) the taxable income of, or the tax payable under this Act by, any predecessor corporation.

**111.** (1) For the purpose of computing the taxable income of a taxpayer for a taxation year, there may be deducted such portion as he may claim of

## II. Les dispositions législatives pertinentes

*Loi de l'impôt sur le revenu*, S.R.C. 1952, ch. 148 et ses modifications

**87.** . . .

(2.1) Lorsqu'il y a eu fusion de deux ou plusieurs corporations, aux seules fins

*a*) de déterminer la perte autre qu'une perte en capital, la perte en capital nette, la perte agricole restreinte ou la perte agricole, selon le cas, de la nouvelle corporation pour une année d'imposition quelconque, et

*b*) de déterminer dans quelle mesure les paragraphes 111(3) à (5.4) s'appliquent de manière à restreindre le montant que peut déduire la nouvelle corporation à titre de perte autre qu'une perte en capital, une perte en capital nette, une perte agricole restreinte ou une perte agricole, selon le cas,

la nouvelle corporation est réputée être la même corporation que chacune des corporations remplacées et est réputée assurer la continuation de chacune d'elles, sauf que le présent paragraphe ne doit en aucun cas influer sur la détermination

*c*) de l'exercice financier de la nouvelle corporation, ou de toute corporation remplacée,

*d*) du revenu de la nouvelle corporation, ou de toute corporation remplacée, ou

*e*) du revenu imposable de toute corporation remplacée ou de l'impôt payable par celle-ci en vertu de la présente loi.

**111.** (1) Aux fins du calcul du revenu imposable d'un contribuable pour une année d'imposition, peuvent être déduites les sommes appropriées suivantes:

13

(*a*) his non-capital losses for the 7 taxation years immediately preceding and the 3 taxation years immediately following the year;

.   .   .

(5) Where, at any time, control of a corporation has been acquired by a person or persons (each of whom is in this subsection referred to as the "purchaser")

(*a*) such portion of the corporation's non-capital loss or farm loss, as the case may be, for a taxation year ending before that time as may reasonably be regarded as its loss from carrying on a business is deductible by the corporation for a particular taxation year ending after that time

(i) only if throughout the particular year and after that time that business was carried on by the corporation for profit or with a reasonable expectation of profit . . . .

**251.** . . .

(2) For the purposes of this Act "related persons", or persons related to each other, are

.   .   .

(*c*) any two corporations

(i) if they are controlled by the same person or group of persons . . . .

**256.** . . .

(7) For the purposes of subsections 66(11) and (11.1), 87(2.1), 88(1.1) and (1.2) and section 111

(*a*) where shares of a particular corporation have been acquired by a person after March 31, 1977, that person shall be deemed not to have acquired control of the particular corporation by virtue of such share acquisition if that person

(i) was, immediately before such share acquisition, related (otherwise than by virtue of a right referred to in paragraph 251(5)(*b*)) to the particular corporation . . . .

*Corporations Act*, R.S.M. 1987, c. C225

**6(3)** Subject to subsection (4), if the articles or a unanimous shareholder agreement require a greater number of votes of directors or shareholders than that required by

*a*) ses pertes autres que des pertes en capital subies au cours des 7 années d'imposition précédentes et des 3 années d'imposition qui suivent l'année;

.   .   .

(5) Lorsque, à une date quelconque, le contrôle d'une corporation a été acquis par une ou plusieurs personnes (chacune de celles-ci étant appelée l'«acheteur» au présent paragraphe)

*a*) la fraction de la perte autre qu'une perte en capital ou de la perte agricole, selon le cas, subie par la corporation pour une année d'imposition se terminant avant cette date, et qui peut raisonnablement être considérée comme étant la perte qu'elle a subie dans l'exploitation d'une entreprise, est déductible par la corporation pour une année d'imposition donnée se terminant après cette date,

(i) seulement si, tout au long de l'année donnée et après cette date, cette entreprise était exploitée par la corporation en vue d'en tirer un profit ou dans une expectative raisonnable de profit . . .

**251.** . . .

(2) Aux fins de la présente loi, des «personnes liées» ou des personnes liées entre elles, sont

.   .   .

*c*) deux corporations quelconques

(i) si elles sont contrôlées par la même personne ou le même groupe de personnes . . .

**256.** . . .

(7) Aux fins des paragraphes 66(11) et (11.1), 87(2.1), 88(1.1) et (1.2) et de l'article 111,

*a*) lorsqu'une personne a acquis des actions d'une corporation après le 31 mars 1977, elle est réputée ne pas avoir acquis le contrôle d'une corporation donnée par suite de l'acquisition de ces actions, si

(i) immédiatement avant une telle acquisition des actions, elle était liée (autrement qu'en vertu d'un droit visé à l'alinéa 251(5)*b*)) à la corporation donnée . . .

*Loi sur les corporations*, L.R.M. 1987, ch. C225

**6(3)** Par dérogation à la présente loi et sous réserve du paragraphe (4), les statuts ou les conventions unanimes des actionnaires peuvent augmenter le nombre de voix

1998 CanLII 827 (SCC)

1998 CanLII 827 (SCC)

this Act to effect any action, the provisions of the articles or of the unanimous shareholder agreement prevail.

**6(4)** The articles may not require a greater number of votes of shareholders to remove a director than the number required by section 104.

**20(1)** A corporation shall prepare and maintain, at its registered office and, subject to subsection (5), at any other place in Manitoba designated by the directors, records containing

    (a) the articles and the by-laws and all amendments thereto, and a copy of any unanimous shareholder agreement;

           .   .   .

**97(1)** Subject to any unanimous shareholder agreement, the directors of a corporation shall

    (a) exercise the powers of the corporation directly or indirectly through the employees and agents of the corporation; and

    (b) direct the management of the business and affairs of the corporation.

**140(2)** An otherwise lawful written agreement among all the shareholders of a corporation, or among all the shareholders and a person who is not a shareholder, that restricts, in whole or in part, the powers of the directors to manage the business and affairs of the corporation is valid.

**140(5)** A shareholder who is a party to a unanimous shareholder agreement has all the rights, powers and duties and incurs the liabilities of a director of the corporation to which the agreement relates to the extent that the agreement restricts the discretion or powers of the directors to manage the business and affairs of the corporation, and the directors are thereby relieved of their duties and liabilities to the same extent.

**240** If a corporation or any director, officer, employee, agent, auditor, trustee, receiver, receiver-manager or liquidator of a corporation does not comply with this Act, the regulations, articles, by-laws, or a unanimous shareholder agreement, a complainant or a creditor of the corporation may, in addition to any other right he has, apply to a court for an order directing any such person to comply with, or restraining any such person from act-

nécessaires à l'adoption de certaines mesures par les administrateurs ou par les actionnaires.

**6(4)** Les statuts ne peuvent, pour la révocation d'un administrateur, exiger un nombre de voix plus élevé que celui prévu à l'article 104.

**20(1)** La corporation tient, à son bureau enregistré, et, sous réserve du paragraphe (5), en tout autre lieu au Manitoba que désignent les administrateurs, des livres où figurent:

    a) les statuts, les règlements administratifs, leurs modifications, ainsi qu'un exemplaire des conventions unanimes des actionnaires;

           .   .   .

**97(1)** Sous réserve de toute convention unanime des actionnaires, les administrateurs:

    a) exercent les pouvoirs de la corporation soit directement, soit indirectement par l'entremise de ses employés et de ses mandataires;

    b) gèrent l'entreprise et les affaires internes de la corporation.

**140(2)** Est valide, si elle est par ailleurs licite, la convention écrite conclue par tous les actionnaires d'une corporation soit entre eux, soit avec des tiers, qui restreint en tout ou en partie les pouvoirs des administrateurs de gérer l'entreprise et les affaires internes de la corporation.

**140(5)** L'actionnaire qui est partie à une convention unanime d'actionnaires assume tous les droits, pouvoirs et obligations des administrateurs de la corporation et encourt toutes leurs responsabilités dans la mesure où la convention restreint le pouvoir discrétionnaire ou les pouvoirs des administrateurs de gérer l'entreprise et les affaires internes de la corporation; les administrateurs sont, par la même occasion, déchargés de leurs obligations et responsabilités dans la même mesure.

**240** En cas d'inobservation par la corporation ou ses administrateurs, dirigeants, employés, mandataires, vérificateurs, fiduciaires, séquestres, séquestres-gérants ou liquidateurs de la présente loi, de ses règlements d'application, des statuts, des règlements administratifs de la corporation ou d'une convention unanime des actionnaires, tout plaignant ou créancier a, en plus de ses autres droits, celui de demander au tribunal de leur

ing in breach of, any provisions thereof, and upon such application the court may so order and make any further order it thinks fit.

14   A few explanatory words regarding this rather complex legislative scheme may be useful at this stage. Under s. 87(2.1) of the *Income Tax Act*, where there has been an amalgamation of two or more corporations, for the purposes of determining the non-capital loss of the new corporation for any taxation year, the new corporation is deemed to be the same corporation as, and a continuation of, each predecessor corporation. Therefore, for the purposes of s. 111(1), the new corporation is entitled to deduct from its taxable income for a year its non-capital losses for the seven years immediately preceding, and the three years immediately following, the year in question. However, this is subject to at least one important qualification: under s. 111(5), where "control" of a corporation has been acquired by another person (the "purchaser"), that corporation's non-capital losses from the carrying on of a business are only deductible by the purchaser in a subsequent taxation year if, throughout that year and after that time, the business in question was carried on by the corporation with a reasonable expectation of profit — that is, as a going concern. The foregoing provisions of the *Corporations Act* are relevant, potentially, as indicators of where "control" of a corporation lay at the material time or times.

## III. Judicial History

### A. *Tax Court of Canada*, [1995] 1 C.T.C. 2481

15   Rip J.T.C.C. observed first that, if Marr's acquired control of Duha No. 2 on February 8, 1984, then ss. 251(2) and 256(7)(*a*)(i) of the *Income Tax Act* would deem there to have been no change of control when its shares were acquired the next day by Duha No. 2, given that the two companies would have been related to one another. As such, s. 111(5) would not prevent Duha No. 3

ordonner de s'y conformer, celui-ci pouvant rendre à cet effet les ordonnances qu'il estime pertinentes.

À ce stade, il peut être utile de donner quelques explications au sujet de ce régime législatif quelque peu complexe. Le paragraphe 87(2.1) de la *Loi de l'impôt sur le revenu* prévoit que, lorsqu'il y a eu fusion de deux ou plusieurs sociétés ou corporations, aux fins de déterminer la perte autre qu'en capital de la nouvelle société pour une année d'imposition quelconque, la nouvelle société est réputée être la même que chacune des sociétés remplacées et est réputée assurer la continuation de chacune d'elles. Par conséquent, aux fins du par. 111(1), la nouvelle société a le droit de déduire de son revenu imposable pour une année ses pertes autres qu'en capital subies au cours des sept années précédentes et des trois années qui suivent l'année en question. Toutefois, cela est assujetti à au moins une condition importante: le par. 111(5) prévoit que, lorsque le «contrôle» d'une société a été acquis par une autre personne (l'«acheteur»), les pertes autres qu'en capital subies par cette société dans l'exploitation d'une entreprise ne sont déductibles par l'acheteur, au cours d'une année d'imposition subséquente, que si, tout au long de cette année et après cette date, l'entreprise en question était exploitée par la société dans une expectative raisonnable de profit — c'est-à-dire en tant qu'entreprise en activité. Les dispositions précédentes de la *Loi sur les corporations* peuvent être utiles pour indiquer qui détenait le «contrôle» d'une société à l'époque pertinente.

## III. Historique des procédures judiciaires

### A. *Cour canadienne de l'impôt*, [1995] 1 C.T.C. 2481

Le juge Rip a d'abord fait observer que, si Marr's avait acquis le contrôle de Duha n° 2 le 8 février 1984, alors aux termes du par. 251(2) et du sous-al. 256(7)*a*)(i) de la *Loi de l'impôt sur le revenu*, ce contrôle serait réputé ne pas avoir changé de mains quand les actions de Marr's ont été acquises le lendemain par Duha n° 2, étant donné que les deux sociétés auraient été liées entre

from deducting from its income the non-capital losses previously incurred by Outdoor, pursuant to s. 87(2.1), even though the business of Outdoor was not carried on by Duha No. 3 as a going concern.

As a preliminary matter, Rip J.T.C.C. noted that, although the parties had referred to the Agreement as a "unanimous shareholders agreement", the Agreement did not by its terms restrict the powers of the directors of Duha No. 2 to manage the business and affairs of the company, as required by the definition of "unanimous shareholder agreement" in s. 140(2) of the *Corporations Act*. In his view, the Agreement, while admittedly unanimous, was simply an ordinary shareholders' agreement, not the special type of "unanimous shareholder agreement" contemplated by that statute.

Turning to the substantive issues on the appeal, Rip J.T.C.C. began by stating that "control" of a corporation, for the purposes of the *Income Tax Act*, means *de jure* control, or the ownership of such a number of shares as carries with it the right to a majority of the votes in the election of the board of directors, and not *de facto* control: *Buckerfield's Ltd. v. Minister of National Revenue*, [1964] C.T.C. 504 (Ex. Ct.) (a definition adopted by this Court in *Minister of National Revenue v. Dworkin Furs (Pembroke) Ltd.*, [1967] S.C.R. 223, *inter alia*). Rip J. noted also that, in assessing *de jure* control, the courts may examine the incorporating or constating documents of the company, which are "in effect an agreement between the shareholders and binding upon all the shareholders" (p. 2490).

The Minister had argued that, although Marr's owned a majority of the voting shares of Duha No. 2, the Agreement "totally neutralized" the ability of Marr's to manage the company, since it effectively prevented Marr's from: electing a majority of its choice to the board of directors, dissenting from corporate transactions and applying to the court for redemption of its shares, or selling its shares. However, after an extensive review of the case law, Rip J. was unable to find authority for

elles. Ainsi, le par. 111(5) n'empêchait pas Duha n° 3 de déduire de son revenu les pertes autres qu'en capital subies antérieurement par Outdoor, conformément au par. 87(2.1), même si Duha n° 3 n'exploitait pas l'entreprise de Outdoor en tant qu'entreprise en activité.

À titre préliminaire, le juge Rip a souligné que, bien que les parties aient qualifié la Convention de «convention unanime des actionnaires», celle-ci ne restreignait pas explicitement les pouvoirs des administrateurs de Duha n° 2 de gérer l'entreprise et les affaires internes de la société, comme l'exige la définition d'une «convention unanime des actionnaires» énoncée au par. 140(2) de la *Loi sur les corporations*. À son avis, la Convention était certes unanime, mais il s'agissait d'une simple convention ordinaire des actionnaires et non pas du type particulier de «convention unanime des actionnaires» prévue par cette loi.

Quant aux questions de fond soulevées dans l'appel, le juge Rip a commencé par affirmer que, aux fins de la *Loi de l'impôt sur le revenu*, le «contrôle» d'une société s'entend du contrôle *de jure*, ou de la propriété d'un nombre d'actions conférant la majorité des voix pour l'élection du conseil d'administration, et non pas du contrôle *de facto*: *Buckerfield's Ltd. c. Minister of National Revenue*, [1964] C.T.C. 504 (C. de l'É.) (définition adoptée par notre Cour, notamment dans *Minister of National Revenue c. Dworkin Furs (Pembroke) Ltd.*, [1967] R.C.S. 223). Le juge Rip a aussi fait remarquer que, pour vérifier s'il y a contrôle *de jure*, les tribunaux peuvent examiner les actes constitutifs de la société, qui sont «en fait une convention entre les actionnaires qui oblige l'ensemble des actionnaires» (p. 2490).

Le Ministre avait soutenu que, même si Marr's détenait la majorité des actions avec droit de vote de Duha n° 2, la Convention [TRADUCTION] «neutralisait totalement» la capacité de Marr's de gérer la société, vu qu'elle l'empêchait effectivement d'élire à son gré la majorité des administrateurs, d'exprimer sa dissidence relativement à des opérations de la société et de présenter une demande à la cour pour racheter ses actions, ou de vendre ses actions. Toutefois, après avoir étudié à fond la

16

17

18

the proposition that the Agreement should be taken to vitiate the apparent *de jure* control of Duha No. 2 by Marr's. At the relevant time, Marr's held more than 50 percent of the voting shares in Duha No. 2 and, in the view of Rip J.T.C.C., nothing in the constating documents prevented Marr's from voting its shares in the normal course, nor was there any evidence that Marr's was not the beneficial owner of the shares and thus unable to decide for itself how the shares were to be voted.

19    Even if Rip J.T.C.C. had accepted that documents other than the constating documents could be considered, he found that nothing in the Agreement obliged Marr's to vote its shares in the manner in which it did, that is, to vote for a majority of directors who were representatives of the Duha family. Marr's was in a position to alter the board of directors, and there was no evidence, in the view of Rip J.T.C.C., that Mr. Quinton was a nominee of the Duha family. Therefore, Marr's was free, by electing to the board Mr. Quinton, either Mr. or Mrs. Duha, and Mr. Marr, to ensure that neither Marr's nor the Duha family would have a majority on the board of directors. Rip J.T.C.C. thus concluded that Marr's, by virtue of its ownership of the majority of the voting shares on February 8, 1984, controlled Duha No. 2 at that time.

20    Turning to whether the transaction was a sham, Rip J.T.C.C. acknowledged that the sole purpose of the chain of events was to enable Duha No. 3 to make use of the losses incurred by Outdoor, that *de facto* control of Duha No. 2 was never transferred to Marr's, and that Marr's never intended to control the company. However, he could not agree that the transaction was a sham, given that there was no attempt to disguise its true character. The various transactions were binding upon the parties and did precisely what they appeared to do. As for the argument that the transaction was contrary to the "object and spirit" of s. 111, Rip J.T.C.C. simply observed that the purpose of the section was to

jurisprudence, le juge Rip n'a pu trouver de précédent établissant que la Convention devrait être interprétée comme viciant le contrôle *de jure* apparent de Duha n° 2 par Marr's. À l'époque pertinente, Marr's détenait plus de 50 pour 100 des actions avec droit de vote de Duha n° 2 et, de l'avis du juge Rip, rien dans les actes constitutifs n'empêchait Marr's d'exercer normalement le droit de vote rattaché à ses actions, et il n'y avait aucune preuve que Marr's n'était pas le propriétaire bénéficiaire des actions et qu'elle n'était donc pas en mesure de décider elle-même de la façon dont le droit de vote rattaché à ces actions devait être exercé.

Même si le juge Rip avait admis que des documents autres que les actes constitutifs pouvaient être pris en considération, il a conclu que rien dans la Convention n'obligeait Marr's à exercer le droit de vote rattaché à ses actions comme elle l'a fait, c'est-à-dire pour élire des administrateurs majoritaires représentant la famille Duha. Marr's était en mesure de modifier la composition du conseil d'administration et il n'y avait, selon le juge Rip, aucune preuve que M. Quinton était un candidat de la famille Duha. En conséquence, en élisant au conseil M. Quinton, et soit M. ou M^me Duha, et M. Marr, Marr's était libre de faire en sorte que ni Marr's ni la famille Duha ne détienne la majorité au conseil d'administration. Le juge Rip a donc conclu que, du fait qu'elle détenait la majorité des actions avec droit de vote le 8 février 1984, Marr's contrôlait alors Duha n° 2.

Quant à savoir si l'opération était un trompe-l'œil, le juge Rip a reconnu que la suite d'événements visait uniquement à permettre à Duha n° 3 de se servir des pertes subies par Outdoor, que le contrôle *de facto* de Duha n° 2 n'avait jamais été transféré à Marr's et que cette dernière n'avait jamais eu l'intention de contrôler la société. Toutefois, il ne pouvait pas accepter que l'opération était un trompe-l'œil, étant donné qu'il n'y a eu aucune tentative d'en cacher la nature véritable. Les diverses opérations liaient les parties et leur effet était précisément ce qu'il paraissait être. Quant à l'argument selon lequel l'opération était contraire à [TRADUCTION] «l'objet et [à] l'esprit» de l'art. 111, le

1998 CanLII 827 (SCC)

permit corporations to apply non-capital losses against income earned in subsequent years, that amalgamated corporations are entitled to deduct the losses of predecessor corporations in this manner if the amalgamated corporation is controlled by the same person or group as the predecessor, and that "control" in this sense refers to *de jure* and not *de facto* control. In his view, there was nothing in the transaction that violated the "object and spirit" of the provision.

Therefore, Rip J.T.C.C. concluded that Marr's did control Duha No. 2 on and immediately prior to February 8, 1984, when Duha No. 2 and Outdoor were amalgamated, and that it controlled Duha No. 3 during the taxation year on appeal. Accordingly, the appeal was allowed.

B. *Federal Court of Appeal*, [1996] 3 F.C. 78

(1) Reasons of Linden J.A. (Isaac C.J. concurring)

Like the trial judge, Linden J.A. was not persuaded that the transaction was a sham. The legal obligations between the parties were real and accomplished exactly what they purported to do. However, this was not sufficient to achieve the tax results ultimately desired by the parties. It remained to be seen whether the transactions came within the relevant sections of the *Income Tax Act*.

Linden J.A. refused to treat as a distinct issue the "object and spirit" of the provisions in question, stating that, instead, the interpretation of the sections should reflect their objects. The object and spirit of a section will only be practically relevant when the application of that section to factual circumstances admits of doubt, not where the meaning of the section is clear and free of ambiguity or uncertainty: *Canada v. Antosko*, [1994] 2 S.C.R. 312. In the view of Linden J.A., the purpose of the provisions at issue on this appeal was "to permit a deduction of a loss if control has not changed

juge Rip a simplement fait observer que l'objet de cette disposition était de permettre à des sociétés de déduire des pertes autres qu'en capital des revenus touchés durant les années subséquentes, que des sociétés fusionnées ont le droit de déduire les pertes des sociétés remplacées de cette manière si la société issue de la fusion est contrôlée par la même personne ou le même groupe de personnes que la société remplacée et que le «contrôle» s'entend alors du contrôle *de jure* et non pas du contrôle *de facto*. À son avis, l'opération ne contrevenait nullement à «l'objet et [à] l'esprit» de cette disposition.

Le juge Rip a donc conclu que Marr's contrôlait effectivement Duha n° 2 le 8 février 1984, date de la fusion de Duha n° 2 et de Outdoor, et immédiatement avant cette date, et qu'elle contrôlait Duha n° 3 pendant l'année d'imposition visée par l'appel. En conséquence, l'appel a été accueilli. 21

B. *Cour d'appel fédérale*, [1996] 3 C.F. 78

(1) Motifs du juge Linden (auxquels a souscrit le juge en chef Isaac)

À l'instar du juge de première instance, le juge Linden n'était pas convaincu que l'opération était un trompe-l'œil. Les obligations juridiques entre les parties étaient réelles et avaient exactement l'effet qu'elles étaient censées avoir. Toutefois, cela n'était pas suffisant pour atteindre les résultats fiscaux souhaités en fin de compte par les parties. Il restait à décider si les opérations relevaient des dispositions pertinentes de la *Loi de l'impôt sur le revenu*. 22

Le juge Linden a refusé de considérer comme une question distincte «l'objet et l'esprit» des dispositions en cause, disant plutôt que l'interprétation des dispositions devrait refléter leur objet. L'objet et l'esprit d'un article ne seront utiles en pratique que lorsque l'application de cet article à des faits est douteuse, et non lorsque le sens de l'article n'est ni ambigu ni incertain: *Canada c. Antosko*, [1994] 2 R.C.S. 312. Selon le juge Linden, l'objet des dispositions dont il est question dans le présent pourvoi est «de permettre la déduction d'une perte si le contrôle n'a pas changé de 23

hands but to deny it if control has changed hands" (p. 109).

24    Linden J.A. acknowledged that control, for these purposes, means *de jure* and not *de facto* control, and that the single most important factor to consider is the voting rights attaching to shares. However, he was equally of the opinion that the scope of scrutiny under the *de jure* test has been extended "beyond a mere technical reference to the share register" (p. 109). After an exhaustive review of the case law, including cases which he interpreted as relying upon restrictions in the constating documents and "other agreements" as an indicator of *de jure* control — and, in particular, *Minister of National Revenue v. Consolidated Holding Co.*, [1974] S.C.R. 419 — Linden J.A. concluded (at p. 118) that:

. . . it is important to look to the legal position of the parties as displayed in the wider circumstances of the parties' affairs. . . . [T]rue *de jure* control is just what it is stated to be, control at law. Any binding instrument, therefore, must be reckoned in the analysis if it affects voting rights.

25    Linden J.A. held that, "[i]n determining issues of corporate control, the Court will look to the time in question, to legal documents pertaining to the issue, and to any actual or contingent legal obligations affecting the voting rights of shares" (p. 121). These factors, he held, "are simply facts with legal consequences, so that the distinction between *de jure* and *de facto* is not as stark as it once was" (p. 121). In his view, then, "corporate control must be real, effective legal control over the company in question" (p. 121). Such an analysis, he continued, incorporates an appreciation for various considerations which might affect the way in which shares are or could be voted. He concluded that, "if majority ownership does not allow for real, effective legal control over a company, the *de jure* test of control will not have been met" (p. 124).

mains, mais de le refuser dans le cas contraire» (p. 109).

Le juge Linden a reconnu qu'à ces fins le contrôle s'entend du contrôle *de jure* et non pas du contrôle *de facto*, et que les droits de vote rattachés aux actions constituent le facteur primordial à considérer. Toutefois, il était également d'avis que l'analyse de l'existence d'un contrôle *de jure* dépasse «la simple considération technique du registre des actionnaires» (p. 109). Après avoir procédé à un examen exhaustif de la jurisprudence, y compris de précédents où, selon lui, l'on a considéré que des restrictions imposées dans les actes constitutifs et dans d'«autres conventions» indiquent l'existence du contrôle *de jure* — en particulier, *Ministre du Revenu national c. Consolidated Holding Co.*, [1974] R.C.S. 419 —, le juge Linden a conclu (à la p. 118) que:

. . . il est important de considérer la position juridique des parties telle qu'elle ressort de la description générale des affaires des parties. [. . .] [U]n véritable contrôle *de jure* n'est rien d'autre que ce que l'expression indique, c'est-à-dire un contrôle au sens du droit. Tout instrument contraignant doit donc être pris en compte dans l'analyse, si tel instrument influe sur les droits de vote.

Le juge Linden a décidé que, «[p]our savoir où siège le contrôle d'une société, la Cour tiendra compte de l'époque considérée, des documents juridiques pertinents et des obligations juridiques réelles ou éventuelles pouvant influer sur les droits de vote afférents aux actions» (p. 121). Il a jugé que ces facteurs «sont simplement des faits ayant des conséquences juridiques, de telle sorte que [. . .] la distinction entre un contrôle *de jure* et un contrôle *de facto* n'est pas aussi nette qu'autrefois» (p. 121). Il a donc estimé que, «lorsqu'on parle du contrôle d'une société, il doit s'agir d'un contrôle juridique réel et effectif exercé sur la société en question» (p. 121). Une telle analyse, a-t-il ajouté, comporte une appréciation de divers facteurs susceptibles d'influer sur la manière dont les droits de vote rattachés aux actions sont ou pourraient être exercés. Il a conclu que, «si une participation majoritaire ne permet pas d'exercer un contrôle juridique réel sur une société, le critère du contrôle *de jure* ne sera pas satisfait» (p. 124).

Applying the law to the facts of the instant appeal, Linden J.A. held that Marr's did not control Duha No. 2 because the Agreement determined that the majority of the Board of Directors would always be nominees of the Duha family. He found that Mr. Quinton was effectively a nominee of the Duha family because he had been a longtime friend of Mr. Duha, had been a director of Duha No. 1 for ten years, and had signed the resolution authorizing the subscription by Marr's of the 2,000 Class "C" shares, the entering into the Agreement by the corporation, and the purchase of Outdoor's shares. On this basis, Linden J.A. concluded that an election of any combination of the directors listed in the Agreement assured the Duha family of control over Duha No. 2. He also noted that Duha No. 2 was worth almost $600,000, and opined that no reasonable person would believe that a $2,000 share purchase would actually yield control of a company of such value. In his view, it was not coincidental that the three Duha family nominees were in fact elected as directors and that Marr's did not elect its own majority shareholder to the board.

Linden J.A. was of the view that the Agreement likely qualified as a unanimous shareholder agreement ("USA") under s. 140(2) of the *Corporations Act*, given that it operated to restrict the powers of the directors both directly and indirectly. However, he also held that the Agreement did not have to meet this statutory requirement before it could be considered in a *de jure* control analysis. The Agreement, signed by all the shareholders and by Duha No. 2, was legally binding and had significantly affected how the shareholders could vote their shares. These, in his view, were the minimum conditions to be met before the Agreement could be considered in a *de jure* control examination, given that "[c]ertain cases of the Supreme Court of Canada explicitly state" (p. 125) that external agreements are not to be considered irrelevant to the issue of *de jure* control. He distinguished the case of *International Iron & Metal Co. v. Minister of National Revenue*, [1974] S.C.R. 898, aff'g [1969] C.T.C. 668, on the basis that the agreement in that case was "contrived to multiply a tax bene-

Appliquant le droit aux faits de l'appel, le juge Linden a décidé que Marr's ne contrôlait pas Duha nᵒ 2 parce que la Convention prévoyait que le conseil d'administration serait toujours composé en majorité de candidats de la famille Duha. Il a jugé que M. Quinton était, en fait, un candidat de la famille Duha parce qu'il était un ami de longue date de M. Duha, qu'il avait été administrateur de Duha nᵒ 1 pendant dix ans et qu'il avait signé la résolution autorisant la souscription par Marr's des 2 000 actions de catégorie «C», la conclusion de la Convention par la société et l'achat d'actions de Outdoor. Il a conclu, pour cette raison, que l'élection d'une combinaison quelconque d'administrateurs énumérés dans la Convention garantirait le contrôle de Duha nᵒ 2 par la famille Duha. Il a aussi fait remarquer que Duha nᵒ 2 valait près de 600 000 $ et s'est dit d'avis qu'aucune personne raisonnable ne croirait qu'un achat de 2 000 $ d'actions conférerait réellement le contrôle d'une société d'une telle valeur. Selon lui, ce n'était pas non plus une coïncidence si les trois candidats de la famille Duha ont été effectivement élus administrateurs et que Marr's n'a pas élu comme administrateur son propre actionnaire majoritaire.

Le juge Linden était d'avis que la Convention remplissait vraisemblablement les conditions requises pour être une convention unanime des actionnaires («CUA») au sens du par. 140(2) de la *Loi sur les corporations*, étant donné qu'elle avait pour effet de restreindre les pouvoirs des administrateurs à la fois directement et indirectement. Toutefois, il a aussi conclu qu'il n'était pas nécessaire que la Convention remplisse cette condition prévue par la Loi pour qu'il en soit tenu compte dans l'analyse du contrôle *de jure*. La Convention, signée par tous les actionnaires et par Duha nᵒ 2, était juridiquement exécutoire et avait sensiblement modifié la façon dont les actionnaires pouvaient exercer les droits de vote rattachés à leurs actions. C'étaient là, selon lui, les conditions minimales à remplir pour qu'il puisse être tenu compte de cette convention dans l'analyse du contrôle *de jure*, étant donné que «[c]ertains arrêts de la Cour suprême du Canada affirment expressément» (p. 125) que des conventions externes ne doivent pas être considérées comme non pertinentes quant

fit" (p. 126) and that the parties to whom control was supposedly transferred by the agreement were not parties to it, *per se*.

28    Moreover, there was other evidence that Marr's did not control Duha No. 2. Linden J.A. noted that the amended articles of Duha No. 2 stated that the company could not issue new voting shares without unanimous shareholder consent and found that this meant that Marr's could not change its restricted choice of directors by using its majority share position. He held that Marr's ability to dissolve Duha No. 2 was not determinative and was little more than "a chimera" because, upon a dissolution, Marr's would receive nothing beyond the stated value of its shares, would forfeit the receivable and would actually suffer a net loss.

29    Linden J.A. concluded that the intentions of the parties had been that Marr's would not control Duha No. 2, that the legal obligations between the parties ensured that the Duha family would retain control over the company, and that this was the legal effect of the transactions. In his view (at p. 129), the appellant had "used the technicalities of revenue law and company law to conjure a legal remedy for restrictions to which it would otherwise be subject. They did not succeed." He concluded, therefore, that Outdoor and Duha No. 2 were not related prior to the amalgamation, that Duha No. 2 never carried on the business of Outdoor as a going concern or with a reasonable expectation of profit, and that the appellant therefore could not make use of Outdoor's non-capital losses.

(2)  Reasons of Stone J.A. (Isaac C.J. concurring)

30    Like Linden J.A., Stone J.A. would have allowed the appeal, but for different reasons. In his

à la question du contrôle *de jure*. Il a établi une distinction d'avec *International Iron & Metal Co. c. Ministre du Revenu national*, [1974] R.C.S. 898, conf. [1969] C.T.C. 668, en expliquant que la convention en cause dans cette affaire avait «pour objet de multiplier un avantage fiscal» (p. 126) et que les personnes à qui la convention était censée transférer le contrôle n'étaient pas elles-mêmes parties à cette convention.

De plus, d'autres éléments de preuve établissaient que Marr's ne contrôlait pas Duha n⁰ 2. Le juge Linden a noté que les statuts modifiés de Duha n⁰ 2 prévoyaient que la société ne pouvait pas émettre de nouvelles actions avec droit de vote sans le consentement unanime des actionnaires, et il a conclu que cela signifiait que Marr's ne pouvait pas modifier son choix restreint d'administrateurs grâce à sa participation majoritaire. Il a décidé que la capacité de Marr's de dissoudre Duha n⁰ 2 n'était pas décisive et n'était guère plus qu'«une chimère», car, lors d'une dissolution, Marr's ne recevrait rien de plus que la valeur comptable de ses actions, elle renoncerait à la créance et subirait en fait une perte nette.

Le juge Linden a conclu que les parties n'avaient pas voulu que Marr's contrôle Duha n⁰ 2, que les obligations juridiques entre les parties garantissaient que la famille Duha garderait le contrôle de la société, et que tel était l'effet juridique des opérations. À son avis (à la p. 129), l'appelante «s'est servi[e] des aspects techniques de la législation fiscale et de la législation sur les sociétés dans l'espoir d'échapper en toute légalité à des restrictions auxquelles [elle] devait se soumettre. Son plan n'a pas réussi.» Il a donc jugé que Outdoor et Duha n⁰ 2 n'étaient pas liées avant la fusion, que Duha n⁰ 2 n'a jamais exploité Outdoor en tant qu'entreprise en activité ou dans une expectative raisonnable de profit et que, par conséquent, l'appelante ne pouvait pas utiliser les pertes autres qu'en capital de Outdoor.

(2)  Motifs du juge Stone (auxquels a souscrit le juge en chef Isaac)

À l'instar du juge Linden, le juge Stone était d'avis d'accueillir l'appel, mais pour des raisons

view, the Agreement was to be considered along with the constating documents of the corporation because it was a USA within the meaning of the *Corporations Act*. Stone J.A. noted that s. 97(1) of the *Corporations Act* gives directors the power to direct "the business and affairs of the corporation" and that s. 1(1) defines "affairs" as including "the relationships among a body corporate, its affiliates and the shareholders, directors and officers of those bodies corporate but . . . not . . . the business carried on by those bodies corporate". He further held that, to be a USA for the purposes of s. 140(2) of the *Corporations Act*, the Agreement had to restrict the powers of the directors to manage the business and affairs of the corporation.

Stone J.A. noted that Article 2.1 of the Agreement required the shareholders to "cause the <u>affairs</u> of the Corporation to be managed by a board of three (3) directors" (emphasis added), and reasoned that this, by exclusion, did not leave the directors with the power to manage the <u>business</u> of Duha No. 2. Further, Article 6.1 of the Agreement provided for the resolution by arbitration of any dispute arising among the shareholders with respect to the "business or accounts or transactions" of the company. Ordinarily, in his view, no dispute as to the "business" of the company would arise between the shareholders, as the business of a corporation is, in the absence of a USA, to be directed by the board of directors. On this basis, he concluded that the Agreement restricted the powers of the directors and was thus a USA within the meaning of the *Corporations Act*. Thus, in his view, the Agreement had to be considered when examining *de jure* control.

In the circumstances of this case, Stone J.A. concluded that the Agreement prevented Marr's from obtaining the *de jure* control that it otherwise might have held by virtue of owning 55.71 percent of the voting shares of Duha No. 2. Even though Marr's could in theory determine the composition of the board of directors, its ability to elect a board that could manage only the "affairs" and not the

différentes. Selon lui, il fallait tenir compte de la Convention au même titre que les actes constitutifs de la société parce qu'elle constituait une CUA au sens de la *Loi sur les corporations*. Le juge Stone a fait remarquer que le par. 97(1) de la *Loi sur les corporations* habilite les administrateurs à gérer «l'entreprise et les affaires internes de la corporation» et que le par. 1(1) définit l'expression «affaires internes» comme s'entendant des «relations, autres que d'entreprise, entre une personne morale, les personnes morales appartenant au même groupe et leurs actionnaires, administrateurs et dirigeants». Il a conclu, en outre, que, pour constituer une CUA aux fins du par. 140(2) de la *Loi sur les corporations*, la Convention devait restreindre les pouvoirs des administrateurs de gérer l'entreprise et les affaires internes de la société.

Le juge Stone a fait observer que l'article 2.1 de la Convention obligeait les actionnaires à [TRADUC-TION] «confier la gestion des <u>affaires internes</u> de la société à un conseil de trois (3) administrateurs» (je souligne), ce qui, selon lui, enlevait aux administrateurs le pouvoir de gérer l'<u>entreprise</u> de Duha nº 2. De plus, l'article 6.1 de la Convention prescrivait l'arbitrage pour régler tout différend surgissant parmi les actionnaires et se rapportant [TRA-DUCTION] «à l'entreprise, aux comptes ou aux opérations» de la société. D'ordinaire, a-t-il estimé, aucun différend concernant l'«entreprise» de la société ne surgirait entre les actionnaires car l'entreprise de la société doit, en l'absence de CUA, être gérée par le conseil d'administration. Pour cette raison, il a conclu que la Convention restreignait les pouvoirs des administrateurs et était donc une CUA au sens de la *Loi sur les corporations*. Il fallait donc, selon lui, tenir compte de la Convention en examinant la question du contrôle *de jure*.

Dans les circonstances de la présente affaire, le juge Stone a conclu que la Convention empêchait Marr's d'obtenir le contrôle *de jure* qu'elle aurait par ailleurs acquis en détenant 55,71 pour 100 des actions avec droit de vote de Duha nº 2. Même si, en théorie, Marr's pouvait décider de la composition du conseil d'administration, sa capacité d'élire un conseil en mesure de gérer seulement les

31

32

"business" of Duha No. 2 was not *de jure* control. Stone J.A. also observed that the referral to arbitration of irreconcilable differences between shareholders implied that the unanimous agreement of all shareholders, not simply a majority of votes, was required for business decisions. In this respect, Marr's clearly lacked *de jure* control over Duha No. 2. Stone J.A. concluded, therefore, that Outdoor and Duha No. 2 had not been related before they amalgamated and that Outdoor's losses could not be utilized by Duha No. 3.

33    While it was not necessary to the manner in which he proposed to dispose of the case, Stone J.A. also held that the transaction was not a sham, as the Minister alleged, given that the requisite element of deceit as to the true nature of the transaction was not present in the circumstances.

## IV. Issues

34    The ultimate issue on this appeal is whether Duha No. 3 should have been entitled to deduct from its 1985 business income non-capital losses incurred in previous years by Outdoor, pursuant to s. 111(5) of the *Income Tax Act*. To answer this question, it will be necessary to decide whether documents other than the constating documents of a corporation should be considered in determining *de jure* control of a company for the purposes of ss. 111(5) and 251(2)(*c*) of the *Act*, and whether USAs enjoy any special status in this regard. If either or both of these questions are resolved in the affirmative, it will then be necessary to establish whether or not the Agreement was a USA within the meaning of s. 140(2) of the *Corporations Act* and, if so, whether it in fact deprived Marr's of *de jure* control over Duha No. 2. On appeal to this Court, the Minister did not pursue the argument that the transaction was a sham.

«affaires internes» et non l'«entreprise» de Duha n° 2 ne constituait pas un contrôle *de jure*. Le juge Stone a également fait observer que le renvoi à l'arbitrage des divergences inconciliables des actionnaires impliquait que le consentement unanime de tous les actionnaires, et non simplement la majorité des voix, était requis pour les décisions d'entreprise. À cet égard, il était clair que Marr's n'avait pas le contrôle *de jure* de Duha n° 2. Le juge Stone a donc statué que Outdoor et Duha n° 2 n'étaient pas liées avant leur fusion et que les pertes de Outdoor ne pouvaient pas être utilisées par Duha n° 3.

Quoique cela n'ait pas été nécessaire pour trancher l'affaire de la façon qu'il a proposée, le juge Stone a aussi décidé que l'opération n'était pas un trompe-l'œil, comme l'avait soutenu le Ministre, en raison de l'absence de l'élément de tromperie requis quant à la nature véritable de l'opération.

## IV. Les questions en litige

En fin de compte, il s'agit en l'espèce de savoir si Duha n° 3 aurait dû, conformément au par. 111(5) de la *Loi de l'impôt sur le revenu*, avoir le droit de déduire de son revenu d'entreprise de 1985 les pertes autres qu'en capital subies au cours des années antérieures par Outdoor. Pour répondre à cette question, il sera nécessaire de décider s'il y a lieu de tenir compte de documents autres que les actes constitutifs d'une société pour déterminer qui détient le contrôle d'une société aux fins du par. 111(5) et de l'al. 251(2)*c*) de la Loi, et si les CUA ont une valeur particulière à cet égard. Si l'on répond par l'affirmative à l'une ou l'autre de ces questions, ou aux deux à la fois, il sera alors nécessaire de déterminer si la Convention était une CUA au sens du par. 140(2) de la *Loi sur les corporations* et, dans l'affirmative, si elle a, en fait, privé Marr's du contrôle *de jure* de Duha n° 2. Lors du pourvoi devant notre Cour, le Ministre a cessé de faire valoir que l'opération était un trompe-l'œil.

1998 CanLII 827 (SCC)

V. Analysis

A. *"Control" of a corporation*

It has been well recognized that, under the *Income Tax Act*, "control" of a corporation normally refers to *de jure* control and not *de facto* control. This Court has repeatedly cited with approval the following test, set out by Jackett P. in *Buckerfield's, supra*, at p. 507:

Many approaches might conceivably be adopted in applying the word "control" in a statute such as the *Income Tax Act* to a corporation. It might, for example, refer to control by "management", where management and the board of directors are separate, or it might refer to control by the board of directors. . . . The word "control" might conceivably refer to *de facto* control by one or more shareholders whether or not they hold a majority of shares. I am of the view, however, that in Section 39 of the *Income Tax Act* [the former section dealing with associated companies], the word "controlled" contemplates the right of control that rests in ownership of such a number of shares as carries with it the right to a majority of the votes in the election of the board of directors. [Emphasis added.]

Cases in which this Court has applied the foregoing test have included, *inter alia*, *Dworkin Furs, supra*, and *Vina-Rug (Canada) Ltd. v. Minister of National Revenue*, [1968] S.C.R. 193.

Thus, *de jure* control has emerged as the Canadian standard, with the test for such control generally accepted to be whether the controlling party enjoys, by virtue of its shareholdings, the ability to elect the majority of the board of directors. However, it must be recognized at the outset that this test is really an attempt to ascertain who is in effective control of the affairs and fortunes of the corporation. That is, although the directors generally have, by operation of the corporate law statute governing the corporation, the formal right to direct the management of the corporation, the majority shareholder enjoys the indirect exercise of this control through his or her ability to elect the board of directors. Thus, it is in reality the majority shareholder, not the directors *per se*, who is in

V. Analyse

A. *Le «contrôle» d'une société*

Il est bien reconnu que, sous le régime de la *Loi de l'impôt sur le revenu*, le «contrôle» d'une société s'entend normalement du contrôle *de jure* et non pas du contrôle *de facto*. Notre Cour a cité et approuvé à maintes reprises le critère suivant, énoncé par le président Jackett dans *Buckerfield's*, précité, à la p. 507:

[TRADUCTION] On pourrait sans doute adopter de nombreuses méthodes pour la définition du mot «contrôle» figurant dans un texte tel que la *Loi de l'impôt sur le revenu*. Il pourrait par exemple s'agir du contrôle exercé par les «dirigeants», lorsque les dirigeants et le conseil d'administration sont distincts, ou il pourrait s'agir du contrôle exercé par le conseil d'administration. [. . .] Le mot «contrôle» pourrait peut-être s'entendre du contrôle de fait exercé par un ou plusieurs actionnaires, qu'ils détiennent ou non la majorité des actions. Je suis d'avis cependant que, dans l'article 39 de la *Loi de l'impôt sur le revenu* [l'ancien article traitant des sociétés associées], le mot «contrôlées» évoque le droit de contrôle auquel donne lieu le fait de détenir un nombre d'actions tel qu'il confère la majorité des voix à leur détenteur dans l'élection du conseil d'administration. [Je souligne.]

Les arrêts dans lesquels notre Cour a appliqué le critère qui précède sont notamment *Dworkin Furs*, précité, et *Vina-Rug (Canada) Ltd. c. Minister of National Revenue*, [1968] R.C.S. 193.

Ainsi, le contrôle *de jure* est devenu la norme canadienne, et le critère généralement admis à cet égard consiste à se demander si la partie qui détient le contrôle a, en vertu des actions qu'elle possède, la capacité d'élire la majorité des membres du conseil d'administration. Toutefois, il faut reconnaître, au départ, que ce critère est vraiment une tentative de vérifier qui exerce un contrôle effectif sur les affaires et les destinées de la société. Autrement dit, bien que les administrateurs aient généralement, en vertu de la loi qui régit la société, le droit explicite de gérer la société, l'actionnaire majoritaire exerce indirectement ce contrôle en raison de sa capacité d'élire le conseil d'administration. Ainsi, c'est en réalité l'actionnaire majoritaire, et non pas les administra-

35

36

1998 CanLII 827 (SCC)

effective control of the corporation. This was expressly recognized by Jackett P. when setting out the test in *Buckerfield's*. Indeed, the very authority cited for the test was the following dictum of Viscount Simon, L.C., in *British American Tobacco Co. v. Inland Revenue Commissioners*, [1943] 1 All E.R. 13, at p. 15:

The owners of the majority of the voting power in a company are the persons who are in <u>effective control of its affairs and fortunes</u>. [Emphasis added.]

37     Viewed in this light, it becomes apparent that to apply formalistically a test like that set out in *Buckerfield's*, without paying appropriate heed to the reason for the test, can lead to an unfortunately artificial result. The task before this Court, then, is to determine whether, just prior to the amalgamation, Marr's was in <u>effective control</u> of the affairs and fortunes of Duha No. 2 by virtue of its majority shareholdings.

38     There is no real dispute between the parties that the *de jure* control test is applicable in the present circumstances. Rather, the dispute is as to which factors may be considered in assessing *de jure* control. In the submission of the appellant, both Linden and Stone JJ.A. erred in their respective applications of the test: Linden J.A. by holding that this Court has widened the test such that bare contractual agreements between shareholders may be considered, and Stone J.A. by concluding that the agreement here in question was a unanimous shareholder agreement within the definition of that term in the *Corporations Act*, and that a USA may be considered in assessing *de jure* control for the purposes of ss. 111(5) and 251(2)(*c*) of the *Income Tax Act*. I will examine each of these submissions in turn.

(1)  <u>External agreements</u>

39     In his reasons, after reviewing a number of authorities, Linden J.A. concluded (at p. 118) that

teurs eux-mêmes, qui exerce un contrôle effectif sur la société. Le président Jackett a reconnu expressément cela en énonçant le critère de l'arrêt *Buckerfield's*. En fait, la source invoquée à l'appui de ce critère est l'opinion incidente suivante que le lord chancelier, le vicomte Simon, a exprimée dans *British American Tobacco Co. c. Inland Revenue Commissioners*, [1943] 1 All E.R. 13, à la p. 15:

[TRADUCTION] Les détenteurs de la majorité des voix dans une société sont ceux qui exerce <u>un contrôle effectif sur ses affaires et ses destinées</u>. [Je souligne.]

Vue sous cet angle, il devient évident que l'application formaliste d'un critère comme celui énoncé dans *Buckerfield's*, qui ne tient pas compte suffisamment de la raison d'être de ce critère, peut mener à un résultat malheureusement artificiel. Il revient donc à notre Cour de déterminer si, juste avant la fusion, Marr's exerçait un <u>contrôle effectif</u> sur les affaires et les destinées de Duha nº 2 en raison de sa participation majoritaire dans la société.

L'applicabilité du critère du contrôle *de jure* en l'espèce ne fait pas vraiment l'objet de contestation entre les parties. Le différend porte plutôt sur les facteurs qui peuvent être pris en considération pour déterminer s'il y a contrôle *de jure*. Selon l'appelante, les juges Linden et Stone ont tous deux appliqué ce critère de façon erronée: le juge Linden en décidant que notre Cour avait élargi le critère de manière à pouvoir tenir compte de simples ententes contractuelles entre actionnaires, et le juge Stone en concluant que la convention dont il est question en l'espèce était une convention unanime des actionnaires au sens de la *Loi sur les corporations* et qu'une CUA peut être prise en considération pour évaluer le contrôle *de jure* aux fins du par. 111(5) et de l'al. 251(2)*c*) de la *Loi de l'impôt sur le revenu*. Je vais examiner chacun de ces deux arguments à tour de rôle.

(1)  <u>Conventions externes</u>

Dans ses motifs, le juge Linden, après avoir étudié un certain nombre de précédents, a conclu (à la p. 118) que

1998 CanLII 827 (SCC)

true *de jure* control is just what it is stated to be, control at law. Any binding instrument, therefore, must be reckoned in the analysis if it affects voting rights.

In the view of Linden J.A. (at p. 118) "it is important to look to the legal position of the parties as displayed in the wider circumstances of the parties' affairs". But while this might seem a sensible approach at first glance, I can find no general support in the extensive authorities cited for Linden J.A.'s application of it.

The general approach to the determination of control, as I have already noted, has been to examine the share register of the corporation to ascertain which shareholder, if any, possesses the ability to elect a majority of the board of directors and, therefore, has the type of power contemplated by the *Buckerfield's* test, *supra*. The case law seems to point only to limited circumstances in which other documents may be examined, and then only to a narrow range of documents which may be considered. In my view, this is readily apparent even in the case law cited by Linden J.A. in support of the opposite position, which I shall now briefly discuss.

The first case in which the *Buckerfield's* test was applied by this Court was *Dworkin Furs*, *supra*. Of the five appeals decided together in *Dworkin Furs*, the one that is most relevant to the instant case is *Aaron's Ladies Apparel Ltd.*, which involved a provision in the articles of association of the corporation which required the unanimous consent of all shareholders or directors, as the case may be, for the successful passage of any resolution. A group of shareholders held two-thirds of the total voting shares of the corporation, and the issue before the Court was whether the aforementioned provision deprived this group of *de jure* control. Hall J., writing for the Court, held that the provision did nullify the shareholders' control of the company (at p. 236):

un véritable contrôle *de jure* n'est rien d'autre que ce que l'expression indique, c'est-à-dire un contrôle au sens du droit. Tout instrument contraignant doit donc être pris en compte dans l'analyse, si tel instrument influe sur les droits de vote.

Selon le juge Linden (à la p. 118), «il est important de considérer la position juridique des parties telle qu'elle ressort de la description générale des affaires des parties». Mais si ce point de vue pouvait sembler raisonnable à première vue, j'estime que la jurisprudence abondante citée par le juge Linden n'appuie pas en général l'application qu'il en a fait.

40

Comme je l'ai déjà souligné, la façon générale de déterminer où se situe le contrôle consiste à examiner le registre des actionnaires de la société pour vérifier quel actionnaire, s'il en est, est en mesure d'élire la majorité des membres du conseil d'administration et possède donc le type de pouvoir envisagé par le critère de l'arrêt *Buckerfield's*, précité. Il semble ressortir de la jurisprudence qu'il n'est possible d'examiner d'autres documents que dans des circonstances limitées et qu'il n'est alors possible d'examiner qu'une gamme restreinte de documents. À mon avis, c'est aussi ce qui se dégage clairement même de la jurisprudence que le juge Linden cite à l'appui du point de vue contraire, que je vais maintenant analyser brièvement.

41

La première affaire dans laquelle le critère de *Buckerfield's* a été appliqué par notre Cour est l'arrêt *Dworkin Furs*, précité. Parmi les cinq pourvois tranchés simultanément par cet arrêt, le plus pertinent relativement à la présente affaire est *Aaron's Ladies Apparel Ltd.*, qui portait sur une disposition des statuts de la société exigeant le consentement unanime de tous les actionnaires ou administrateurs, selon le cas, pour qu'une résolution soit adoptée. Un groupe d'actionnaires détenait les deux tiers des actions avec droit de vote de la société et la question soumise à la Cour était de savoir si la disposition susmentionnée privait ce groupe du contrôle *de jure*. Le juge Hall a conclu, au nom de notre Cour, que cette disposition annulait effectivement le contrôle de la société par les actionnaires (à la p. 236):

Control of a company within *Buckerfield* rests with the shareholders as such and not as directors. A contract between shareholders to vote in a given or agreed way is not illegal. The Articles of Association are in effect an agreement between the shareholders and binding upon all shareholders. Article 6 in question here was neither illegal nor *ultra vires*.

42    In his reasons, Linden J.A. appears to have taken this statement to support the proposition that the court is entitled to consider ordinary contracts between shareholders to assess control. However, the flaw in this interpretation is immediately obvious: in *Dworkin Furs*, Hall J. was dealing not with an "ordinary" contractual arrangement but with a provision of the company's articles of association, one of its constating documents. It is entirely proper to look beyond the share register when the constating documents provide for something unusual which alters the control of the company. To consider every legally binding arrangement between shareholders as such, however, is another matter entirely. As I will explain in more detail below, the distinction between contractually binding agreements outside the constating documents on the one hand, and legally binding provisions within the constating documents on the other, is crucial. With respect, Linden J.A.'s interpretation of *Dworkin Furs* cannot be sustained. In fact, Gibson J. in *International Iron & Metal Co. v. Minister of National Revenue*, [1969] C.T.C. 668 (Ex. Ct.), expressly distinguished the shareholders' agreement there at issue from the "contract" considered in *Dworkin Furs*, which was "part of the constitution of the Company" (p. 674).

43    Attempted analogies to other cases cited by Linden J.A. suffer from similar frailties. For example, Linden J.A. cites *Donald Applicators Ltd. v. Minister of National Revenue*, 69 D.T.C. 5122 (Ex. Ct.), aff'd 71 D.T.C. 5202 (S.C.C.), as standing for the proposition that *de jure* control is to be determined in light of the overall voting structure of the company, including "the effect of any restrictions imposed on the decision-making powers of the directors by the memorandum, the Arti-

[TRADUCTION] Le contrôle d'une société dans le contexte de *Buckerfield* appartient aux actionnaires en tant que tels et non en tant qu'administrateurs. Il n'est pas illégal pour des actionnaires de s'entendre pour voter de telle ou telle manière. Les statuts forment eux-mêmes une entente entre les actionnaires, et ils lient tous les actionnaires. L'article 6 dont il s'agit ici n'était pas illégal et ne constituait pas un excès de pouvoir.

Dans ses motifs, le juge Linden semble s'appuyer sur ces propos pour affirmer que la cour a le droit de tenir compte des contrats ordinaires entre les actionnaires pour évaluer le contrôle. Toutefois, la faiblesse de cette interprétation saute aux yeux: dans *Dworkin Furs*, le juge Hall traitait non pas d'une entente contractuelle «ordinaire», mais d'une disposition des statuts de la société, c'est-à-dire de l'un de ses actes constitutifs. Il est parfaitement légitime d'aller au-delà du registre des actionnaires quand les actes constitutifs comprennent une disposition inusitée qui modifie le contrôle de la société. Cependant, examiner chaque entente qui lie juridiquement les actionnaires est une tout autre chose. Comme je vais l'expliquer plus loin, la distinction entre, d'une part, les ententes contractuelles obligatoires, autres que les actes constitutifs, et d'autre part, les dispositions juridiquement obligatoires qui sont contenues dans les actes constitutifs est cruciale. En toute déférence, l'interprétation que donne le juge Linden de l'arrêt *Dworkin Furs* ne saurait être maintenue. En fait, dans *International Iron & Metal Co. c. Minister of National Revenue*, [1969] C.T.C. 668 (C. de l'É.), le juge Gibson a expressément distingué la convention des actionnaires en cause dans cette affaire d'avec le «contrat» examiné dans *Dworkin Furs*, qui [TRADUCTION] «faisait partie des actes constitutifs de la société» (p. 674).

Les analogies que l'on tente d'établir avec les autres causes citées par le juge Linden comportent les mêmes faiblesses. Par exemple, le juge Linden cite *Donald Applicators Ltd. c. Minister of National Revenue*, 69 D.T.C. 5122 (C. de l'É.), conf. par 71 D.T.C. 5202 (C.S.C.), comme établissant que le contrôle *de jure* doit être apprécié en fonction de la structure globale des droits de vote au sein de la société, dont «l'effet des restrictions imposées sur les pouvoirs décisionnels des admi-

cles, and by any shareholders agreements" (pp. 115-16). In fact, Thurlow J. (as he then was) made no reference whatsoever in that case to shareholders' agreements as an indicator of *de jure* control, restricting his analysis and comments, at p. 5125, only to the memorandum and articles of the company.

What does emerge, however, from *Donald Applicators*, is the notion that, in determining *de jure* control, the court is not limited to a strictly technical and narrow interpretation of the share register and associated share rights of a corporation. Rather, as this Court confirmed in *The Queen v. Imperial General Properties Ltd.*, [1985] 2 S.C.R. 288, at p. 295, "these rights must be assessed in their impact 'over the long run'". However, this view of control, at least as enunciated by Thurlow J. in *Donald Applicators*, still depends upon the share rights and other powers granted by the corporate constitution, not upon any external shareholders' agreement. *Donald Applicators* turned on the power of the shareholders to pass any ordinary resolution as well as special resolutions by which they could remove the powers of the directors and reserve decisions to their particular class of shareholders. Given that extensive power, it could not be said that the particular shareholders lacked *de jure* control "in the long run". However, as shall be seen, the question of control "in the long run" does not arise in the instant case, as the majority shareholder group retained the <u>immediate</u> voting power to elect directors.

Similarly, in *Imperial General Properties*, *supra*, the issue of control arose following a corporate reorganization which saw the original majority owners of the corporation create non-participating preference shares which were issued to another group of shareholders. While each class of shareholders then held 50 percent of voting shares, meaning that neither enjoyed clear majority control, the corporate constitution provided that a 50

nistrateurs par les statuts de la société et par les conventions des actionnaires» (p. 116). En réalité, le juge Thurlow (plus tard Juge en chef) n'a aucunement affirmé dans cet arrêt que les conventions des actionnaires étaient un indice du contrôle *de jure*, limitant son analyse et ses observations, à la p. 5125, à l'acte constitutif et aux statuts de la société.

Cependant, l'idée qui se dégage de *Donald Applicators* est que, pour déterminer l'existence du contrôle *de jure*, la cour n'a pas à s'en tenir à une interprétation strictement formaliste et étroite du registre des actionnaires et des droits qui sont liés aux actions d'une société. Au contraire, comme notre Cour l'a confirmé dans *La Reine c. Imperial General Properties Ltd.*, [1985] 2 R.C.S. 288, à la p. 295, «ces droits doivent s'évaluer selon leur effet "à long terme"». Toutefois, cette conception du contrôle, du moins telle qu'énoncée par le juge Thurlow dans *Donald Applicators*, repose tout de même sur les droits liés aux actions et aux autres pouvoirs conférés par les actes constitutifs de la société, et non sur quelque convention externe des actionnaires. L'arrêt *Donald Applicators* reposait sur le pouvoir des actionnaires d'adopter des résolutions ordinaires, ainsi que des résolutions spéciales leur permettant de retirer aux administrateurs leurs pouvoirs et de réserver les décisions à prendre à leur propre catégorie d'actionnaires. Compte tenu de ce vaste pouvoir, on ne pouvait dire que les actionnaires en question n'avaient pas «à long terme» le contrôle *de jure*. Toutefois, comme nous le verrons, la question du contrôle «à long terme» ne se pose pas en l'espèce, car le groupe des actionnaires majoritaires conservait le droit <u>immédiat</u> de voter dans l'élection des administrateurs.

44

De même, dans l'arrêt *Imperial General Properties*, précité, la question du contrôle s'est posée à la suite d'une réorganisation de la société au cours de laquelle les premiers propriétaires majoritaires de la société ont créé des actions privilégiées non participantes qui ont été émises à un autre groupe d'actionnaires. Même si chaque catégorie d'actionnaires détenait alors 50 pour 100 des actions avec droit de vote, de sorte que ni l'une ni l'autre ne

45

percent vote was sufficient to wind up the company, in which case the assets of the corporation would be distributed only among the common shareholders. Therefore, Estey J., writing for the majority of this Court, held that the common shareholders had a clear advantage over the preferred shareholders and thus enjoyed *de jure* control. While the apparent equality of voting power in this case made it necessary for the majority to resort to the constating documents of the corporation to assess the reality of the situation, Estey J., at p. 298, made clear that this was no extraordinary step in the law:

The approach to "control" here taken does not involve any departure from prior judicial pronouncements nor does it involve any "alteration" of the existing statute. The conclusions reached above merely result from applying existing case law and existing legislation to the particular facts of the case at bar. The application of the "control" concept, as earlier enunciated by the courts, to the circumstances now before the court is, in my view, the ordinary progression of the judicial process and in no way amounts to a transgression of the territory of the legislator.

46    With this admonition in mind, I do not believe that *Imperial General Properties* assists the Minister's case. The approach taken by the majority in deciding the case flows logically from its facts, and, in particular, the voting equality that was apparent on the share register. Indeed, the limitation of this case to the corporate structure and combination of share interests of its particular circumstances was explicitly acknowledged by Estey J. at p. 298. No such parity of shareholding is present in the circumstances of the instant appeal. In addition, in the emphatic words of Wilson J., dissenting (McIntyre J. and Lamer J., as he then was, concurring), at pp. 307-8:

Although the scope of scrutiny under the *de jure* test has been extended beyond a mere examination of the share register in order to determine who really has voting control, there has been no deviation from the princi-

détenait clairement le contrôle conféré par la majorité des voix, les actes constitutifs de la société prévoyaient que 50 pour 100 des voix suffisaient pour mettre la société en liquidation et que, le cas échéant, l'actif de la société ne serait réparti qu'entre les actionnaires ordinaires. En conséquence, le juge Estey a conclu, au nom de notre Cour à la majorité, que les actionnaires ordinaires avaient un net avantage sur les actionnaires privilégiés et qu'ils détenaient donc le contrôle *de jure*. Même si l'égalité apparente des droits de vote dans cette affaire a obligé les juges majoritaires à recourir aux actes constitutifs de la société pour évaluer la situation réelle, le juge Estey a précisé, à la p. 298, qu'il ne s'agissait pas là d'une mesure extraordinaire du droit:

La façon d'aborder le mot «contrôle» adoptée en l'espèce ne comporte aucune dérogation à la jurisprudence antérieure ni aucune «modification» de la loi existante. Les conclusions tirées plus haut résultent simplement de l'application de la jurisprudence et des textes législatifs existants aux faits particuliers de l'espèce. L'application du concept du «contrôle», selon les arrêts antérieurs des tribunaux, aux circonstances soumises à cette Cour, constitue, à mon avis, un cheminement normal du processus judiciaire et n'équivaut d'aucune manière à une incursion dans le domaine du législateur.

Gardant cet avertissement à l'esprit, je ne crois pas que l'arrêt *Imperial General Properties* soit utile à la thèse du Ministre. Le point de vue adopté par les juges majoritaires pour trancher l'affaire découle logiquement des faits de cette dernière et, en particulier, de l'égalité des droits de vote qui ressortait du registre des actionnaires. En fait, le juge Estey a reconnu explicitement, à la p. 298, que l'affaire était limitée à ses circonstances particulières, à savoir la structure de la société et la combinaison de participations à son capital-actions. Dans les circonstances du présent pourvoi, il n'y a pas d'égalité de participation dans la société. De plus, pour reprendre les propos catégoriques du juge Wilson, dissidente (avec l'appui du juge McIntyre et du juge Lamer, maintenant Juge en chef), aux pp. 307 et 308:

Bien que la portée de l'analyse ait été étendue, par application du critère du contrôle de droit, au delà du simple examen du registre des actionnaires pour déterminer qui détient réellement la majorité des voix, il n'y

ple that voting control is the proper *indicium* of control until [*Oakfield Developments (Toronto) Ltd. v. Minister of National Revenue*, [1971] S.C.R. 1032]. I am of the view, therefore, that the decision in *Oakfield* is anomalous and should not be followed. For the courts suddenly to change direction in face of well-settled and long-standing authority in our tax jurisprudence is, in my view, quite inappropriate. . . . I do not think that this is a suitable area for judicial creativity. People plan their personal and business affairs on the basis of the existing law and they are entitled to do so.

Apart from whether or not it is good authority in light of the foregoing dictum of Wilson J., *Oakfield Developments (Toronto) Ltd. v. Minister of National Revenue*, [1971] S.C.R. 1032, which was also cited by Linden J.A. in the instant appeal, is, in my view, clearly distinguishable from the case at bar. In that case, as in *Imperial General Properties*, the Court had recourse to the constating documents of the corporation only because there was no other clear indicator of *de jure* control, as each of two shareholder groups held 50 percent of the overall voting shares of the company. Therefore, the Court considered the share rights attached to each class of shares and concluded that, because the holders of one class had the power to dissolve the company and to receive all surplus upon its dissolution, that class had *de jure* control even though its voting power was no greater than that of the other class. Perhaps more importantly, though, there is no indication that the Court in either case looked to any external shareholder agreement as an indicium of control; rather, only the specifics of the constating documents were considered.

Equally distinguishable, in my view, are *Consolidated Holding*, *supra*, and *The Queen v. Lusita Holdings Ltd.*, 84 D.T.C. 6346 (F.C.A.), two cases in which the courts considered documents other than the constating documents only because the majority of the shares in the companies in question were held by trustees. It was therefore necessary to

a pas eu, jusqu'à l'arrêt [*Oakfield Developments (Toronto) Ltd. c. Ministre du Revenu national*, [1971] R.C.S. 1032], de dérogation au principe selon lequel la majorité des voix est le véritable indice du contrôle. Je suis donc d'avis que l'arrêt *Oakfield* est anormal et qu'il ne doit pas être suivi. À mon avis, il n'est pas du tout approprié que les tribunaux changent soudainement d'orientation à l'égard d'un principe bien établi depuis longtemps dans notre jurisprudence fiscale. [. . .] [J]e ne crois pas qu'il s'agisse d'un domaine qui se prête à la créativité judiciaire. Les gens planifient leurs affaires personnelles et commerciales en fonction du droit existant et ils ont le droit de le faire.

Indépendamment de la question de savoir si l'arrêt *Oakfield Developments (Toronto) Ltd. c. Ministre du Revenu national*, [1971] R.C.S. 1032, est bien fondé compte tenu de l'opinion incidente précitée du juge Wilson, j'estime que cet arrêt, qui a également été cité par le juge Linden en l'espèce, peut nettement être distingué de la présente affaire. Dans cet arrêt, comme dans *Imperial General Properties*, la Cour n'a eu recours aux actes constitutifs de la société que parce qu'il n'y avait aucun autre indice clair de contrôle *de jure*, vu que chacun des deux groupes d'actionnaires détenait 50 pour 100 de l'ensemble des actions avec droit de vote de la société. Par conséquent, la Cour a examiné les droits liés à chaque catégorie d'actions et a conclu que, puisque les détenteurs d'une catégorie avaient le pouvoir de dissoudre la société et de recevoir tout excédent existant au moment de la dissolution, cette catégorie d'actionnaires exerçait le contrôle *de jure*, même si le nombre des droits de vote qu'elle détenait n'était pas supérieur à celui de l'autre catégorie. Ce qui est peut-être plus important, toutefois, c'est que rien n'indique que la Cour, dans l'une ou l'autre affaire, a considéré quelque convention externe des actionnaires comme un indice de contrôle; au contraire, seul les détails des actes constitutifs ont été pris en considération.

J'estime qu'une distinction peut aussi être établie d'avec les arrêts *Consolidated Holding*, précité, et *La Reine c. Lusita Holdings Ltd.*, 84 D.T.C. 6346 (C.A.F.), dans lesquels les tribunaux ont tenu compte de documents autres que les actes constitutifs pour la seule raison que la majorité des actions des sociétés en cause étaient détenues par des fidu-

47

48

examine the trust instruments in order to determine what, if any, limitations existed on the trustees' powers to vote the shares. As it happened, in both cases, the trustees could be constrained in their voting of the shares by the actions of their cotrustees: in *Consolidated Holding*, the will of the deceased shareholder provided that "the views, discretion or direction of any two of my trustees shall be binding upon the other of my trustees" (p. 422), while in *Lusita Holdings* it was found as a fact by Stone J.A. that "[t]he right to control the voting rights resided in the co-trustees and not in either of them" (p. 6348).

49    These factors, in my view, clearly demonstrate the distinction between a trust instrument and other external documents for the purposes of assessing *de jure* control. A trust imposes upon the trustee a fiduciary obligation to act within the terms of the trust instrument and for the benefit of the beneficiary. That is, the trustee is not free to act other than in accordance with the trust document, and if the trust document imposes limitations upon the capacity of the trustee to vote the shares then these must accordingly be taken into account in the *de jure* control analysis. By contrast, any limitations which might be imposed by an outside agreement are limitations freely agreed to by the shareholders, and not at all inconsistent with their *de jure* power to control the company. In other words, limitations on the voting powers of trustees must be seen as limitations on their capacity as free actors in the circumstances. No such limitations encumber the ordinary shareholder in his or her exercise of *de jure* control, even if an outside agreement exists to limit actual or *de facto* control.

50    In any event, I certainly do not think it can be said that *Consolidated Holding* supports the very broad proposition gleaned from it by Linden J.A. (at p. 118), that "[a]ny binding instrument . . . must be reckoned in the analysis if it affects voting

ciaires. Il était donc nécessaire d'examiner les actes de fiducie pour décider si les droits de vote des fiduciaires étaient assujettis à des restrictions et, le cas échéant, quelles étaient ces restrictions. Il s'est trouvé que, dans les deux cas, l'exercice par les fiduciaires de leurs droits de vote rattachés aux actions pouvait être limité par les actes de leurs cofiduciaires: dans *Consolidated Holding*, le testament de l'actionnaire décédé prévoyait que [TRADUCTION] «les vues, bon plaisir et directives de deux de [ses] fiduciaires, quels qu'ils soient, lient le troisième de [ses] fiduciaires» (p. 422), alors que, dans *Lusita Holdings*, le juge Stone a constaté le fait que «[l]e droit de contrôler les droits de vote appartenait aux cofiduciaires et n'était pas l'apanage d'un seul» (p. 6348).

Je suis d'avis que ces facteurs démontrent clairement la distinction qui s'impose, dans l'appréciation du contrôle *de jure*, entre un acte de fiducie et d'autres documents externes. Une fiducie impose au fiduciaire l'obligation d'agir conformément aux dispositions de l'acte de fiducie et au profit du bénéficiaire. Autrement dit, le fiduciaire n'est pas libre d'agir autrement qu'en conformité avec l'acte de fiducie et, si cet acte de fiducie impose des restrictions à sa capacité d'exercer les droits de vote rattachés aux actions, alors il faut prendre ces restrictions en considération dans l'analyse du contrôle *de jure*. Par contre, toute restriction qui pourrait être imposée par un document externe est une restriction à laquelle les actionnaires ont consenti librement et n'est pas du tout incompatible avec leur pouvoir *de jure* de contrôler la société. En d'autres termes, les restrictions imposées aux droits de vote des fiduciaires doivent être considérées comme une restriction de leur capacité d'agir librement dans les circonstances. Aucune restriction de cette nature ne vient entraver l'exercice du contrôle *de jure* par l'actionnaire ordinaire, même si une convention externe vient restreindre le contrôle réel ou *de facto*.

De toute façon, je ne crois sûrement pas qu'il soit possible d'affirmer que l'arrêt *Consolidated Holding* étaye la proposition très générale qu'en a tirée le juge Linden (à la p. 118), selon laquelle «[t]out instrument contraignant doit [. . .] être pris

rights." For precisely the reasons expressed by Wilson J. in the above-quoted passage of her dissent in *Imperial General Properties*, and in keeping with the approach taken by courts since *Buckerfield's*, it is clear that the general test for *de jure* control remains majority voting control over the corporation, as manifested by the ability to elect the directors of the corporation. While this Court has occasionally been willing to examine factors other than the share register of the company, its assessment has been restricted only to the constating documents, not external agreements. The only exception to this rule has been in cases like *Consolidated Holding*, where the shareholders' very capacity to act has been limited by external documents, but this has to date been manifested only in cases where the shares are held by trustees.

Thus, I would conclude that, as a general rule, external agreements are not to be taken into account as determinants of *de jure* control. This is consistent with the relatively recent decision of the Alberta Court of Queen's Bench in *Harvard International Resources Ltd. v. Provincial Treasurer of Alberta*, 93 D.T.C. 5254, in which Hutchinson J. declined to interpret the reasons of Estey J. in *Imperial General Properties*, *supra*, as inviting the consideration of agreements other than constating documents, other than possibly as an indicium of *de facto* control. For Linden J.A. to rest his disposition of the instant case on the basis that, in determining issues of corporate control, "the Court will look to the time in question, to legal documents pertaining to the issue, and to any actual or contingent legal obligations affecting the voting rights of shares" (p. 121) was, with respect, inconsistent with the Canadian jurisprudence in this area.

Moreover, as Wilson J. correctly observed in her dissent in *Imperial General Properties*, *supra*, taxpayers rely heavily on whatever certainty and predictability can be gleaned from the *Income Tax*

en compte dans l'analyse, si tel instrument influe sur les droits de vote.» Exactement pour les mêmes motifs que ceux exprimés par le juge Wilson dans le passage précité de sa dissidence dans *Imperial General Properties*, et conformément au point de vue adopté par les tribunaux depuis *Buckerfield's*, il est clair que le critère général du contrôle *de jure* reste le contrôle conféré par la majorité des voix dans la société, que traduit la capacité d'élire les administrateurs de cette dernière. Quoique notre Cour ait parfois été disposée à examiner d'autres facteurs que le registre des actionnaires de la société, son examen a porté seulement sur les actes constitutifs et non sur des conventions externes. La seule exception à cette règle se trouve dans des affaires comme *Consolidated Holding*, où la capacité même d'agir était limitée par des documents externes, mais jusqu'à ce jour, elle ne s'est manifestée que dans des cas où les actions étaient détenues par des fiduciaires.

51 Je suis donc d'avis de conclure qu'en règle générale les conventions externes ne doivent pas être prises en considération comme constituant des facteurs déterminants quant au contrôle *de jure*. Cela est compatible avec la décision assez récente de la Cour du Banc de la Reine de l'Alberta *Harvard International Resources Ltd. c. Provincial Treasurer of Alberta*, 93 D.T.C. 5254, dans laquelle le juge Hutchinson a refusé d'interpréter les motifs du juge Estey dans *Imperial General Properties*, précité, comme invitant à considérer des conventions autres que des actes constitutifs, autrement que comme des indices possibles de contrôle *de facto*. En toute déférence, il n'était pas compatible avec la jurisprudence canadienne en la matière que le juge Linden tienne pour acquis, afin de statuer sur la présente affaire, que, pour savoir où est situé le contrôle d'une société, «la Cour tiendra compte de l'époque considérée, des documents juridiques pertinents et des obligations juridiques réelles ou éventuelles pouvant influer sur les droits de vote afférents aux actions» (p. 121).

52 En outre, comme le juge Wilson l'a fait remarquer à juste titre dans la dissidence qu'elle a exprimée dans *Imperial General Properties*, précité, les contribuables comptent beaucoup sur la certitude

*Act.* As such, a simple test such as that which has been followed since *Buckerfield's* is most desirable. If the distinction between *de jure* and *de facto* control is to be eliminated at this time, this should be left to Parliament, not to the courts. In fact, while it is not directly relevant to the outcome of this appeal, I would observe nonetheless that Parliament has now recognized the distinction between *de jure* and *de facto* control, adopting the latter as the new standard for the associated corporation rules by means of s. 256(5.1) of the *Income Tax Act*, enacted in 1988.

53    In addition, I do not think that the respondent's case is assisted by the decision of the Tax Court of Canada in *Alteco Inc. v. Canada*, [1993] 2 C.T.C. 2087. *Alteco* concerned an agreement which provided, *inter alia*, that no shares in the corporation could be sold or pledged without unanimous shareholder consent, that the five-member board of the company could not be altered without unanimous consent, and that the minority (49 percent) shareholder was entitled to three of the five seats on the board. This agreement was indeed considered in deciding that the minority shareholder enjoyed *de jure* control over the company. But two significant distinctions separate *Alteco* from the case at bar. For one, Bell J.T.C.C. found that the agreement at issue in *Alteco* was a "unanimous shareholder agreement" within the definition of that term in the Saskatchewan *Business Corporations Act*. While it may be that the agreement in the present case was also a USA, a possibility which I shall consider below, this was not the basis for the reasoning of Linden J.A., and it simply cannot be said that giving effect to a USA as a determinant of *de jure* control necessarily opens the door to the consideration of all shareholder agreements for this purpose.

54    Secondly, the agreement in *Alteco* guaranteed the minority shareholder a majority of seats on the board of directors. As I see it, it is not clear in the

et la prévisibilité que peut offrir la *Loi de l'impôt sur le revenu*. Il est donc tout à fait souhaitable d'utiliser un critère simple comme celui qui a été appliqué depuis *Buckerfield's*. Si la distinction entre le contrôle *de jure* et le contrôle *de facto* doit être éliminée à ce moment-ci, il devrait appartenir au Parlement, et non aux tribunaux, de le faire. En fait, bien que cela ne soit pas directement pertinent quant à l'issue du présent pourvoi, je ferais observer néanmoins que le Parlement a reconnu la distinction entre le contrôle *de jure* et le contrôle *de facto*, en retenant ce dernier comme étant la nouvelle norme des règles de la société associée, au moyen du par. 256(5.1) de la *Loi de l'impôt sur le revenu* adopté en 1988.

De plus, je ne crois pas que la décision de la Cour canadienne de l'impôt *Alteco Inc. c. Canada*, [1993] 2 C.T.C. 2087, soit utile à la thèse de l'intimée. L'affaire *Alteco* portait sur une convention qui prévoyait, notamment, qu'aucune action de la société ne pouvait être vendue ou donnée en gage sans le consentement unanime des actionnaires, que la composition de cinq membres du conseil ne pouvait pas être modifiée sans consentement unanime et que l'actionnaire minoritaire (49 pour 100) avait droit à trois des cinq sièges au conseil. Cette convention a vraiment été prise en considération pour décider que l'actionnaire minoritaire avait le contrôle *de jure* de la société. Mais *Alteco* se distingue, à deux égards importants, de la présente affaire. Premièrement, le juge Bell a décidé que la convention en cause était une «convention unanime des actionnaires» au sens de la *Business Corporations Act* de la Saskatchewan. Bien qu'il se puisse que la convention en cause dans la présente affaire ait été aussi une CUA — une possibilité que je vais étudier plus loin — , le raisonnement du juge Linden n'était pas fondé sur ce facteur et on ne peut tout simplement pas affirmer qu'en reconnaissant une CUA comme facteur déterminant du contrôle *de jure*, on autorise nécessairement la prise en compte de toutes les conventions d'actionnaires à cette fin.

Deuxièmement, la convention dans *Alteco* garantissait à l'actionnaire minoritaire la majorité des sièges au conseil d'administration. Selon moi,

case at bar that either party enjoyed this type of guaranteed control. While it is true that Marr's could only elect one direct nominee of its own, it would have been possible, as the trial judge found, for it to elect its own nominee, one Duha nominee, and Paul Quinton, who could not be said to be a nominee of either party. While Mr. Quinton was a longtime friend of the Duha family and a director of Duha No. 1, he was also a friend of William Marr and no actual evidence was adduced to suggest that his loyalties lay with the Duhas. If anything, this assessment must have come down to a question of credibility, and with respect, it was not open to Linden J.A. to interfere with such a finding of the trial judge in the absence of palpable and overriding error. In any event, however, the major concern of the *de jure* test is to ascertain which shareholder or shareholders have the voting power to elect a majority of the directors. The test neither requires nor permits an inquiry into whether a given director is the nominee of any shareholder, or any relationship or allegiance between the directors and the shareholders.

Therefore, as I have indicated, I conclude that Linden J.A. erred in considering the Agreement for the purposes of ascertaining *de jure* control, even assuming, for the sake of argument only, that he was correct in treating it as an ordinary shareholders' agreement. This determination is generally to be restricted to the share register of the company, as is clear from *Buckerfield's* and the related case law. However, as I have already mentioned, it would be unduly artificial to restrict the analysis in this way if something exists in the corporate constitution of the company to alter the picture of *de jure* control. Thus, to ensure an accurate result, the share register should be read in light of the relevant corporate law legislation (in this case, the *Corporations Act*) and the constating documents of the corporation. External agreements,

il n'est pas évident, en l'espèce, que l'une ou l'autre des parties détenait ce type de contrôle garanti. Même s'il est vrai que Marr's ne pouvait élire qu'un seul de ses candidats directs, il lui aurait été possible, comme l'a conclu le juge de première instance, d'élire son propre candidat, un candidat de Duha, et Paul Quinton, qui ne pouvait être considéré comme un candidat de l'une ou l'autre partie. Quoique M. Quinton ait été un ami de longue date de la famille Duha et qu'il ait été administrateur de Duha n° 1, il était aussi un ami de William Marr et on n'a produit aucune preuve laissant croire qu'il était du côté des Duha. Quoiqu'il en soit, cette appréciation doit nécessairement s'être résumée à une question de crédibilité et, en toute déférence, il n'était pas loisible au juge Linden de modifier cette conclusion du juge de première instance en l'absence d'une erreur manifeste et dominante. De toute façon, cependant, le critère du contrôle *de jure* est principalement axé sur la question de savoir quel actionnaire ou quels actionnaires ont les droits de vote requis pour élire la majorité des administrateurs. Ce critère n'exige pas et ne permet pas non plus d'examiner si un administrateur donné est le candidat d'un actionnaire, ou encore s'il existe un lien ou une allégeance entre les administrateurs et les actionnaires.

55

En conséquence, comme je l'ai indiqué, je conclus que le juge Linden a commis une erreur en tenant compte de la Convention pour vérifier qui détenait le contrôle *de jure*, même en supposant, pour les fins de la discussion seulement, qu'il a jugé à bon droit qu'elle était une convention ordinaire des actionnaires. Cette décision doit généralement être confinée au registre des actionnaires, comme il ressort clairement de l'arrêt *Buckerfield's* et de la jurisprudence connexe. Cependant, comme je l'ai déjà mentionné, il serait trop artificiel de limiter ainsi l'analyse s'il y a quelque chose dans les actes constitutifs de la société qui vient modifier la situation du contrôle *de jure*. Donc, pour garantir l'exactitude du résultat, le registre des actionnaires devrait être lu en fonction des mesures législatives pertinentes régissant les sociétés (en l'occurrence la *Loi sur les corporations*) et des actes constitutifs de la société. Les conventions externes n'ont cependant pas leur

however, have no place in this analysis; they are relevant only to *de facto* control.

56     Of course, all of this begs the question of the status of the unanimous shareholder agreement, in its statutory form, as a determinant of *de jure* control. It is to this question that I now turn.

### (2) Unanimous shareholder agreements

#### (a) *The nature and significance of the USA for the purposes of de jure control*

57     Stone J.A. based his concurring reasons on the characterization of the agreement in question as a USA. Important references to such agreements in the *Corporations Act* are to be found in ss. 97(1) and 140(2). Section 97(1)(b) contemplates the abrogation, by a USA, of the power of the directors to "direct the management of the business and affairs of the corporation", while s. 140(2) confirms the validity of such agreements for the purpose of restricting the powers of the directors to manage said business and affairs.

58     The legal status of the USA, which is a unique species of agreement given its statutory origin and recognition, has nonetheless been a matter of some uncertainty. At the outset, it is important to bear in mind the distinction between the tests of *de jure* and *de facto* control developed by the courts. In my view, the *de jure* standard was chosen because in some respects it is a relevant and relatively certain and predictable concept to employ in determining control. In general terms, *de jure* refers to those legal sources that determine control: namely, the corporation's governing statute and its constitutional documents, including the articles of incorporation and by-laws. The *de facto* concept was rejected because it involves ascertaining control in fact, which can lead to a myriad of indicators which may exist apart from these sources. See, for example, F. Iacobucci and D. L. Johnston, "The Private or Closely-held Corporation", in J. S. Zie-

place dans cette analyse; elles ne sont pertinentes que relativement au contrôle *de facto*.

Bien entendu, tout cela présume résolue la question de la valeur de la convention unanime des actionnaires, telle que définie par la Loi, comme facteur déterminant du contrôle *de jure*. C'est la question que je vais maintenant étudier.

### (2) Conventions unanimes des actionnaires

#### a) *La nature et l'importance des CUA aux fins du contrôle de jure*

Le juge Stone a fondé ses motifs concordants sur la qualification de la convention en cause comme étant une CUA. On trouve, aux par. 97(1) et 140(2) de la *Loi sur les corporations*, des mentions importantes de telles conventions. L'alinéa 97(1)b) prévoit l'abolition, au moyen d'une CUA, du pouvoir des administrateurs de «g[érer] l'entreprise et les affaires internes de la corporation», tandis que le par. 140(2) confirme la validité de ces conventions pour ce qui est de restreindre les pouvoirs des administrateurs de gérer cette entreprise et ces affaires internes.

La valeur juridique de la CUA, qui est un type exceptionnel de convention étant donné son origine et sa reconnaissance législatives, a néanmoins engendré une certaine incertitude. Il importe, au départ, de garder à l'esprit la distinction entre les critères du contrôle *de jure* et du contrôle *de facto* qu'ont énoncés les tribunaux. À mon avis, la norme *de jure* a été retenue parce qu'à certains égards elle représente un concept pertinent et relativement certain et prévisible pour l'examen du contrôle. De façon générale, l'expression *de jure* renvoie aux sources juridiques qui déterminent le contrôle; à savoir la loi qui régit la société et les actes constitutifs de cette dernière, y compris ses statuts et ses règlements administratifs. La notion *de facto* a été rejetée parce qu'elle oblige à vérifier qui exerce le contrôle de fait, ce qui peut conduire à une multitude d'indices susceptibles d'exister outre ces sources. Voir, par exemple, F. Iacobucci et D. L. Johnston, «The Private or Closely-held Corporation», dans J. S. Ziegel, dir., *Studies in*

gel, ed., *Studies in Canadian Company Law* (1973), vol. 2, 68, at pp. 108-12.

As I have already indicated, agreements among shareholders, voting agreements, and the like are, as a general matter, arrangements that are not examined by courts to ascertain control. In my view, this is because they give rise to obligations that are contractual and not legal or constitutional in nature. Thus, to my mind, the issue comes down to whether the USA is to be characterized as constitutional or contractual in nature. If it is the former, then its provisions are to be examined under the *de jure* control analysis; if it is the latter, then its provisions are beyond the scope of that test. For a discussion of the origin of the USA in Canadian corporate law, see, generally, R. W. V. Dickerson, J. L. Howard and L. Getz, *Proposals for a New Business Corporations Law for Canada* (1971), vol. 1, at paras. 298-99.

Fortunately, the instant case provides ample opportunity to put this debate to rest. In my view, for the reasons that follow, the USA is to be considered a constating document for the purposes of determining *de jure* control of a corporation.

The argument for treating a USA as part of the corporate constitution, along with and equivalent to the articles of incorporation and the by-laws, is strong, given the role of such an agreement in the overall context of corporate governance. As Professor Welling points out in *Corporate Law in Canada* (2nd ed. 1991), at pp. 481 *et seq.*, prior to statutory provision for USAs, the ability of shareholders to control a corporation incorporated in Canadian jurisdictions (and which, I would add, did not follow the English memorandum and articles of association system of incorporation) was in reality limited to the power to elect and dismiss directors. Directors generally owe a duty not to the shareholders but to the corporation, and shareholders could not, therefore, control the day-to-day business decisions made by the directors and their

*Canadian Company Law* (1973), vol. 2, 68, aux pp. 108 à 112.

Comme je l'ai déjà indiqué, les conventions entre les actionnaires, les conventions en matière de droits de vote, et ainsi de suite, sont généralement des ententes que les tribunaux n'examinent pas pour vérifier qui exerce le contrôle. À mon avis, cela s'explique par le fait qu'elles créent des obligations contractuelles et non des obligations juridiques ou tenant d'un acte constitutif. Ainsi, à mon sens, la question est donc de savoir si la CUA doit être considérée comme étant de nature contractuelle ou comme tenant d'un acte constitutif. Si elle tient d'un acte constitutif, ses dispositions doivent être examinées dans le cadre de l'analyse du contrôle *de jure*; si elle est de nature contractuelle, ses dispositions ne relèvent pas alors de ce critère. Pour une analyse de l'origine de la CUA en droit canadien des sociétés, voir, de façon générale, R. W. V. Dickerson, J. L. Howard et L. Getz, *Propositions pour un nouveau droit des corporations commerciales canadiennes* (1971), vol. 1, aux par. 298 et 299.

Heureusement, la présente affaire fournit largement l'occasion de mettre fin à ce débat. À mon avis, pour les motifs qui vont suivre, la CUA doit être considérée comme un acte constitutif aux fins de déterminer qui détient le contrôle *de jure* d'une société.

L'argument selon lequel la CUA doit être considérée comme faisant partie des actes constitutifs de la société, au même titre que les statuts et les règlements administratifs, est solide étant donné le rôle que joue une telle convention dans le contexte global de la gestion de la société. Comme le souligne le professeur Welling dans *Corporate Law in Canada* (2e éd. 1991), aux pp. 481 et suivantes, avant que les CUA soient prévues par la loi, la capacité des actionnaires de contrôler une société constituée dans un ressort canadien (qui, j'ajouterais, n'observait pas le régime anglais de constitution des sociétés par acte constitutif et statuts) était en réalité limitée au pouvoir d'élire et de révoquer les administrateurs. En général, les administrateurs ont une responsabilité non pas envers les actionnaires mais envers la société, de sorte que les

59

60

61

appointed officers. In other words, although the shareholders could elect the individuals who would make up the board, the board members, once elected, wielded virtually all the decision-making power, subject to the ability of the shareholders to remove or fail to re-elect unsatisfactory directors.

62     However, in a private or closely held corporation, it may generally be assumed that the dominant interests to be served by decision-making are the expectations and needs of the shareholders, as opposed to the corporation in the abstract. These corporations were modelled to some extent on incorporated partnerships, and the underlying economic policy was thought to be best met by enabling the shareholders to arrange the organization of their enterprise as they choose: see Iacobucci and Johnston, *supra*.

63     Because, at common law, shareholders could not agree to fetter or interfere with the discretion of the directors, even unanimously (see *Motherwell v. Schoof*, [1949] 4 D.L.R. 812 (Alta. S.C.), and *Atlas Development Co. v. Calof* (1963), 41 W.W.R. 575 (Man. Q.B.)), legislative intervention was needed to allow shareholders to choose their corporate control and management structure. See Iacobucci, "Canadian Corporation Law: Some Recent Shareholder Developments", in *The Cambridge Lectures 1981* (1982), 88, at pp. 92 *et seq*.

64     The advent of the USA, first in the *CBCA* and then in other statutes modelled after it, materially altered this situation by providing a mechanism by which the shareholders, through a unanimous agreement, could strip the directors of some or all of their managerial powers as desired by the shareholders. Rather than removing the directors from their positions, a USA simply relieves them of their powers, rights, duties, and associated responsibilities. This may be accomplished without specific formality; all that is required appears to be some unanimous written expression of shareholder

actionnaires ne pouvaient pas contrôler les décisions quotidiennes des administrateurs concernant l'entreprise ni celles des dirigeants qu'ils avaient désignés. Autrement dit, même si les actionnaires pouvaient élire les personnes qui composeraient le conseil, les membres du conseil, une fois élus, exerçaient pratiquement tout le pouvoir décisionnel, sous réserve de la capacité des actionnaires de révoquer ou de ne pas réélire les administrateurs dont ils n'étaient pas satisfaits.

Toutefois, dans le cas d'une société privée ou à capital fermé, on peut généralement présumer que les intérêts dominants que doit servir la prise de décision sont les attentes et les besoins des actionnaires, par opposition à ceux de la société considérée dans l'abstrait. Ces sociétés s'inspirent dans une certaine mesure des sociétés de personnes dotées de la personnalité morale et l'on croyait que le meilleur moyen de réaliser la politique économique sous-jacente était de permettre aux actionnaires d'organiser leur entreprise à leur gré: voir Iacobucci et Johnston, *loc. cit.*

Comme, en common law, les actionnaires ne pouvaient pas convenir d'entraver le pouvoir discrétionnaire des administrateurs, même à l'unanimité (voir *Motherwell c. Schoof*, [1949] 4 D.L.R. 812 (S.C. Alb.), et *Atlas Development Co. c. Calof* (1963), 41 W.W.R. 575 (B.R. Man.)), il a fallu que le législateur intervienne pour autoriser les actionnaires à choisir leur structure de contrôle et de gestion de la société. Voir Iacobucci, «Canadian Corporation Law: Some Recent Shareholder Developments», dans *The Cambridge Lectures 1981* (1982), 88, aux pp. 92 et suivantes.

L'avènement des CUA, d'abord dans la *LCSA* puis dans d'autres lois qui s'en inspirent, a sensiblement modifié la situation en établissant un mécanisme permettant aux actionnaires de dépouiller, à leur gré, par convention unanime, les administrateurs de la totalité ou d'une partie de leurs pouvoirs de gestion. Au lieu de les révoquer, la CUA les dégage simplement de leurs pouvoirs, droits, obligations et responsabilités connexes. Cela peut être accompli sans formalités précises; il semble suffisant d'avoir une expression écrite de la volonté unanime des actionnaires. Il en résulte,

will. The result, however, amounts to a fundamental change in the management of the company, as s. 140(5) of the *Corporations Act* provides that the shareholders who are parties to the USA assume all the rights, powers, duties and liabilities of the directors which are removed by the agreement, and that the directors are relieved of their duties and liabilities to the same extent. As I have already intimated, what is in effect created is an "incorporated partnership" with statutory force.

Stone J.A. opined that, if an agreement can be viewed as a USA within the definition in the *Corporations Act*, it is to be read alongside the corporation's constating documents in determining the issue of *de jure* control. I agree. The fact that the USA has supplanted the long-standing principle of shareholder non-interference with the directors' powers to manage the corporation, an exclusive right which is granted by the statute and the corporate constitution, clearly indicates that it is at least as important as the "traditional" constating documents in assessing *de jure* control. It would be truly artificial to conclude, only on the basis of the share register, the articles of incorporation, and the by-laws, that one shareholder has *de jure* control over the corporation by virtue of its apparent power to elect the majority of the board of directors, if a USA exists which limits substantially the power of the board itself.

In other words, the USA is a corporate law hybrid, part contractual and part constitutional in nature. The contractual element is immediately apparent from a reading of s. 140(2): to be valid, a USA must be an "otherwise lawful written agreement among all the shareholders of a corporation, or among all the shareholders and a person who is not a shareholder". It seems to me that this indicates not only that the USA must take the form of a written contract, but also that it must accord with the other, general requirements for a lawful and valid contract. More generally, the USA is by its

cependant, un changement fondamental dans la gestion de la société, car le par. 140(5) de la *Loi sur les corporations* prévoit que les actionnaires qui sont parties à la CUA assument tous les droits, pouvoirs et obligations des administrateurs révoqués par la convention, et encourent toutes leurs responsabilités, et que les administrateurs sont déchargés de leurs obligations et responsabilités dans la même mesure. Comme je l'ai déjà laissé entendre, c'est une «société de personnes dotée de la personnalité morale» qui est, en fait, créée et sanctionnée par la loi.

Le juge Stone s'est dit d'avis que, si une convention peut être considérée comme une CUA au sens de la *Loi sur les corporations*, elle doit être interprétée conjointement avec les actes constitutifs de la société afin de trancher la question du contrôle *de jure*. Je suis d'accord. Le fait que la CUA a supplanté le principe de longue date selon lequel les actionnaires ne doivent pas entraver les pouvoirs des administrateurs de gérer la société, qui représentent un droit exclusif conféré par la loi et les actes constitutifs de la société, indique clairement que la CUA est au moins aussi importante que les actes constitutifs «classiques» pour apprécier le contrôle *de jure*. Il serait vraiment artificiel de conclure, uniquement à partir du registre des actionnaires, des statuts et des règlements administratifs, qu'un actionnaire a acquis le contrôle *de jure* de la société en raison de son pouvoir apparent d'élire la majorité des membres du conseil d'administration, dans le cas où il existe une CUA qui limite sensiblement le pouvoir du conseil lui-même.

Autrement dit, la CUA est une création hybride du droit des sociétés, qui est en partie contractuelle et qui tient en partie d'un acte constitutif. L'aspect contractuel ressort immédiatement de la lecture du par. 140(2): pour être valide, une CUA doit être une convention écrite par ailleurs licite «conclue par tous les actionnaires d'une corporation soit entre eux, soit avec des tiers». Il me semble que cela indique non seulement que la CUA doit être sous forme de contrat écrit, mais encore qu'elle doit être conforme aux autres conditions générales de validité des contrats. D'une manière plus géné-

nature able to govern both the procedure for running the corporation and the personal or individual rights of the shareholders: see Iacobucci, *supra*.

67    The constitutional element of the USA is even more potent than its contractual features. Numerous provisions of the *Corporations Act* that govern fundamental aspects of the running of the corporation, including the management of its business and affairs (s. 97(1)), the issuing of shares (s. 25(1)), the passing of by-laws (s. 98(1)), the appointment of officers (s. 116), and the situations in which a dissenting shareholder can request dissolution of the company (s. 207(1)(b)), are expressly made subject to the USA. More generally, s. 6(3) reads as follows:

**6(3)** Subject to subsection (4), if the articles or a unanimous shareholder agreement require a greater number of votes of directors or shareholders than that required by this Act to effect any action, the provisions of the articles or of the unanimous shareholder agreement prevail. [Emphasis added.]

Subsection (4) stipulates only that the articles may not require a greater number of votes to remove a director than that required elsewhere in the Act, but does not place any such limitation on a USA. This denotes the equivalent constitutional status of the USA *vis-à-vis* the articles of incorporation.

68    This status is greatly reinforced by s. 20(1) of the *Corporations Act*, which requires that a copy of any USA, along with the articles and by-laws of the corporation, be contained in the corporate records required by that section to be maintained at the registered office of the corporation. This is cogent evidence that the legislator has treated the corporation's constating documents and the USA *in pari materia*. It is also significant that s. 240 of the *Corporations Act* includes USAs along with the Act, the regulations promulgated thereunder, and the articles and by-laws of a corporation as documents the breach of which entitle a complainant or a creditor to seek a compliance order or other remedy deemed appropriate by the court. As

rale, la CUA est susceptible, par nature, de régir tant les modalités de fonctionnement de la société que les droits personnels ou individuels des actionnaires: voir Iacobucci, *loc. cit.*

L'aspect de la CUA qui tient d'un acte constitutif est encore plus puissant que son caractère contractuel. De nombreuses dispositions de la *Loi sur les corporations* qui régissent des aspects fondamentaux du fonctionnement de la société, y compris la gestion de son entreprise et de ses affaires internes (par. 97(1)), l'émission d'actions (par. 25(1)), l'adoption des règlements administratifs (par. 98(1)), la nomination de dirigeants (art. 116) et les situations dans lesquelles un actionnaire dissident peut demander la dissolution de la société (al. 207(1)b)), sont expressément assujetties aux CUA. De manière plus générale, le par. 6(3) est ainsi conçu:

**6(3)** Par dérogation à la présente loi et sous réserve du paragraphe (4), les statuts ou les conventions unanimes des actionnaires peuvent augmenter le nombre de voix nécessaires à l'adoption de certaines mesures par les administrateurs ou par les actionnaires. [Je souligne.]

Le paragraphe (4) prévoit seulement que les statuts ne peuvent, pour la révocation d'un administrateur, exiger un nombre de voix plus élevé que celui prévu ailleurs dans la Loi, mais n'impose pas une telle restriction à une CUA, ce qui dénote que les CUA ont valeur d'acte constitutif au même titre que les statuts.

Cette valeur est largement confirmée par le par. 20(1) de la *Loi sur les corporations*, qui exige qu'un exemplaire des CUA soit versé, avec les statuts, et les règlements administratifs de la société, dans les livres que la société doit tenir à son bureau enregistré, en vertu de cette disposition. C'est une preuve convaincante que le législateur a mis sur un pied d'égalité les actes constitutifs de la société et les CUA. Il est également révélateur que l'art. 240 de la *Loi sur les corporations* prévoie que les CUA sont, au même titre que la Loi et ses règlements d'application, ainsi que les statuts et les règlements administratifs de la société, des documents dont l'inobservation confère à tout plaignant ou créancier le droit de demander une ordonnance enjoi-

well, the provisions of a USA may be enforced against the corporation and its officers and directors although they need not be parties to the agreement. This stands as a further indication of the constitutional character of the USA.

Thus, a USA can play a vital role in the *de jure* control analysis. If the *Buckerfield's* test were to be followed slavishly and the inquiry limited only to the share register of the corporation, or even extended to the articles of incorporation and by-laws but not to USAs, then a company could circumvent the test or obfuscate the picture of corporate control simply by confining to a USA provisions that substantially alter the way in which corporate decisions are made. If, by a USA, the board of directors is deprived of the power to manage the business and affairs of the corporation, this is more than simply an issue of *de facto* control. It would defy logic to treat *de jure* control as remaining unaltered by an agreement which, by the very statute which governs the incorporation of the company and the governance thereof by its articles and by-laws, is given the same power as the articles to supersede the statutory provisions for corporate control. Not only is this a distinction without a difference, but it is also one without any principled foundation.

As I have said, the essential purpose of the *Buckerfield's* test is to determine the locus of effective control of the corporation. To my mind, it is impossible to say that a shareholder can be seen as enjoying such control simply by virtue of his or her ability to elect a majority of a board of directors, when that board may not even have the actual authority to make a single material decision on behalf of the corporation. The *de jure* control of a corporation by a shareholder is dependent in a very real way on the control enjoyed by the majority of directors, whose election lies within the control of that shareholder. When a constating document such as a USA provides that the legal authority to manage the corporation lies other than with the

gnant de s'y conformer ou un autre redressement que la cour juge approprié. De même, les dispositions d'une CUA peuvent être appliquées contre la société et ses dirigeants et administrateurs même s'ils n'ont pas à être parties à la convention. C'est là un autre indice que la CUA tient d'un acte constitutif.

Ainsi, une CUA peut jouer un rôle vital dans l'analyse du contrôle *de jure*. Si le critère de *Buckerfield's* était suivi servilement et si l'examen était limité au registre des actionnaires de la société, ou même étendu aux statuts et aux règlements administratifs mais non aux CUA, une société pourrait alors contourner le critère ou obscurcir la situation quant au contrôle de la société simplement en s'en tenant aux dispositions d'une CUA qui modifient sensiblement la façon dont les décisions de la société sont prises. Si, en raison d'une CUA, le conseil d'administration est privé du pouvoir de gérer l'entreprise et les affaires internes de la société, ce n'est pas simplement une question de contrôle *de facto*. Il serait illogique d'affirmer que le contrôle *de jure* reste inchangé par une convention qui, en vertu de la loi même qui régit la constitution de la société et sa gestion au moyen de ses statuts et de ses règlements administratifs, se voit conférer le même pouvoir que les statuts de l'emporter sur les dispositions de la Loi pour ce qui est du contrôle de la société. Cette distinction est non seulement vide de sens, mais encore elle ne repose sur aucun principe.

Comme je l'ai affirmé, le but essentiel du critère de *Buckerfield's* est de déterminer où est situé le contrôle véritable de la société. À mon sens, il est impossible d'affirmer qu'un actionnaire a acquis ce contrôle du seul fait qu'il est en mesure d'élire la majorité des membres du conseil d'administration, alors que ce conseil n'a peut-être même pas réellement le pouvoir de prendre une seule décision importante au nom de la société. Le contrôle *de jure* d'une société par un actionnaire dépend d'une manière très réelle du contrôle exercé par la majorité des administrateurs dont l'élection est contrôlée par cet actionnaire. Quand un acte constitutif comme une CUA prévoit que le pouvoir légal de gérer la société est conféré à une autre per-

69

70

board, the reality of *de jure* control is necessarily altered and the court must acknowledge that alteration.

71    Therefore, I would conclude that, while "ordinary" shareholder agreements and other external documents generally should not be considered in assessing *de jure* control, in keeping with the long line of jurisprudence to this effect, the USA is a constating document and as such must be considered for the purposes of this analysis. To this end, I must add that, to the extent that it held that a USA is not one of the constating documents of a corporation, *Alteco*, *supra*, was wrongly decided. It is true that, at common law, a unanimous agreement between or among shareholders would have been considered only as part of the *de facto* analysis. However, in my view, the unique status of the statutory form of USA in corporate law, when compared to other shareholder agreements, provides a complete answer to the appellant's concern that the consideration of the USA for the present purpose would open the door to the consideration of all agreements between shareholders. Unlike an "ordinary" shareholder agreement, which cannot interfere with the exercise of the directors' powers, a USA can and must do so. Moreover, as we have seen, a USA can in fact incorporate provisions that would otherwise be contained in the articles. Viewed in this light, I fail to see how the USA can be ignored as a vital determinant of *de jure* control.

72    The appellant correctly points out that to recognize the USA as affecting *de jure* control begs the question of how much power must be removed from the directors before one may safely conclude that the majority voting shareholder no longer has *de jure* control. Certainly, the existence of a USA does not necessarily imply the loss of *de jure* control. But I cannot agree that there is no rational basis for determining when a majority shareholder loses *de jure* control on the basis of a restriction of the directors' powers. As I will discuss in more detail below, this issue comes down to a question

sonne qu'au conseil d'administration, le contrôle *de jure* véritable change nécessairement de mains et le tribunal doit reconnaître cette réalité.

En conséquence, je conclurais que, alors que les conventions «ordinaires» des actionnaires et les autres documents externes ne devraient pas, en général, être pris en considération pour évaluer le contrôle *de jure*, et ce, conformément à un long courant de jurisprudence, la CUA est un acte constitutif et doit, à ce titre, être prise en compte dans cette analyse. À cette fin, je dois ajouter que, dans la mesure où il a été statué dans la décision *Alteco*, précitée, qu'une CUA n'est pas un acte constitutif d'une société, cette décision est erronée. Il est vrai qu'en common law une convention unanime des actionnaires n'aurait été prise en considération que dans le cadre de l'analyse du contrôle *de facto*. Cependant, j'estime que la situation exceptionnelle de la CUA en droit des sociétés, en ce qu'elle est sanctionnée par la loi contrairement aux autres conventions des actionnaires, dissipe totalement la crainte de l'appelante que la prise en compte de la CUA aux présentes fins n'ouvre la porte à la prise en compte de toutes les conventions des actionnaires. Contrairement aux conventions «ordinaires» des actionnaires, qui ne peuvent entraver l'exercice des pouvoirs des administrateurs, une CUA peut et doit avoir cet effet. De plus, comme nous l'avons vu, une CUA peut, en fait, comprendre des dispositions qui seraient par ailleurs contenues dans les statuts. Considérée sous cet angle, je ne vois pas comment la CUA peut ne pas être tenue pour un facteur décisif dans l'examen du contrôle *de jure*.

L'appelante a raison de souligner que le fait de reconnaître que la CUA influe sur le contrôle *de jure* élude la question de savoir dans quelle mesure les administrateurs doivent être dépouillés de leurs pouvoirs pour qu'il soit possible de conclure avec certitude que l'actionnaire détenant la majorité des voix n'a plus le contrôle *de jure*. Assurément, l'existence d'une CUA n'implique pas nécessairement la perte du contrôle *de jure*. Mais je ne saurais convenir qu'il n'y a aucun motif rationnel de décider dans quels cas un actionnaire majoritaire perd le contrôle *de jure* en raison d'une restriction

1998 CanLII 827 (SCC)

of fact, turning on the extent to which the powers of the directors to manage are restricted, to what extent these powers have devolved to the shareholders, and to what extent the majority shareholders are thereby able to control the exercise of the governing powers.

Accordingly, two questions remain to be answered: whether the Agreement in this case was a USA, and, if so, whether it in fact deprived Marr's of *de jure* control over Duha No. 2.

(b) *Was the Agreement a USA?*

Section 1(1) of the *Corporations Act* defines a USA as, *inter alia*, an agreement of the type described in s. 140(2). Stone J.A. recognized that this section discloses a number of requirements for a valid USA: the agreement must be "otherwise lawful", must be among all the shareholders of the corporation (as well as, possibly, a non-shareholder), and must restrict, in whole or in part, the powers of the directors to manage "the business and affairs of the corporation". There is really no room for debate as to whether the Agreement satisfied the first two criteria. To the extent that the status of the Agreement is in question, the issue is whether it satisfied the third.

In the view of Stone J.A., the Agreement satisfied those requirements and was therefore a USA. He based this conclusion on a technical analysis of the Agreement, and especially Article 2.1, which provided that the "affairs" of the corporation were to be managed by the board of directors, and Article 6.1, which provided for the settlement by arbitration of disputes between shareholders on matters concerning the "business" of the corporation. From these provisions, Stone J.A. inferred that the Agreement deprived the directors of Duha No. 2 of the power to manage the "business" of the corporation, leaving them with control only over its "affairs". Because s. 1(1) of the *Corporations Act* defines "business" as a concept separate from and exclusive of "affairs", Stone J.A. concluded that

des pouvoirs des administrateurs. Comme je vais l'expliquer plus loin, cette question se résume à une question de fait dont la réponse dépend de la mesure dans laquelle les pouvoirs des administrateurs sont restreints, de la mesure dans laquelle ces pouvoirs ont été transmis aux actionnaires et de la mesure dans laquelle les actionnaires majoritaires sont ainsi en mesure de contrôler l'exercice des pouvoirs de gestion.

En conséquence, il reste deux questions à trancher: celles de savoir si la Convention était en l'espèce une CUA et, dans l'affirmative, si elle privait, en fait, Marr's du contrôle *de jure* de Duha n° 2.

b) *La Convention était-elle une CUA?*

Selon la définition donnée au par. 1(1) de la *Loi sur les corporations*, la CUA s'entend notamment d'une convention du genre décrit au par. 140(2). Le juge Stone a reconnu que cette disposition assujettit la validité de la CUA à certaines conditions: elle doit être «par ailleurs licite», être conclue par tous les actionnaires de la société (soit entre eux, soit avec des tiers), et restreindre en totalité ou en partie les pouvoirs des administrateurs de gérer l'«entreprise et les affaires internes de la corporation». Nul ne saurait vraiment contester que la Convention satisfait aux deux premiers critères. Dans la mesure où c'est sa valeur qui est en cause, il s'agit de décider si elle satisfait au troisième critère.

Du point de vue du juge Stone, la Convention remplissait ces conditions et était donc une CUA. Il a basé sa conclusion sur une analyse technique de la Convention et surtout de l'article 2.1, qui prévoyait que les [TRADUCTION] «affaires internes» de la société seraient gérées par le conseil d'administration, et de l'article 6.1 qui prescrivait l'arbitrage pour régler les différends surgissant parmi les actionnaires et se rapportant à l'«entreprise» de la société. Le juge Stone a déduit de ces dispositions que la Convention dépouillait les administrateurs de Duha n° 2 du pouvoir de gérer l'«entreprise» de la société, et ne leur laissait que le contrôle de ses «affaires internes». Parce que le par. 1(1) de la *Loi sur les corporations* définit le terme «entreprise» comme une notion séparée et distincte des

73

74

75

the Agreement restricted the s. 97(1) management power of the directors and was therefore a USA within the meaning of s. 140(2).

76    For my part, I find this conclusion difficult to accept. To provide that the directors shall have the power to manage the "affairs" of the corporation cannot, without more, be taken to exclude them from the management of the "business". Despite the separate definitions of the two concepts in s. 1(1), it seems to me that clearer language would be required to remove such a fundamental power from the directors. Moreover, it is not at all clear that "affairs" must be defined, for the purposes of the Agreement, by reference to its statutory definition — especially, as I will discuss below, when to so define this term could lead to a rather awkward result. Indeed, the *Concise Oxford Dictionary* (9th ed. 1995) defines "affairs" as including "business dealings". Considering this linguistic ambiguity in addition to the foregoing concerns, I do not think it safe to conclude that the intention of Article 2.1 was to deprive the directors of their power to manage the business of Duha No. 2.

77    I take a similar view of the effect of Article 6.1. The presence of this arbitration clause to resolve disputes among shareholders does not lead to the conclusion that all business of the corporation was to be transacted by unanimous shareholder resolution, as the Minister contends. Again, clearer language would be required to achieve this end, particularly when it is considered that the result of such an arrangement would be that the entire corporation could be paralyzed by the dissent of a single shareholder on a very minor issue. A better interpretation, as contended for by the appellant, is that the word "business" in Article 6.1 was used to refer to corporate business that is ordinarily transacted among shareholders, rather than business of the corporation which is within the power of the directors to manage. In fact, this is consistent with s. 129(5) of the *Corporations Act*, which makes

«affaires internes», le juge Stone a conclu que la Convention restreignait le pouvoir de gestion conféré aux administrateurs par le par. 97(1) et était donc une CUA au sens du par. 140(2).

Je trouve personnellement cette conclusion difficile à accepter. Le fait de prévoir que les administrateurs ont le pouvoir de gérer les «affaires internes» de la société ne saurait, sans plus, être considéré comme les écartant de la gestion de l'«entreprise». Malgré les définitions distinctes données aux deux termes au par. 1(1), il me semble qu'il faudrait un texte plus clair pour dépouiller les administrateurs d'un pouvoir aussi fondamental. En outre, il n'est pas du tout évident que le terme «affaires internes» doive, aux fins de la Convention, être défini en fonction de la définition qu'en donne la Loi — surtout, comme je vais l'expliquer plus loin, lorsqu'une telle définition risquerait d'entraîner un résultat plutôt fâcheux. En fait, le *Concise Oxford Dictionary* (9e éd. 1995) définit le mot «*affairs*» (employé dans la version anglaise de la Loi pour «affaires internes») comme s'entendant entre autres des «*business dealings*» («relations d'affaires»). Vu cette ambiguïté linguistique et les préoccupations précitées, je ne pense pas qu'il soit prudent de conclure que l'article 2.1 avait pour but de priver les administrateurs de leur pouvoir de gérer l'entreprise de Duha nᵒ 2.

J'adopte un point de vue semblable quant à l'effet de l'article 6.1. L'existence de cette clause d'arbitrage des différends entre les actionnaires n'amène pas à conclure que toutes les opérations de la société devaient faire l'objet d'une résolution unanime des actionnaires, comme le soutient le Ministre. Là encore, il faudrait un texte plus clair pour atteindre cette fin, en particulier si l'on considère qu'une telle entente ferait en sorte que toute la société pourrait être paralysée si un seul actionnaire exprimait une opinion dissidente sur une question de très peu d'importance. Il vaut mieux considérer, comme le soutient l'appelante, que le mot [TRADUCTION] «entreprise» («*business*») employé à l'article 6.1 était destiné à désigner les questions concernant la société qui sont habituellement traitées entre les actionnaires, plutôt que l'entreprise de la société qui relève du pouvoir de ges-

specific reference to "business" transacted by shareholders at an annual or special meeting of shareholders.

Generally speaking, USAs exist to deal with major issues facing a corporation: corporate structure, issuance of shares, declaration of dividends, election of directors, appointment of officers, and the like. General business decisions are not ordinarily touched by such arrangements, and with good reason: it would not be efficient, for business purposes, to remit every decision, however minor, to a shareholder vote, let alone to require unanimous agreement among the shareholders on such decisions. Fundamental disagreements among shareholders are ordinarily dealt with by different means, such as, for example, buy-sell arrangements or other methods of dispute resolution. In exceptional cases, a USA may provide that an aggrieved shareholder may apply to the court for dissolution of the corporation and the return of his or her share capital. But these are long-term solutions which are agreed upon with a view to facilitating the ongoing operation of the business, undisturbed by the day-to-day wrangling and disagreements that often characterize the relationships among shareholders in closely-held companies, while permitting insurmountable disputes to be resolved by special measures. This is vastly different from requiring unanimous consent to every action taken in furtherance of the business of a corporation. Such an extraordinary corporate policy would require specific expression in the constating documents. In my view, the provisions cited by the Minister do not qualify as such.

However, this is not to say that the Agreement does not affect the powers of the directors at all and, as such, is not a USA. On the contrary, Article 4.4, which prevented the corporation from issuing further shares "without the written consent of all of

tion des administrateurs. En réalité, cette interprétation est compatible avec le par. 129(5) de la *Loi sur les corporations*, qui mentionne expressément les «points» («*business*») de l'ordre du jour des assemblées annuelles ou extraordinaires des actionnaires.

D'une façon générale, les CUA existent pour régler des questions importantes auxquelles est confrontée une société: structure de la société, émission d'actions, déclaration de dividende, élection des administrateurs, désignation des dirigeants, et ainsi de suite. Les décisions générales concernant l'entreprise ne sont ordinairement pas visées par de telles ententes, et ce, pour une bonne raison: il ne serait pas efficace, aux fins de l'entreprise, que chaque décision, si peu importante soit-elle, soit soumise au vote des actionnaires, et encore moins qu'on exige qu'elle fasse l'objet de l'accord unanime des actionnaires. Les désaccords fondamentaux entre les actionnaires sont habituellement réglés en recourant à divers moyens, comme, par exemple, les conventions de rachat d'actions ou d'autres modes de règlement des différends. Dans des cas exceptionnels, une CUA peut prévoir que tout actionnaire lésé peut demander aux tribunaux la dissolution de la société et le remboursement de son capital-actions. Mais ce sont là des solutions à long terme dont on convient pour faciliter l'exploitation de l'entreprise en évitant les disputes et les désaccords de tous les jours qui caractérisent souvent les rapports entre les actionnaires des sociétés à capital fermé, tout en permettant que des conflits insurmontables soient réglés par des mesures spéciales. Voilà qui est très différent de l'obligation d'obtenir le consentement unanime pour toute mesure relative à l'entreprise d'une société. Une telle politique extraordinaire de la société devrait être énoncée expressément dans ses actes constitutifs. À mon avis, les dispositions citées par le Ministre n'entrent pas dans cette catégorie.

Toutefois, cela ne veut pas dire que la Convention n'influe absolument pas sur les pouvoirs des administrateurs et que, pour ce motif, elle n'est pas une CUA. Au contraire, l'article 4.4, qui empêchait la société d'émettre de nouvelles actions

78

79

the Shareholders", imposed a clear restriction upon the directors' power to manage. According to s. 25(1) of the *Corporations Act*,

> Subject to the articles, the by-laws and any unanimous shareholder agreement . . . shares may be issued at such times and to such persons and for such consideration <u>as the directors may determine</u>. [Emphasis added.]

Thus, by reserving to themselves one of the powers of management which the Act expressly grants to the directors, the shareholders obviously restricted in part the ability of the directors to manage the corporation. Additionally, the language of s. 25(1) makes clear that, in the absence of a specific provision in the constating documents, such can only be accomplished by means of a USA. To my mind, there is no doubt that this brings the Agreement within the terms of s. 140(2).

80     To summarize my conclusions on this point, I agree with Stone J.A. that the Agreement constituted a USA, within the meaning of s. 140(2) of the *Corporations Act*, but for different reasons. While the provisions of Articles 2.2 and 6.1 did not, to my mind, pose any restrictions on the power of the directors to manage the business and affairs of the corporation, Article 4.4 surely did. The next question, therefore, is whether this particular USA had the effect of depriving Marr's of *de jure* control over Duha No. 2.

### (c) *The effect of the USA*

81     As I have already said, the simple fact that the shareholders of a corporation have entered into a USA does not have the automatic effect of removing *de jure* control from a shareholder who enjoys the majority of the votes in the election of the board of directors. Rather, the specific provisions of the USA must alter such control as a matter of law. But to what extent must these powers be compromised before the majority shareholder can be said to have lost *de jure* control over the company?

[TRADUCTION] «sans le consentement écrit de tous les actionnaires», imposait une restriction claire au pouvoir de gestion des administrateurs. Le paragraphe 25(1) de la *Loi sur les corporations* est ainsi conçu:

> Sous réserve des statuts, des règlements administratifs et de toute convention unanime des actionnaires [. . .], <u>les administrateurs peuvent déterminer</u> la date des émissions d'actions, les personnes qui peuvent souscrire et l'apport qu'elles doivent fournir. [Je souligne.]

Ainsi, en se réservant l'un des pouvoirs de gestion que la Loi confère expressément aux administrateurs, les actionnaires ont manifestement restreint en partie la capacité des administrateurs de gérer la société. De plus, il ressort nettement du par. 25(1) que, en l'absence d'une disposition particulière dans les actes constitutifs, cela ne peut se faire qu'au moyen d'une CUA. À mon sens, il n'y a pas de doute que cela fait relever la Convention du par. 140(2).

Pour résumer mes conclusions sur ce point, je suis d'accord avec le juge Stone pour dire que la Convention fait une CUA au sens du par. 140(2) de la *Loi sur les corporations*, mais pour des motifs différents. Quoique les dispositions des articles 2.2 et 6.1 n'apportent pas, à mon sens, de restriction au pouvoir des administrateurs de gérer l'entreprise et les affaires internes de la société, l'article 4.4 le fait sûrement. En conséquence, il s'agit maintenant de décider si cette CUA particulière a eu pour effet de priver Marr's du contrôle *de jure* de Duha n⁰ 2.

### c) *L'effet de la CUA*

Comme je l'ai déjà précisé, le simple fait que les actionnaires d'une société aient conclu une CUA n'a pas automatiquement pour effet de dépouiller du contrôle *de jure* un actionnaire qui détient la majorité des voix pour l'élection du conseil d'administration. Les dispositions particulières de la CUA doivent plutôt modifier ce contrôle en droit. Mais dans quelle mesure ces pouvoirs doivent-ils être compromis pour qu'il soit possible d'affirmer que l'actionnaire majoritaire a perdu le contrôle *de jure* de la société?

1998 CanLII 827 (SCC)

In my view, it is possible to determine whether *de jure* control has been lost as a result of a USA by asking whether the USA leaves any way for the majority shareholder to exercise effective control over the affairs and fortunes of the corporation in a way analogous or equivalent to the power to elect the majority of the board of directors (as contemplated by the *Buckerfield's* test). There need be no concern that the consideration of USAs in the *de jure* analysis will lead either to uncertainty or to a situation where every USA would automatically imply a loss of *de jure* control by the majority shareholder. It will in every case be necessary to establish this result by examining the specific provisions of the USA in question.

In my view, the provisions in the Agreement at issue in this case did not in fact result in the loss of *de jure* control by Marr's. The inability to issue new shares without unanimous shareholder approval, while surely a restriction on the powers of the directors to manage the business and affairs of Duha No. 2, was not so severe a restriction that Marr's can be said to have lost the ability to exercise effective control over the affairs and fortunes of the company through its majority shareholdings. In fact, Thurlow J. expressly found in *Donald Applicators*, *supra*, at p. 5125, that "the authority of the directors of the appellant companies [was] only slightly restricted or modified" from their statutory powers by their inability to issue new shares, and that this restriction did not have "any serious effect on the authority of the directors to govern the business of the company and generally to direct its affairs". These holdings, along with the balance of the reasons in *Donald Applicators*, were affirmed by this Court.

Thus, I would conclude that, in the circumstances of this case, the general rule holds. Marr's, by virtue of its ability to elect the majority of the board of directors, enjoyed *de jure* control over Duha No. 2 immediately prior to its amalgamation

À mon avis, il est possible de déterminer si le contrôle *de jure* a été perdu par suite d'une CUA en se demandant si cette CUA laisse à l'actionnaire majoritaire quelque moyen d'exercer un contrôle effectif sur les affaires et les destinées de la société, d'une manière analogue ou équivalente au pouvoir d'élire la majorité des membres du conseil d'administration (tel que prévu par le critère de *Buckerfield's*). Il n'y a pas à s'inquiéter que la prise en compte des CUA dans l'analyse du contrôle *de jure* ne conduise soit à l'incertitude soit à une situation où chaque CUA impliquerait automatiquement une perte du contrôle *de jure* par l'actionnaire majoritaire. Il faudra dans chaque cas décider si tel est le résultat par un examen des dispositions particulières de la CUA en cause.

À mon avis, les dispositions de la convention en cause dans le présent pourvoi n'ont pas entraîné, en réalité, la perte du contrôle *de jure* par Marr's. Même si elle constituait sûrement une restriction des pouvoirs des administrateurs de gérer l'entreprise et les affaires internes de Duha nº 2, l'incapacité d'émettre de nouvelles actions sans le consentement unanime des actionnaires n'était pas une restriction grave au point de pouvoir dire que Marr's avait perdu la capacité d'exercer un contrôle effectif sur les affaires et les destinées de la société grâce à sa participation majoritaire. En fait, le juge Thurlow a décidé expressément, dans l'affaire *Donald Applicators*, précitée, à la p. 5125, que [TRADUCTION] «le pouvoir des administrateurs des sociétés appelantes [n'a été] que légèrement restreint ou modifié», par rapport aux pouvoirs dont ils étaient investis par la Loi, par leur incapacité d'émettre de nouvelles actions, et que cette restriction n'a pas eu [TRADUCTION] «d'effet grave sur le pouvoir des administrateurs de gérer l'entreprise de la société et, de façon générale, d'administrer ses affaires internes». Ces conclusions ainsi que le reste des motifs de la décision *Donald Applicators* ont été confirmés par notre Cour.

Ainsi, je suis d'avis que, dans les circonstances de la présente affaire, la règle générale s'applique. En raison de sa capacité d'élire la majorité des membres du conseil d'administration, Marr's détenait le contrôle *de jure* de Duha nº 2 immédiate-

82

83

84

with Outdoor. Nothing in the constating documents, including the USA, served to alter this state of affairs. Accordingly, there was no change in control occasioned by the amalgamation, which means that s. 111(5) of the *Income Tax Act* did not prevent Duha No. 3 from deducting from its 1985 taxable income the non-capital losses accumulated in previous years by Outdoor, regardless of whether or not the business of Outdoor was intended to be or was actually carried on by Duha No. 3 as a going concern.

### (3) Summary of principles and conclusion as to control

85   It may be useful at this stage to summarize the principles of corporate and taxation law considered in this appeal, in light of their importance. They are as follows:

(1) Section 111(5) of the *Income Tax Act* contemplates *de jure*, not *de facto*, control.

(2) The general test for *de jure* control is that enunciated in *Buckerfield's*, *supra*: whether the majority shareholder enjoys "effective control" over the "affairs and fortunes" of the corporation, as manifested in "ownership of such a number of shares as carries with it the right to a majority of the votes in the election of the board of directors".

(3) To determine whether such "effective control" exists, one must consider:

(a) the corporation's governing statute;

(b) the share register of the corporation; and

(c) any specific or unique limitation on either the majority shareholder's power to control the election of the board or the board's power to manage the business and affairs of the company, as manifested in either:

---

ment avant la fusion de cette dernière avec Outdoor. Rien dans les actes constitutifs, y compris la CUA, n'a contribué à changer cette situation. Par conséquent, aucun changement de contrôle n'a résulté de la fusion, ce qui signifie que le par. 111(5) de la *Loi de l'impôt sur le revenu* n'empêchait pas Duha nᵒ 3 de déduire de son revenu imposable de 1985 les pertes autres qu'en capital accumulées par Outdoor au cours des années antérieures, peu importe que Duha nᵒ 3 ait eu l'intention d'exploiter Outdoor, ou qu'elle l'ait effectivement exploitée, en tant qu'entreprise en activité.

### (3) Sommaire des principes et conclusion quant au contrôle

Il peut être utile à ce stade, de résumer les principes du droit des sociétés et du droit fiscal étudiés dans le présent pourvoi, étant donné leur importance. Ces principes sont le suivants:

(1) Le paragraphe 111(5) de la *Loi de l'impôt sur le revenu* vise le contrôle *de jure*, et non pas le contrôle *de facto*.

(2) Le critère général du contrôle *de jure* a été énoncé dans l'arrêt *Buckerfield's*, précité: il s'agit de décider si l'actionnaire majoritaire exerce un «contrôle effectif» sur «les affaires et les destinées» de la société, contrôle qui ressort de la «propriété d'un nombre d'actions conférant la majorité des voix pour l'élection du conseil d'administration».

(3) Pour décider s'il y a «contrôle effectif», il faut prendre en considération ce qui suit:

a) la loi qui régit la société;

b) le registre des actionnaires de la société;

c) toute restriction, particulière ou exceptionnelle, imposée soit au pouvoir de l'actionnaire majoritaire de contrôler l'élection du conseil, soit au pouvoir du conseil de gérer l'entreprise et les affaires internes de la société, qui ressort de l'un ou l'autre des documents suivants:

(i) the constating documents of the corporation; or

(ii) any unanimous shareholder agreement.

(4) Documents other than the share register, the constating documents, and any unanimous shareholder agreement are not generally to be considered for this purpose.

(5) If there exists any such limitation as contemplated by item 3(c), the majority shareholder may nonetheless possess *de jure* control, unless there remains no other way for that shareholder to exercise "effective control" over the affairs and fortunes of the corporation in a manner analogous or equivalent to the *Buckerfield's* test.

B. *Object and spirit*

In light of the foregoing conclusions, it is not necessary to consider whether the Federal Court of Appeal erred in considering the object and spirit of the *Income Tax Act* provisions, the intentions of the parties, and the commercial reality of the transactions, given that the relevant provisions of the Act are clear and unambiguous. However, I would like to comment briefly on the suggestion by the appellant that Linden J.A. would have denied the taxpayer the benefit of the provisions of the Act "simply because the transaction was motivated solely for tax planning purposes".

It is well established in the jurisprudence of this Court that no "business purpose" is required for a transaction to be considered valid under the *Income Tax Act*, and that a taxpayer is entitled to take advantage of the Act even where a transaction is motivated solely by the minimization of tax: *Stubart Investments Ltd. v. The Queen*, [1984] 1 S.C.R. 536. Moreover, this Court emphasized in *Antosko*, *supra*, at p. 327 that, although various techniques may be employed in interpreting the Act, "such techniques cannot alter the result where the words of the statute are clear and plain and where the legal and practical effect of the transaction is undisputed".

(i) des actes constitutifs de la société;

(ii) d'une convention unanime des actionnaires.

(4) Les documents autres que le registre des actionnaires, les actes constitutifs et les conventions unanimes des actionnaires ne doivent généralement pas être pris en considération à cette fin.

(5) Lorsqu'il existe une restriction du genre visé à l'alinéa 3c), l'actionnaire majoritaire peut tout de même exercer le contrôle *de jure*, à moins qu'il ne dispose d'aucun moyen d'exercer un «contrôle effectif» sur les affaires et les destinées de la société, d'une manière analogue ou équivalente au critère de *Buckerfield's*.

B. *Objet et esprit*

Vu les conclusions qui précèdent, il n'est pas nécessaire d'examiner si la Cour d'appel fédérale a commis une erreur en tenant compte de l'objet et de l'esprit des dispositions de la *Loi de l'impôt sur le revenu*, de l'intention des parties et de la réalité commerciale des opérations, étant donné que les dispositions pertinentes de la Loi sont claires et nettes. Toutefois, j'aimerais commenter la proposition de l'appelante selon laquelle le juge Linden aurait privé le contribuable du bénéfice des dispositions de la Loi [TRADUCTION] «simplement parce que la planification fiscale était la seule raison d'être de l'opération». 86

Il est bien établi, dans la jurisprudence de notre Cour, qu'aucune «fin commerciale» n'est exigée pour qu'une opération soit jugée valide selon la *Loi de l'impôt sur le revenu* et qu'un contribuable peut se prévaloir de la Loi même si l'opération en cause vise seulement à réduire au minimum l'imposition: *Stubart Investments Ltd. c. La Reine*, [1984] 1 R.C.S. 536. En outre, notre Cour a souligné dans l'arrêt *Antosko*, précité, à la p. 327, que, bien que diverses techniques puissent être utilisées pour interpréter la Loi, «ces techniques ne sauraient altérer le résultat lorsque les termes de la Loi sont clairs et nets et que l'effet juridique et pratique de l'opération est incontesté». 87

1998 CanLII 827 (SCC)

88    Although Linden J.A. cites these principles in his reasons, he appears not to have adhered to them in his analysis. At various junctures, he comments broadly about the apparent structuring of transactions, including the one at issue in this appeal, solely for tax purposes, and seems to imply, particularly in his analysis of the *International Iron* and *Buckerfield's* cases, *supra*, that the courts will not permit shareholders to attain tax benefits by means of "contrived" transactions. To the extent that this analytical approach may have affected his ultimate decision, Linden J.A. was, with respect, in error. It was entirely open to the parties to use what Linden J.A. referred to as "technicalities of revenue law" to achieve their desired end: to transfer *de jure* control of Duha No. 2 to Marr's while preventing Marr's from exercising actual or *de facto* control over the business of the corporation. Indeed, this is what they accomplished, and nothing in the "object and spirit" of any of the various provisions can serve to displace this result. That is, while the general purpose of s. 111(5) may be to prevent the transfer of non-capital losses from one corporation to another, the parties successfully excepted themselves from the general rule by bringing the two companies under common control prior to their amalgamation.

## VI. Disposition

89    For these reasons, I would allow the appeal, set aside the judgment of the Federal Court of Appeal, and restore the judgment of the Tax Court of Canada, with costs to the appellant throughout.

*Appeal allowed with costs.*

*Solicitors for the appellant: Aikins, MacAulay & Thorvaldson, Winnipeg.*

*Solicitor for the respondent: George Thomson, Winnipeg.*

Quoique le juge Linden cite ces principes dans ses motifs, il ne semble pas les avoir respectés dans son analyse. À divers moments, il fait des remarques générales sur l'organisation apparente d'opérations, dont celle en cause dans le présent pourvoi, uniquement à des fins fiscales, et semble laisser entendre, en particulier dans son analyse des arrêts *International Iron* et *Buckerfield's*, précités, que les tribunaux ne permettront pas à des actionnaires d'obtenir des avantages fiscaux au moyen d'opérations «arrangées». Dans la mesure où cette méthode analytique peut avoir influé sur la décision qu'il a prise en définitive, le juge Linden a, en toute déférence, commis une erreur. Les parties étaient entièrement libres de se servir de ce que le juge Linden a appelé des «aspects techniques de la législation fiscale» pour réaliser la fin qu'elles recherchaient: transférer le contrôle *de jure* de Duha n° 2 à Marr's tout en empêchant cette dernière d'exercer le contrôle réel ou *de facto* sur l'entreprise de la société. C'est précisément ce qu'elles ont fait et rien dans «l'objet et l'esprit» de l'une ou l'autre des diverses dispositions ne saurait servir à écarter ce résultat. Autrement dit, si le par. 111(5) peut avoir pour objet général d'empêcher le transfert de pertes autres qu'en capital d'une société à une autre, les parties ont réussi à se soustraire à la règle générale en assujettissant les deux sociétés à un contrôle commun avant leur fusion.

## VI. Dispositif

Pour ces raisons, je suis d'avis d'accueillir le pourvoi, d'infirmer l'arrêt de la Cour d'appel fédérale et de rétablir le jugement de la Cour canadienne de l'impôt, avec dépens en faveur de l'appelante dans toutes les cours.

*Pourvoi accueilli avec dépens.*

*Procureurs de l'appelante: Aikins, MacAulay & Thorvaldson, Winnipeg.*

*Procureur de l'intimée: George Thomson, Winnipeg.*

# EXHIBIT 3

# In the Matter of:

*Gentex Corporation vs*

*Galvion LTD., et al.*

---

*Nicholas Shewchenko*

*December 03, 2021*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Gentex Corporation vs
Galvion LTD., et al.

Videotaped

Nicholas Shewchenko
December 03, 2021

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
* * * * * * * * * * * * * * * * * *
                                  *
  GENTEX CORPORATION,             *
                                  *  No. 12-921-MN
          Plaintiff,              *
                                  *
      vs.                         *
                                  *
  GALVION LTD, and GALVION,       *
  INC.,                           *
          Defendants.             *
                                  *
* * * * * * * * * * * * * * * * * *
```

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF NICHOLAS

SHEWCHENKO,

Deposition taken with all parties appearing remotely,

on Friday, December 3, 2021, commencing at 10:09 a.m.

Eastern Time.

Court Reporter:
Pamela J. Carle, LCR, RPR, CRR

```
                                                                2
 1                        APPEARANCES

 2
     For the Plaintiff:
 3
            MORGAN, LEWIS & BOCKIUS LLP
 4          77 West Wacker Drive, Stuite 500
            Chicago, Illinois 60601
 5          By:  Karon Fowler, Esq.
                 312.324.1000
 6               karon.fowler@morganlewis.com

 7
     For the Defendants:
 8
            WOLF GREENFIELD & SACKS, P.C.
 9          600 Atlantic Avenue
            Boston, Massachusetts 02210
10          By:  Jason Balich, Esq.
                 617.720.3500
11               jbalich@wolfgreenfield.com

12

13

14
     Videographer:
15          Couirey Eckmayer

16

17

18

19

20

21

22

23

24

25
```

Gentex Corporation vs               Videotaped                    Nicholas Shewchenko
Galvion LTD., et al.                                               December 03, 2021

3

```
 1                    I N D E X
     WITNESS:        NICHOLAS SHEWCHENKO
 2
     EXAMINATION:                        PAGE
 3   By Mr. Balich                       7/283
     By Ms. Fowler                       260
 4

 5

 6

 7
     EXHIBITS FOR IDENTIFICATION:
 8   SHEWCHENKO      DESCRIPTION               PAGE
```

 9   Exhibit 1     Shewchenko Opening Report        10

10   Exhibit 2     Shewchenko Rebuttal Report       12

11   Exhibit 3     Shewchenko Reply Report          12

12   Exhibit 4     US Patent No. 7,849,517          13

13   Exhibit 5     US Patent No. 7,908,667          13

14   Exhibit 6     US Patent No. 9,717,294          14

15   Exhibit 7     US Design Patent No. D750,846 S  14

16   Exhibit 8     US Design Patent D750,847 S      15

17   Exhibit 9     US Patent No. 10,638,807         16

18   Exhibit 10    Two-page document with           54
                   reproductions
19
     Exhibit 11    One-page document with           58
20                 reproductions

21   Exhibit 12    Two-page document with           63
                   reproductions
22
     Exhibit 13    One-page document with           66
23                 reproductions

24   Exhibit 14    One-page document with           67
                   reproductions
25

Gentex Corporation vs                    Videotaped              Nicholas Shewchenko
Galvion LTD., et al.                                            December 03, 2021

4

1   Exhibit 15     One-page document with           69
                   reproductions
2
    Exhibit 16     One-page document with           70
3                  reproductions

4   Exhibit 17     One-page document with           75
                   reproductions
5
    Exhibit 18     One-page document with           76
6                  reproductions

7   Exhibit 19     One-page document with           77
                   reproductions
8
    Exhibit 20     One-page document with           78
9                  reproductions

10  Exhibit 21     One-page document with           79
                   reproductions
11
    Exhibit 22     One-page document with           80
12                 reproductions and highlights

13  Exhibit 23     One-page document with           86
                   reproductions
14
    Exhibit 24     One-page document with           88
15                 reproductions

16  Exhibit 25     One-page document with           91
                   reproductions
17
    Exhibit 26     Exhibit S of Shewchenko Opening  92
18                 Report

19  Exhibit 27     Bates numbers Revision Military  96
                   00168553 through 556
20
    Exhibit 28     Revision Military 00444769        130
21                 through 784

22  Exhibit 29     Revision Military 1198456         131
                   through 469
23
    Exhibit 30     Seven-page document with helmet   132
24                 views

25

Gentex Corporation vs                  Videotaped                    Nicholas Shewchenko
Galvion LTD., et al.                                                  December 03, 2021

5

| | | | |
|---|---|---|---|
| 1 | Exhibit 31 | Seven-page document with helmet views with rails and Velcro | 139 |
| 2 | | | |
| 3 | Exhibit 32 | Seven-page document with views of Caiman helmet | 142 |
| 4 | Exhibit 33 | Two-page document with views of PDxT helmet | 145 |
| 5 | | | |
| 6 | Exhibit 34 | Two-page document with views of Viper P6N helmet | 147 |
| 7 | Exhibit 35 | Eight images of helmets and mounting systems | 160 |
| 8 | | | |
| 9 | Exhibit 36 | Bates No. Revision Military 0000002 | 195 |
| 10 | Exhibit 37 | Bates No. Revision Military 0000002 with colored markings | 205 |
| 11 | | | |
| 12 | Exhibit 38 | Bates No. Revision Military 0000034-35 | 206 |
| 13 | Exhibit 39 | Drawing of the Viper front mount assembly with overlay | 209 |
| 14 | | | |
| 15 | Exhibit 40 | Bates No. Revision Military 0000053-54 | 214 |
| 16 | Exhibit 41 | Bates No. Revision Military 0000055-57 | 215 |
| 17 | | | |
| 18 | Exhibit 42 | Revision Military 01413843 through 845 | 216 |
| 19 | Exhibit 43 | US Design Patent D447,604S | 219 |
| 20 | Exhibit 44 | Three-page document with reproduction | 220 |
| 21 | | | |
| 22 | Exhibit 45 | Three-page document with reproduction | 221 |
| 23 | Exhibit 46 | Four-page document | 222 |
| 24 | | (Exhibits retained by counsel.) | |
| 25 | | | |

Gentex Corporation vs
Galvion LTD., et al.

Videotaped

Nicholas Shewchenko
December 03, 2021

6

1        THE VIDEOGRAPHER:  We are going on the

2   record on 2021, December 3rd at approximately

3   10:09 a.m. Eastern Standard Time.  This is the

4   video recorded deposition of Nicholas Shewchenko

5   in the matter of Gentex Corporation, plaintiff,

6   versus Galvion, Limited and Galvion, Incorporated,

7   defendants, filed in the United States District

8   Court for the district of Delaware, case

9   No. 19-921-MN.

10        This deposition is being taken

11   remotely.  This witness is appearing remotely from

12   2470 Don Reid Drive, Ottawa, Ontario, K1H1B1,

13   Canada.  My name is Couirey Eckmayer with

14   O'Brien & Levine Court Reporting Solutions, and I

15   am the legal video specialist.  I will be

16   recording the proceedings remotely.

17        The court reporter today is Pam Carle

18   with O'Brien & Levine Court Reporting Solutions,

19   and she will be reporting this proceeding remotely

20   and is a notary public in the Commonwealth of

21   Massachusetts.  Neither of us is physically

22   present with the witness.

23        Will counsel please state their

24   appearances and who they represent for the record

25   and acknowledge that in lieu of an oath

7

1    administered in person, the witness will verbally

2    declare his testimony in this matter under the

3    pains and penalties of perjury, and also that

4    counsel consent to this arrangement and waive any

5    objections to this manner of proceeding, after

6    which our court reporter will swear in the witness

7    and we may begin.

8                    MR. BALICH:  Jason Balich for the

9    defendants Galvion, Limited and Galvion,

10   Incorporated.  Also with me today is Christopher

11   Stalzer.

12                   MS. FOWLER:  Karon Fowler from Morgan

13   Lewis on behalf of plaintiff Gentex, and we

14   consent to the proceeding.

15                   MR. BALICH:  And Galvion consents to

16   the proceeding as well.

17                   NICHOLAS SHEWCHENKO,

18                   having been duly sworn,

19                   was deposed and testified

20                   as follows:

21                   EXAMINATION

22   BY MR. BALICH:

23       Q.    Good morning, Mr. Shewchenko.  If you

24   could state your full name and business address

25   for the record.

54

1              MR. BALICH:  All right, I am marking a

2     document as Exhibit 10.  For the record,

3     Exhibit 10 has two pages, page 1 reproduces

4     figure 1b of the '294 patent on the left and

5     claim 15 of the '294 patent on the right.

6              Page 2 reproduces figure 1b of the '667

7     patent on the left and claim 15 of the '294 patent

8     on the right.

9   (Shewchenko Exhibit 10 was marked for

10  identification.)

11  BY MR. BALICH:

12        Q.    Looking at page 1, does the embodiment

13    shown in figure 1b of the '294 patent on the left

14    fall within the scope of claim 15 of the '294

15    patent?

16              MS. FOWLER:  Objection, form.

17        A.    Yes, it does.

18  BY MR. BALICH:

19        Q.    And you understand that for a person to

20    obtain a utility patent, the claimed invention has

21    to be useful?

22        A.    Yes.

23        Q.    Did the features of claim 15 of the

24    '294 patent describe functional aspects of the

25    design of the rail shown in figure 1b shown in the

Gentex Corporation vs                    Videotaped                    Nicholas Shewchenko
Galvion LTD., et al.                                                   December 03, 2021

                                                                                   55
1      '294 patent?

2              MS. FOWLER:  Objection, form, scope.

3         A.     So my understanding, '294 is a method

4      patent, which in this case claim 15 describes the

5      attachment method, not the functionality.

6   BY MR. BALICH:

7         Q.     So claim 15 is directed to a device, do

8      you see that?

9         A.     Yes.

10        Q.     So does claim 15 describe function

11     aspects of that device?

12        A.     The functional aspects in this case are

13     related to the mounting rail, which describes holes

14     for the function of attachment to the helmet.

15        Q.     So is what claim 15 describes the

16     functional aspects that are depicted in figure 1b

17     of the '294 patent?

18             MS. FOWLER:  Objection, form.

19        A.     Not in its entirety.  The last phrase

20     in claim 5, for example, describes the rail having

21     a retaining groove, and the implication there is

22     there's other functionality not stated specifically

23     in claim 5.  Claim 15, sorry.

24   BY MR. BALICH:

25        Q.     Got it.  That's a very good point.  So

56

1      I'm not suggesting that claim 15 describes all of

2      the functionality shown in figure 1b of the '294

3      patent.  My question is just are the things

4      described by claim 15 of the '294 patent

5      functional aspects of what's depicted in figure

6      1b?

7           A.    Yes.

8           Q.    Okay.

9                 MS. FOWLER:  And, Mr. Balich, I don't

10     know if you have real time, but I've lost my real

11     time feed.

12                MR. BALICH:  Why don't we go off the

13     record.

14                THE VIDEOGRAPHER:  The time is 11:35

15     a.m.  We are off the record.

16                (Discussion off the record.)

17                THE VIDEOGRAPHER:  We are on the record

18     at 11:35 a.m.

19   BY MR. BALICH:

20          Q.    Mr. Shewchenko, a mounting rail capable

21     of including a retaining groove is a functional

22     aspect of the design of the device shown in figure

23     1b of the '294 patent?

24          A.    I'll qualify my answer.  The way it's

25     stated in claim 15, it's describing a geometrical

57

```
 1    feature, but in -- elsewhere the retaining groove
 2    has functional features that are inherent in it as
 3    well.
 4         Q.     A mounting rail configured to attach to
 5    an outer surface of the helmet is a functional
 6    aspect of the design of the device shown in
 7    figure 1b in the '294 patent?
 8         A.     Yes, it is.
 9         Q.     A mounting rail capable of including a
10    plurality of holes configured to align with
11    existing through holes in a helmet for common
12    affixation of the mounting rail and retention
13    straps are functional aspects of the design of the
14    device shown in figure 1b of the '294 patent?
15              MS. FOWLER:  Objection to form and
16    scope.  You may answer.
17         A.     Yes, they are.
18  BY MR. BALICH:
19         Q.     Mounting rail extending horizontally,
20    and then an oblique downward angle along a bend in
21    the bottom edge of the helmet, when attached is a
22    functional aspect of the design of the device
23    shown in 1b of the '294 patent?
24              MS. FOWLER:  Objection, form and scope.
25    You may answer.
```

Gentex Corporation vs
Galvion LTD., et al.

Videotaped

Nicholas Shewchenko
December 03, 2021

58

1          A.     Yes, it is.

2    BY MR. BALICH:

3          Q.     And then looking at page 2 of

4    Exhibit 10, does the embodiment shown in figure 1b

5    of the '667 patent fall within the scope of

6    claim 15 of the '294 patent?

7          A.     Yes, it does.

8          Q.     Does the '667 patent disclose the

9    device claimed by claim 15 of the '294 patent?

10          A.     Sorry, can you repeat?

11          Q.     Sure.  Does the '667 patent disclose

12    the device claimed by claim 15 of the '294 patent?

13          A.     Yes, it does.

14               MR. BALICH:  I'm marking another

15    document as Exhibit 11.  And for the record,

16    Exhibit 11 reproduces figure 2 of the '846 patent

17    on the left and claim 15 of the '294 patent on the

18    right.  And Exhibit 11 only has one page.

19    (Shewchenko Exhibit 11 was marked for

20    identification.)

21    BY MR. BALICH:

22          Q.     Mr. Shewchenko, does the design of the

23    rail claimed by the '846 patent fall within the

24    scope of claim 15 of the '294 patent?

25               MS. FOWLER:  Objection, form and scope.

Gentex Corporation vs                    Videotaped                    Nicholas Shewchenko
Galvion LTD., et al.                                                   December 03, 2021

59

1    You may answer.
2         A.    I, again, wasn't asked to provide an
3    opinion on '846 being a design patent and I'm not
4    sure I have the qualifications to provide design
5    related opinions.
6    BY MR. BALICH:
7         Q.    But you do have the qualifications to
8    opine as to whether something falls within the
9    scope of the utility patent, right?
10              MS. FOWLER:  Objection, form.  You may
11   answer.
12        A.    Yes, I do.
13   BY MR. BALICH:
14        Q.    Okay.  And claim -- sorry.
15        A.    So my understanding, again, I'm not a
16   design patent expert, but it's more in terms of
17   form and aesthetics and shape that's an issue here,
18   not technical matters, per se, and the dashed lines
19   in the utility patent are basically not to be
20   addressed and therefore don't match what you have
21   in terms of technical requirements in the '294.
22   That's my layman's view of it, but not my expert
23   view.
24        Q.    Okay.  Claim 15 of the '294 patent was
25   one of the claims that you looked at as to whether

60

1    Galvion's -- the accused products fell within the

2    scope of that claim, is that right?

3         A.      Correct.

4         Q.      So based on your expertise, is the

5    design shown in figure 2 of the '846 patent, does

6    that fall within the scope of claim 15 of the '294

7    patent?

8              MS. FOWLER:   Objection, form, exceeds

9    scope of the opinion.

10        A.      So my layman's interpretation is that

11   the only lines describing the horizontal and

12   downward oblique portions have some similarities to

13   the figures in figure 2.  The rest of it does not

14   seem to apply.

15  BY MR. BALICH:

16        Q.      Got you.  If you -- for a moment, if

17   you take your understanding of how to interpret

18   figures of design patents and ignore them.  So

19   don't worry about the difference between dashed

20   lines and solid lines, at least for this next

21   question, okay?

22        A.      Okay.

23        Q.      Okay.  So my only question is do the

24   combination of the dashed lines and solid lines

25   shown in figure 2 of the '846 patent, does that

61

1    show a device that falls within the scope of

2    claim 15 of the '294 patent?

3             MS. FOWLER:  Objection, form, scope.

4        A.    Aside from the difference that a design

5    patent is not a utility patent and therefore can't

6    be a correspondence, the shape of the object,

7    dashed and solid lines, appears to be similar to

8    the same figure that was presented in the '294

9    patent.

10            So by virtue of similarities, I would

11   say, yes, it falls within that scope.

12   BY MR. BALICH:

13       Q.    So a mounting rail capable of including

14   a retaining groove is a functional aspect of the

15   design shown in figure 2 of the '846 patent?

16            MS. FOWLER:  Objection, form, exceeds

17   the scope.

18       A.    I'm not comfortable in answering that

19   because, again, we're applying utility patent

20   claims to a design patent.  And I don't feel

21   qualified to comment on that.

22   BY MR. BALICH:

23       Q.    I'm -- to be clear, I'm not asking you

24   anything about the '846 patent in terms of what it

25   claims.  Would you -- I mean -- strike that.

                                                                   62

1                You mentioned just recently that

2      figure 2 of the '846 patent has some similarities

3      with figure 1b of the '294 patent, do you recall

4      that testimony?

5                MS. FOWLER:  Objection,

6      mischaracterizes the testimony.  You may answer.

7           A.    Yes.

8    BY MR. BALICH:

9           Q.    And you've previously testified that a

10     mounting rail capable of including a retaining

11     groove is a functional aspect of figure 1b of the

12     '294 patent, is that right?

13               MS. FOWLER:  Objection, form.

14          A.    Yes.

15   BY MR. BALICH:

16          Q.    So all I'm asking is is a mounting rail

17     capable of including a retaining groove also a

18     functional aspect of the rail shown -- the device

19     shown in figure 2 of the '846 patent?

20               MS. FOWLER:  Objection, form, exceeds

21     the scope of the opinion offered.  You may answer.

22          A.    Again, I don't feel comfortable

23     answering that question, because I don't feel I

24     have the proper knowledge base to assess design

25     patents and what the scope entails.

63

1    BY MR. BALICH:

2        Q.    Just to be clear, I'm really not asking

3    you to provide opinions as to the scope of the

4    design patent.  All I'm asking is whether a

5    mounting rail capable of including a retaining

6    groove is a functional aspect of the device shown

7    in Exhibit 11.

8              MS. FOWLER:  Same objection.

9        A.    All I can say is that the device shown

10   in figure 2, or the '846, again, is similar in

11   depiction to the embodiment in '294.  That's all I

12   can say.

13             MR. BALICH:  I'm marking a document as

14   Exhibit 12.  For the record, Exhibit 12 has two

15   pages, page 1 reproduces figure 5 from the '294

16   patent on the left and claim 15 of the '294 patent

17   on the right.  Page 2 reproduces figure 5 of the

18   '667 patent on the left and claim 15 of the '294

19   patent on the right.

20   (Shewchenko Exhibit 12 was marked for

21   identification.)

22   BY MR. BALICH:

23       Q.    Taking a look at page 1 of Exhibit 12,

24   does the embodiment shown in figure 5 of the '294

25   patent fall within the scope of claim 15 of the

64

```
 1      '294 patent?

 2          A.     Yes.

 3          Q.     And a mounting rail capable of

 4      including a retaining groove is a functional

 5      aspect of the design of the device shown in

 6      figure 5 of the '294 patent?

 7              MS. FOWLER:  Objection, form and scope.

 8      You may answer.

 9          A.     I believe it does, yes.

10  BY MR. BALICH:

11          Q.     A mounting rail configured to attach to

12      an outer surface of a helmet is a functional

13      aspect of the design of the device shown in

14      figure 5 of the '294 patent?

15              MS. FOWLER:  Objection, form and scope.

16          A.     Yes.

17  BY MR. BALICH:

18          Q.     A mounting rail capable of including a

19      plurality of holes configured to align with

20      existing through holes in a helmet for common

21      affixation of the mounting rail and the retention

22      straps are functional aspects of the design of the

23      device shown in figure 5 of the '294 patent?

24              MS. FOWLER:  Same objection.

25          A.     Yes, there are functional aspects.
```

65

```
 1     Figure 5 does not show retention straps, however.
 2   BY MR. BALICH:
 3          Q.     A mounting rail extending horizontally
 4     and then at an oblique downward angle along the
 5     bend in the bottom edge of the helmet when
 6     attached is a functional aspect of the design of
 7     the device shown in figure 5 of the '294 patent?
 8                 MS. FOWLER:  Same objection.
 9          A.     Yes.
10   BY MR. BALICH:
11          Q.     And I'm looking at page 2 of
12     Exhibit 12.  Does the embodiment shown in figure 5
13     of the '667 patent fall within the scope of
14     claim 15 of the '294 patent?
15                 MS. FOWLER:  Same objection.
16          A.     Yes.
17   BY MR. BALICH:
18          Q.     The '667 patent discloses the device
19     claimed by claim 15 of the '294 patent, right?
20                 MS. FOWLER:  Objection, form.
21          A.     Can you repeat, please?
22   BY MR. BALICH:
23          Q.     Sure.  The '667 patent discloses the
24     device claimed by claim 15 of the '294 patent?
25                 MS. FOWLER:  Objection, form.
```

Gentex Corporation vs                    Videotaped                    Nicholas Shewchenko
Galvion LTD., et al.                                                    December 03, 2021

66

1          A.      Yes.

2                  MR. BALICH:  I'm marking a document as

3      Exhibit 13.  It has one page, and it reproduces

4      figure 2 of the '847 patent on the left and

5      claim 15 of the '294 patent on the right.

6  (Shewchenko Exhibit 13 was marked for

7  identification.)

8  BY MR. BALICH:

9          Q.      Would you agree that the device shown

10     in figure 2 of the '847 patent is similar to the

11     device shown in figure 5 of the '294 patent?

12                 MS. FOWLER:  Objection, form, and

13     exceeds the scope of the opinion offered.  You may

14     answer.

15         A.      So, again, I wasn't asked to opine on

16     design patents, and in particular the '847.  And

17     again, I'll limit my comment to similarities in

18     what is being depicted in this embodiment between

19     one figure and the other, and, yes, they look

20     similar to each other.

21  BY MR. BALICH:

22         Q.      And taking the solid lines and the

23     dashed lines together, does the device shown in

24     figure 2 of the '847 patent fall within the scope

25     of claim 15 of the '294 patent?

67

1              MS. FOWLER:  Objection, form and

2     exceeds the scope.  You may answer.

3          A.      With the same limitations as before,

4     yes, they would.

5              MR. BALICH:  I'm marking a document as

6     Exhibit 14.  For the record, Exhibit 14 has one

7     page.  It reproduces figure 1b of the '517 patent

8     on the left and claims 1 and 2 of the '517 patent

9     on the right.

10    (Shewchenko Exhibit 14 was marked for

11    identification.)

12    BY MR. BALICH:

13         Q.      Does the embodiment shown in figure 1b

14    of the '517 patent fall within the scope of claim

15    2 of the '517 patent?

16         A.      Yes, it does.

17         Q.      And just to be clear, when -- you

18    understand claim 2 is a dependent claim, right?

19         A.      Yes, it depends on claim 1.

20         Q.      And so that means that claim 2 has all

21    the requirements of claim 1, plus the added

22    requirements in claim 2?

23         A.      Correct.

24         Q.      Do the features of claim 2 of the '517

25    patent describe functional aspects of the design

Gentex Corporation vs                    Videotaped                 Nicholas Shewchenko
Galvion LTD., et al.                                                December 03, 2021

68

 1      of the mounting facility shown in figure 1b of the
 2      '517 patent?
 3                  MS. FOWLER:  Objection, form and scope.
 4           A.     Do you mind repeating?
 5   BY MR. BALICH:
 6           Q.     Sure.  Do the features of claim 2 of
 7      the '517 patent describe functional aspects of the
 8      design of the mounting facility shown in figure 1b
 9      of the '517 patent?
10                  MS. FOWLER:  Same objection.
11           A.     The claimed -- sorry, claim 2 does
12      describe what is depicted in figure 1b, and further
13      details are obviously provided in the specification
14      to further elaborate on that.  And the reason I say
15      that, figure 1b does not depict, for example, the
16      inner surface of the rail system, so I can't say
17      with certainty from the figure alone whether it
18      satisfies 2, but 2 does describe the figure.  If
19      that makes any sense, I hope.
20   BY MR. BALICH:
21           Q.     Got you.  I appreciate that.  I'm
22      trying to ask something a little bit different,
23      and that is does claim 2 of the '517 patent
24      describe functional aspects of the mounting
25      facility that's depicted in figure 1b of the '517

69

```
 1    patent?
 2              MS. FOWLER:  Objection, form, scope.
 3        A.      Yes, claim 2 describes an inner surface
 4    having a contour conforming -- conforming to the
 5    helmet, which I consider to be a functional aspect.
 6              MR. BALICH:  I'm marking a document as
 7    Exhibit 15.  And for the record, Exhibit 15
 8    reproduces figure 2 of the '846 patent on the left
 9    and claims 1 and 2 of the '517 patent on the
10    right.
11    (Shewchenko Exhibit 15 was marked for
12    identification.)
13    BY MR. BALICH:
14        Q.      Taking the solid lines and the dashed
15    lines of figure 2 of the '846 patent together,
16    does figure 2 show a mounting facility similar to
17    figure 1b of the '517 patent?
18              MS. FOWLER:  Objection, form, exceeds
19    the scope of the opinion offered.
20        A.      So with my previous limitations in
21    regard to design patents, the form of what is shown
22    on '846 is covered by what is in claims 1 and 2.
23              MR. BALICH:  I'm marking another
24    document as Exhibit 16.  Exhibit 16 has one page.
25    It reproduces figure 5 of the '517 patent on the
```

70

1    left and claims 1 and 2 of the '517 patent on the

2    right.

3    (Shewchenko Exhibit 16 was marked for

4    identification.)

5    BY MR. BALICH:

6         Q.     Does the embodiment shown in figure 5

7    of the '517 patent fall within the scope of

8    claim 2 of the '517 patent?

9         A.     Yes, it does.

10        Q.     And a mounting facility for a helmet

11   where the mounting facility has a contour

12   conforming to the helmet, is that a functional

13   aspect of the design shown in figure 5?

14             MS. FOWLER:  Objection, form, scope.

15        A.     So conforming to the inner surface is a

16   functional aspect, yes, which may be implied in the

17   figure 5.  But, again, my conditions on certainty,

18   because the inner surface is not shown.

19   BY MR. BALICH:

20        Q.     So you would need to see the inner

21   surface of the mounting facility in order to

22   evaluate whether it has a surface conforming to

23   the helmet?

24        A.     That is one bit of information, but the

25   other one obviously is the specification of the

71

1    '517 patent describes it in greater detail.  So the

2    scope is better known from the specification and

3    the claims together.

4          Q.     Got you.  And I think you testified

5    that figure 5 indicates a contour conforming to

6    the helmet, but if you just had figure 5 and you

7    didn't have the specification, would you be able

8    to tell for certain as to whether the mounting

9    facility shown in figure 5 has a contour

10   conforming to the helmet?

11         A.     Not with absolute certainty.  There are

12   key visual elements that imply -- that follows the

13   contours of the helmet, but patent drawings are

14   always simplified versions, and I would need to see

15   other vantage points.

16         Q.     Fair enough.  Just looking at figure 5,

17   what level of certainty would you have that it had

18   a contour conforming to the helmet?  Like under 50

19   percent, over 50 percent?  And I don't want to put

20   words in your mouth, but I'll let you describe the

21   level of certainty that it has a contour

22   conforming to the helmet.

23               MS. FOWLER:  Objection, form.

24         A.     So based on figure 5, there are a few

25   assumptions that are -- would help me make that

72

1    determination.  The location of the retention

2    fasteners, for example, would be in line with the

3    shell itself and the rail seems to taper down to

4    those attachment points, so therefore I would say

5    it's in contact in those regions.

6              There is also indication of the lower

7    edge of the rail being above the helmet bulge

8    indicated by the horizontal and oblique downward

9    line above No. 56 that you see there, and because

10   it conforms around there, there's some indication

11   that, again, it's trying to follow the contours of

12   the shell.

13             Whether there's gaps behind there, I

14   cannot say for certainty without seeing other

15   views.

16   BY MR. BALICH:

17       Q.    And in terms of evaluating whether

18   mounting facility has a contour conforming to the

19   shell, would a person of ordinary skill understand

20   that as requiring the entire surface conforming to

21   the helmet, or would just a part of the surface

22   conforming to the helmet be enough?

23             MS. FOWLER:  Objection, form.

24       A.    So if I take the description in the

25   specification into account, part of the functional

73

1     aspects of conforming to the helmet shell is to

2     provide securement and stability of the rail once

3     placed on the helmet.

4               As an engineer, to obtain that

5     stability you have to have a minimum of three

6     contact points along the curved surface,

7     preferably more, the specification talks more of a

8     surface-to-surface contour.

9               Realistically there will always be gaps

10    or ribs or separation along the rail at various

11    parts.  Rails typically are not molded solid,

12    they're injection molded with, you know, plastic

13    housings and thin walls.

14  BY MR. BALICH:

15       Q.    Let's presume that the mounting

16    facility shown in figure 5 was an injected --

17    injection molded piece of plastic, and only the

18    outer perimeter of the mounting facility was in

19    contact with the helmet shell.

20               Would that meet the requirement of

21    claim 2 of having an inner surface conforming to

22    the helmet shell?

23               MS. FOWLER:  Objection, form.

24       A.    I can't say with great certainty, but

25    there's -- more likely if you had full contact

74

1    front to back, top to bottom, as well as

2    potentially some inner surface to provide support,

3    then I would say it meets that requirement.

4  BY MR. BALICH:

5        Q.     Okay.  Well, what if it didn't have any

6    inner surface -- strike that.

7               I mean, you know, with plastic parts,

8    like, you can have just the edge have a surface

9    that conforms to the helmet shell, but like it

10   could be hollow on the inside.  I know that's not

11   a very good technical description, but if

12   figure -- the mounting facility of figure 5 was

13   constructed in such a way that it was just the

14   shell of what's seen in figure 5 is solid, most of

15   what's underneath that mounting facility is

16   hollow, but the edge does conform to the helmet

17   shell, would that meet the requirements of

18   claim 2?

19       A.     Claim 2 and the specifications are

20   fairly broad, obviously, not to limit those claims

21   to any specific reproduction, if you'd like, of the

22   mounting system or manufacturing methods.

23              Again, the specifications in my mind

24   when I read it, the intent there for conformity is

25   to provide security of the rail to the helmet, as

Gentex Corporation vs                  Videotaped              Nicholas Shewchenko
Galvion LTD., et al.                                           December 03, 2021

75

1      well as low profile, and whether this is done along

2      all the edges, part of the edge, underneath, it's

3      not stated in the patent, and it would encompass

4      all those variations as long as the functional

5      aspects are met.

6              Q.      Thanks.

7                      MR. BALICH:  I'm marking a document as

8      Exhibit 17.  Exhibit 17 has one page.  It

9      reproduces figure 2 of the '847 patent on the left

10     and claims 1 and 2 of the '517 patent on the

11     right.

12     (Shewchenko Exhibit 17 was marked for

13     identification.)

14     BY MR. BALICH:

15             Q.      Taking the solid lines and the dashed

16     lines of figure 2 together, does that show a

17     mounting facility that falls within the scope of

18     claim 2 of the '517 patent?

19                     MS. FOWLER:  Objection, form, exceeds

20     the scope of the opinion offered.  You may answer.

21             A.      So, again, with my limitations in

22     regards to opining on design patents, the figure

23     has similarities to the prior one in '517 I believe

24     you just showed me, and therefore I would draw the

25     same observations.

76

1    BY MR. BALICH:

2         Q.     Meaning that the mounting facility in

3    figure 2 falls within the scope of claim 2 of the

4    '517 patent, is that right?

5              MS. FOWLER:  Objection, form, exceeds

6    the scope of the opinion offered.  You may answer.

7         A.     Yes.

8    BY MR. BALICH:

9         Q.     And a mounting facility having a

10   contour conforming to the helmet is a functional

11   aspect of the design shown in figure 2 in

12   Exhibit 17, is that right?

13             MS. FOWLER:  Objection, form, and

14   exceeds the scope of the opinion offered.  You may

15   answer.

16        A.     Yes.

17             MR. BALICH:  Now I'm marking a document

18   as Exhibit 18.  Exhibit 18 has one page.  It

19   reproduces figure 1b of the '667 patent on the

20   left and claim 1 of the '667 patent on the right.

21   (Shewchenko Exhibit 18 was marked for

22   identification.)

23   BY MR. BALICH:

24        Q.     Does the embodiment shown in figure 1b

25   of the '667 patent fall within the scope of

77

1     claim 1 of the '667 patent?

2          A.     Yes.

3          Q.     And the features of claim 1 of the '667

4     patent describe functional aspects of the design

5     of the rail shown in figure 1b of the '667 patent?

6               MS. FOWLER:  Objection, form, scope.

7          A.     Yes, they do.

8   BY MR. BALICH:

9          Q.     So a fixture configured for attachment

10    to a helmet above a bulge when worn is a

11    functional aspect of the mounting facility shown

12    in figure 1b of the '667 patent?

13         A.     Yes.

14              MR. BALICH:  I'm marking a document as

15    Exhibit 19.  And for the record, Exhibit 19 has

16    one page.  It reproduces figure 2 of the '846

17    patent on the left and claim 1 of the '667 patent

18    on the right.

19   (Shewchenko Exhibit 19 was marked for

20   identification.)

21   BY MR. BALICH:

22         Q.     Taking the dashed lines and the solid

23    lines together, does the device shown in figure 2

24    of the '846 patent fall within the scope of

25    claim 1 of the '667 patent?

78

1           MS. FOWLER:  Objection, form, exceeds

2     the scope of the opinion offered.

3           A.      So with my usual limitations on design

4     patents and opining, yes, the figures have

5     similarities again to the prior one which is

6     encompassed by what is shown in claim 1.

7           MR. BALICH:  I'm marking a document as

8     Exhibit 20.  Exhibit 20 has one page, and for the

9     record, Exhibit 20 reproduces figure 5 of the '667

10    patent on the left and claim 1 of the '667 patent

11    on the right.

12    (Shewchenko Exhibit 20 was marked for

13    identification.)

14    BY MR. BALICH:

15          Q.      Does the embodiment shown in figure 5

16    of the '667 patent fall within the scope of claim

17    1 of the '667 patent?

18          A.      Yes, it does.

19          Q.      And a fixture configured for the

20    attachment to a helmet shell above a bulge when

21    worn is a functional aspect of the mounting

22    facility shown in figure 5 of the '667 patent?

23          MS. FOWLER:  Objection, form.  You may

24    answer.

25          A.      Yes, it is, for helmets that have a

79

1    bulge, obviously.

2                 MR. BALICH:  I'm marking a document as

3    Exhibit 21.  21 has one page.  It reproduces

4    figure 2 of the '847 patent on the left and

5    claim 1 of the '667 patent on the right.

6    (Shewchenko Exhibit 21 was marked for

7    identification.)

8    BY MR. BALICH:

9         Q.     If you take both of solid lines and the

10   dashed lines of figure 2 together, does that show

11   a mounting facility that falls within the scope of

12   claim 1 of the '667 patent?

13                MS. FOWLER:  Objection, exceeds the

14   scope of the opinion offered, also objection as to

15   form.  You may answer.

16        A.     So with my usual limitations on design

17   patents and opining, figure 2 depicted here is

18   embodied in claim 1.

19                MR. BALICH:  I'm marking a document as

20   Exhibit 22.  For the record, Exhibit 22 has one

21   page.  It reproduces figure 5 of the '667 patent

22   on the left, and an excerpt of the specification

23   from the '667 patent, column 4, line 50, to

24   column 5, line 6, on the right, with highlighting

25   that I added.

80

1   (Shewchenko Exhibit 22 was marked for

2   identification.)

3   BY MR. BALICH:

4        Q.     Does the text that I've highlighted in

5   Exhibit 22 describe figure 5 of the '667 patent?

6        A.     The text describes certain elements of

7   figure 5, yes.

8        Q.     I made a mistake.  So this is -- the

9   text that I've reproduced is one paragraph from

10  the '667 patent, right?

11       A.     Yes, from the specification.

12       Q.     And the entire paragraph describes

13  figure 5 of the '667 patent, is that right?

14       A.     Yes, it is.

15       Q.     So the first highlighted portions

16  states, In this embodiment, the mounting rail 55

17  on the left side of the helmet, shown, is extended

18  forward by a front connecting element, 94, which

19  joins with the mounting rail 55 on the right side

20  of the helmet, not shown.  The entire mounting

21  rail thus encircles three-quarters of the helmet

22  shell 51, and that sentence continues.  Did I read

23  that correctly?

24       A.     Yes, you did.

25       Q.     Does that first highlighted portion

Gentex Corporation vs                    Videotaped                  Nicholas Shewchenko
Galvion LTD., et al.                                                  December 03, 2021

81

1      describe functional aspects of the design of the

2      mounting facility shown in figure 5 of the '667

3      patent?

4                  MS. FOWLER:  Objection, form, exceeds

5      the scope of the opinion offered.

6         A.      The functional aspect here is the

7      connecting element between the various mounts.  The

8      description of encompassing three-quarters of the

9      helmet shell, I don't believe is a functional

10     aspect, per se, other than necessity for it to be

11     secured, which is described later on.

12  BY MR. BALICH:

13        Q.      Would a mounting facility that

14     encircles three-quarters of the helmet shell,

15     could that provide stability in comparison to a

16     mounting facility that encircled less than

17     three-quarters of the helmet shell?

18                 MS. FOWLER:  Objection, form.

19        A.      That depends on how that mounting

20     facility interfaces with the helmet and where the

21     fastening points are and how many fastening points

22     there are.

23                 The fasteners are just one means of

24     securement.  The other ones are, you know,

25     geometrical interface or interference, if you'd

82

 1    like, which provides another form of securement or

 2    retention.

 3   BY MR. BALICH:

 4        Q.      So it's possible that encircling

 5    three-quarters of the helmet shell could provide

 6    additional stability --

 7              MS. FOWLER:  Objection.

 8   BY MR. BALICH:

 9        Q.      -- depending on the other design

10    aspects?

11              MS. FOWLER:  Objection, form.

12        A.      I would not make that generalized

13    statement, no.

14   BY MR. BALICH:

15        Q.      Taking a look at the second highlighted

16    portion, it states, An attachment surface 99 on

17    the front connecting element 94 accepts

18    accessories such as PVS-14 night vision goggles to

19    the front of the helmet.  Did I read that

20    correctly?

21        A.      Yes.

22        Q.      Does that second highlighted portion

23    describe a functional aspect of the design of the

24    mounting facility shown in figure 5 of the '667

25    patent?

83

 1              MS. FOWLER:  Objection, form.  Exceeds

 2     the scope of the opinion offered.

 3         A.     It's describing a connecting element to

 4     the shroud, but it's limited to the front shroud

 5     component which I have not opined on previously.

 6  BY MR. BALICH:

 7         Q.     Okay.  Is a front connecting element

 8     that accepts a night vision goggle a functional

 9     aspect of the design shown in figure 5 of the '667

10     patent?

11              MS. FOWLER:  Objection, form, scope.

12         A.     My layman's opinion, again, is having a

13     receptacle for a night vision goggle would be a

14     functional aspect to that design.

15  BY MR. BALICH:

16         Q.     So a mounting facility for a helmet

17     having left and right mounting rails that extend

18     forward to a connecting element that has an

19     attachment surface to accept accessories such as

20     night vision goggles are functional aspects of the

21     mounting facility shown in figure 5 of the '667

22     patent?

23              MS. FOWLER:  Objection, form, and it

24     exceeds the scope of the opinion offered.  You may

25     answer.

84

 1          A.      So the way I would phrase that is that

 2     the connecting element is basically a means of

 3     integrating the front shroud with the side rail

 4     portions.  It could be there just as a matter of

 5     convenience because there are other methods to

 6     connect front shrouds independent of the side rail.

 7     BY MR. BALICH:

 8          Q.      Do you disagree that a mounting

 9     facility having left and right mounting rails that

10     extend forward to a front connecting element and

11     has a surface to accept accessories such as night

12     vision goggles is a functional aspect of the

13     mounting facility shown in figure 5 of the '667

14     patent?

15               MS. FOWLER:  Objection, form.

16          A.      I would say it's more a feature, not

17     necessarily a functional aspect.  The feature is

18     the integration component.  The functional aspects

19     are how each portion functions on its own.

20     BY MR. BALICH:

21          Q.      And the integration component having a

22     surface to accept night vision goggles provides

23     functionality to that connecting element, is that

24     right?

25               MS. FOWLER:  Objection, form, scope.

85

1          A.      No, the way I'd phrase it is that the

2     front shroud provides one element of functionality,

3     the side portions provide another aspect of

4     functionality.  The connecting component, No. 94 in

5     this particular case, is a means of integrating

6     those mounts and providing a convenience feature, I

7     would say, more than a functional aspect from a

8     performance standpoint.

9   BY MR. BALICH:

10         Q.      Why would someone want a mounting

11    facility that has that connecting element 94 over

12    an identical mounting facility that lacked that

13    connecting element 94?

14              MS. FOWLER:  Objection, form.

15         A.      There could be a number of different

16    reasons.  One could be a matter of convenience, as

17    I said, there could be separate parts that you have

18    to mount to the helmet versus one part that is

19    easier to locate and bolt in place, that is

20    certainly an advantage.

21              The other aspect could be 94 could

22    serve other functions, whether it's perhaps

23    interface with adviser components, cabling,

24    attachment points for covers, any number of

25    potential added features.

86

1    BY MR. BALICH:

2          Q.     So you mentioned the easier attachment

3    because it's one piece?

4          A.     Yes.  Sorry, continue.

5          Q.     I mean, in some sense providing an

6    easier attachment does provide functionality,

7    right, because then you don't have to attach three

8    different parts?

9                MS. FOWLER:  Objection, form.

10         A.     So that is -- you know, if you go back

11   to the '807, the motivation for the connectivity

12   and coupling of components is basically to

13   facilitate the attachment of these mounting

14   facilities to helmets by any number of means and

15   what you depict here in figure 5 is just perhaps an

16   example of one of those means.

17               MR. BALICH:  I'm marking a document

18   as 23, which has one page.  It reproduces figure 2

19   of the '847 patent on the left and the same text

20   from the '667 patent on the right that we just saw

21   in Exhibit 22.

22   (Shewchenko Exhibit 23 was marked for

23   identification.)

24   BY MR. BALICH:

25         Q.     Taking the solid lines and the dashed

87

```
 1    lines of figure 2 together, does the highlighted
 2    portion describe functional aspects of the design
 3    shown in figure 2?
 4                  MS. FOWLER:  Objection, scope --
 5    exceeds the scope.  Form.
 6         A.    So, again, the claims as they were
 7    applied to the previous figure in the patent would
 8    certainly apply, what we see here in the design
 9    patent.  Again, we're making assumptions on
10    functionality from a form patent that only
11    describes aesthetics, not function.
12                  So with those qualifications, because
13    there are similarities between figure 2 and the
14    previous figure, one could draw a very loose
15    relationship between that and the claims that are
16    being presented.
17  BY MR. BALICH:
18         Q.    So a front mount that accepts a night
19    vision goggle as shown in figure 2 is a functional
20    aspect?
21                  MS. FOWLER:  Objection, form.
22         A.    So I believe figure 2 in the design
23    patents, again, is more the aesthetics, not the
24    functionality of that front shroud mount.  But the
25    same or similar figure in '667 would depict the
```

88

1       functional aspect of the shroud mount.

2                    MR. BALICH:   I'm marking a document as

3       Exhibit 24, which has one page.   It reproduces the

4       figure 2 of '846 patent on the left and figure 1b

5       of the '667 patent on the right.

6     (Shewchenko Exhibit 24 was marked for

7     identification.)

8     BY MR. BALICH:

9          Q.     In your opinion, does the '667 patent

10      disclose the design shown in figure 2 of the '846

11      patent?

12                   MS. FOWLER:   Objection, exceeds the

13      scope of the opinion offered.

14                   MR. BALICH:   Hold on, actually, I

15      strike that.   I want to strike that last question,

16      because maybe I don't understand your opinions.

17    BY MR. BALICH:

18         Q.     Is one of your opinions that the '667

19      patent provides written description support for

20      the '846 patent?

21                   MS. FOWLER:   Objection, exceeds the

22      scope of the opinion offered.

23         A.     No, I don't imply that.   All we're

24      doing is comparing images from the design patent,

25      and you're asking about relating -- relating that

89

1     to functional aspects described in the utility

2     patent, and the embodiment in figure 1b again is

3     just that, it's one embodiment of what is in the

4     claims in the '667, and that should not be limiting

5     in terms of what is being depicted in '846

6     necessarily in relation to those claims.

7              So it's just that in my mind it's --

8     the claim should always override the comparisons,

9     not carry it through different embodiments.

10    BY MR. BALICH:

11    Q.    Got you.  And I realize that I'm

12    confusing my experts.

13              MS. FOWLER:  You're fine.

14              MR. BALICH:  It all gets muddled up in

15    there.

16              MS. FOWLER:  I hear you.

17              MR. BALICH:  My fault.

18    BY MR. BALICH:

19    Q.    Would you agree that taking the solid

20    lines and the dashed lines of figure 2 together,

21    the two mounting facilities of figure 2 of the

22    '846 patent and figure 1b of the '667 patent are

23    similar?

24              MS. FOWLER:  Objection, form and scope.

25    Go ahead.

Gentex Corporation vs                  Videotaped                 Nicholas Shewchenko
Galvion LTD., et al.                                              December 03, 2021

90

1         A.      The figures look similar, yes.

2    BY MR. BALICH:

3         Q.      Would you dispute that the design

4    claimed by the '847 patent is at least an

5    improvement or addition or modification to the

6    subject matter disclosed by the '667 patent?

7                 MS. FOWLER:  Objection, exceeds the

8    scope.

9         A.      Can you be more specific in terms of

10   which features?  When you say better, there's many

11   avenues as to what's better, what's worse, so it's

12   an open-ended question.

13   BY MR. BALICH:

14        Q.      Sure, sure.  I guess let me ask it this

15   way.  Other than the fact that figure 1b of the

16   '667 patent has a number of annotations with

17   reference numbers and retention straps, is the

18   design of the rail shown in figure 1b the same as

19   the design of the rail shown in figure 2 of the

20   '846 patent?

21                MS. FOWLER:  Objection, form, and

22   exceeds the scope of the opinion offered.  You may

23   answer it.

24        A.      I'll answer as before in that the

25   figures are similar, yes.

Gentex Corporation vs                     Videotaped                   Nicholas Shewchenko
Galvion LTD., et al.                                                   December 03, 2021

91

1  BY MR. BALICH:

2       Q.     But not necessarily the same, is that

3  right?

4              MS. FOWLER:  Same objection.

5       A.     Again, you have to qualify what you

6  mean by same, are we talking aesthetics, function,

7  et cetera?

8              MR. BALICH:  I'm marking a document as

9  Exhibit 25.  25 has one page.  It reproduces

10 figure 2 of the '847 patent on the left and

11 figure 5 of the '667 patent on the right.

12 (Shewchenko Exhibit 25 was marked for

13 identification.)

14 BY MR. BALICH:

15      Q.     Would you agree that the device shown

16 in figure 5 of the '667 patent is similar to the

17 device shown in figure 2 of the '847 patent?

18             MS. FOWLER:  Objection, form, exceeds

19 the scope of the opinion offered.

20      A.     So, again, same limitations, the

21 figures do have similarities between the two.  As

22 mentioned earlier, '667 doesn't depict the

23 retention straps, however, but that's not the

24 component that you're pointing to.

25             Part 107 as well as depicted in '667 is

92

```
 1    not implied, I guess, in '847.  Otherwise front
 2    shroud and side mount components appear to be
 3    similar -- similarly depicted.
 4              MR. BALICH:  Okay, this would be
 5    another good place to stop, so let's go off the
 6    record.
 7              MS. FOWLER:  Sure.
 8              THE VIDEOGRAPHER:  The time is
 9    12:32 p.m.  We are off the record.
10              (Recess taken.)
11              THE VIDEOGRAPHER:  We are on the record
12    at 1:03 p.m.
13  BY MR. BALICH:
14        Q.    Welcome back, Mr. Shewchenko.  During
15    the lunch break did you speak with Ms. Fowler
16    about anything relating to your deposition?
17        A.    No, I did not.
18              MR. BALICH:  I'm marking a document as
19    Exhibit 26.
20  (Shewchenko Exhibit 26 was marked for
21  identification.)
22  BY MR. BALICH:
23        Q.    Do you recognize Exhibit 26 as a copy
24    of Exhibit S of your opening report?
25        A.    Sorry, it's taking time to load up
```

Gentex Corporation vs                    Videotaped                  Nicholas Shewchenko
Galvion LTD., et al.                                                 December 03, 2021

104

 1         Q.      The helmet pictured on page 4 of
 2    Exhibit 26 has a system for attaching accessories,
 3    is that right?
 4         A.      Sorry, which image are you looking at?
 5         Q.      Page 4 of Exhibit 26.
 6         A.      Oh, okay.  I heard page 26, I'm sorry.
 7         Q.      I'm sorry.  I might have misspoke.  The
 8    helmet pictured on page 4 of Exhibit 26 has a
 9    system for attaching accessories, is that correct?
10         A.      Yes, it does.
11         Q.      And what are the accessories pictured
12    on page 4?
13         A.      So if we start at the front there's
14    night vision goggles mounted to the front shroud.
15    On the right side I see a light torch on the upper
16    horizontal rail, and a com system attached to the
17    lower vertical portion of the rail on the right
18    side.
19              And attached with Velcro there's a flag
20    on the right side, there's a beacon on the crown,
21    and a light torch on the rear of the helmet, which
22    looks like it's attached by Velcro as well.
23         Q.      And I think you might have already told
24    me this, but just to be sure, the night vision
25    goggle is attached to the front mount?

Gentex Corporation vs                    Videotaped                    Nicholas Shewchenko
Galvion LTD., et al.                                                   December 03, 2021

112

1    attached to the helmet through the front mount?

2         A.     Correct.

3         Q.     So the front mount is used to attach an

4    accessory to the helmet, right?

5         A.     It's used to attach one accessory, yes.

6         Q.     So the front mount is part of the

7    system for attaching accessories to the Caiman

8    helmet, right?

9              MS. FOWLER:  Objection, form.

10        A.     The way I look at it is the helmet is a

11   mounting platform upon which you can have several

12   different mounts.  If you offer a different

13   combination of mounts, you call it a system 1 or

14   system 2, then that's up to the manufacturer, but

15   it's a collection of components as far as a

16   functionality standpoint goes.

17   BY MR. BALICH:

18        Q.     Okay.  Well, presume for a moment that

19   Galvion called its system for attaching

20   accessories the side rail, the front mount and the

21   Velcro.  Would that be a reasonable description of

22   those components of the side rails, the front

23   mount and the Velcro?

24             MS. FOWLER:  Objection, form, scope,

25   foundation.

Gentex Corporation vs                   Videotaped                  Nicholas Shewchenko
Galvion LTD., et al.                                                December 03, 2021

113

 1         A.      That could be one example of a system,

 2    yes.

 3    BY MR. BALICH:

 4         Q.      Okay.  And the side rails are fixed to

 5    the side of the helmet, right?

 6              MS. FOWLER:  Objection, form.  You may

 7    answer.

 8         A.      So the Caiman helmet rails are bolted

 9    through the front and rear retention bolts, yes.

10    BY MR. BALICH:

11         Q.      And are they fixed to the sides of the

12    Caiman helmet?

13         A.      Yes.

14         Q.      And the front mount is fixed to the

15    front of the helmet, right?

16         A.      Correct.

17         Q.      And some of the Velcro is applied to

18    the back of the helmet, right?

19         A.      As well as to the crown and sides of

20    the helmet, yes.

21         Q.      If you could use that blue box on the

22    bottom and go to page 13 of Exhibit 26.  Does the

23    image on page 13 show a helmet system?

24         A.      It shows a helmet with different

25    accessories mounted to it, if you're referring to

181

```
 1   BY MR. BALICH:
 2        Q.    Okay, that's fair enough.  Would you
 3   agree that the Viper interlocking side rails have
 4   a second track in the rear portion of the rail --
 5   strike that.  I've got a different question.
 6              So based on your experience in
 7   designing helmets, is the design of the Viper
 8   interlocking side rails dissimilar from the rail
 9   design in box 1?
10              MS. FOWLER:  Objection, form, scope,
11   foundation.
12        A.    The word dissimilar again has come up.
13   If we put aside the aesthetic similarities and talk
14   about functional similarities, then the two are
15   similar for the side rail component.
16   BY MR. BALICH:
17        Q.    Okay.  Based on your experience with
18   helmet design, if you put aside the functional
19   aspects and only look at the aesthetic aspects,
20   are the aesthetics of the rail system in box 6
21   dissimilar from the aesthetics of the rails in
22   box 1?
23              MS. FOWLER:  Objection, form, scope,
24   foundation.
25        A.    Well, aesthetically box 6 obviously has
```

182

```
 1      a front mount for night vision as well as a

 2      connector element to the side rail, which box 1

 3      does not have.  So they are obviously dissimilar.

 4   BY MR. BALICH:

 5          Q.     Do you recognize the helmet system

 6      shown in box 7?

 7          A.     I would -- it seems like a full cut

 8      Caiman helmet, but the rail system on it is more

 9      the Viper skeletonized rail shape.

10          Q.     That's pretty good.

11                 So for the record, the image in box 7

12      is indeed a Viper P6N helmet system and it comes

13      from Revision Military 00139997 at 998.

14                 So I want to ask about the system that

15      the Viper P6N helmet uses to attach accessories.

16      That system for attaching accessories includes

17      side rails, bungee cord, front mount and Velcro;

18      is that right?

19          A.     I can't establish if box 7 has Velcro

20      or not.

21          Q.     Okay, but it's got the other things,

22      it's got the side rails, the bungee cord and the

23      front mount?

24          A.     Yes, in addition to having the

25      appliques in place.
```

Gentex Corporation vs                    Videotaped                   Nicholas Shewchenko
Galvion LTD., et al.                                                     December 03, 2021

193

 1      helmet; is that right?
 2              MS. FOWLER:  Objection, form,
 3      foundation.
 4         A.      Replacement rails are exactly that,
 5      replacement of components.
 6    BY MR. BALICH:
 7         Q.      Right.  And so the rail kits that
 8      Galvion sells are for replacement rails?
 9              MS. FOWLER:  Objection, form,
10      foundation, scope.
11         A.      So the rail kits that Galvion sells
12      could be for replacement rails or they could be, I
13      would imagine, new rails for someone who wants to
14      equip their helmet accordingly.
15    BY MR. BALICH:
16         Q.      Okay.  Now, are you aware that for
17      Caiman helmets, in particular, all of the Caiman
18      helmets that Galvion sells come with rails?
19         A.      I wasn't aware that all helmets that
20      are sold come with rails, but we've listed all the
21      Caiman helmets that we found in appendix A have
22      rails.
23         Q.      Right.  Let's assume for a moment that
24      all Caiman helmets have rails.  If that's true,
25      would that mean that all kits that just have rails

Gentex Corporation vs
Galvion LTD., et al.

Videotaped

Nicholas Shewchenko
December 03, 2021

195

 1    foundation.

 2         A.    As before, it's a possibility, that's

 3    one condition that would be applicable to rails

 4    being provided.

 5    BY MR. BALICH:

 6         Q.    Okay.  And you don't have any opinions

 7    as to whether the rail kits that Galvion sells

 8    with just the Viper stand-alone rails, the Caiman

 9    rails, the PDxT rails, you don't have any opinions

10    as to whether those are sold as replacement parts

11    or for some other purpose; is that right?

12              MS. FOWLER:  Objection, form.

13         A.    I have no insight into that.

14              MR. BALICH:  I'm marking a document as

15    Exhibit 36 that has the Bates No. Revision

16    Military, there's a bunch of Os and then 2.

17    (Shewchenko Exhibit 36 was marked for

18    identification.)

19    BY MR. BALICH:

20         Q.    Do you recognize Exhibit 36 as one of

21    the Galvion documents that you cite in your

22    opening report?

23         A.    Yes, I do.

24         Q.    And, in fact, this was actually the

25    only scale drawing of the Viper front mount

203

 1          A.      Yes.

 2          Q.      Okay.  Is what's highlighted in blue

 3     the shroud mount framework?

 4          A.      Yes, as it extends and connects to the

 5     wings.

 6          Q.      And so is the shroud mount framework

 7     highlighted in blue different in your mind than

 8     the component --

 9                  MS. FOWLER:  Objection.

10   BY MR. BALICH:

11          Q.      -- as that's used in claim 17?

12                  MS. FOWLER:  Objection, form.

13          A.      Yes.  Sorry.  Yes, I do.

14   BY MR. BALICH:

15          Q.      Do you see a green highlight?

16          A.      Yes, I do.

17          Q.      Is what's highlighted in green -- is it

18     your opinion that -- that portion of the front

19     mount wings is the component?

20                  MS. FOWLER:  Objection, form.

21          A.      So the component should -- more

22     technically be correct starting at the front shroud

23     mount or to the side of the front shroud framework

24     that we spoke about earlier, and everything else

25     that you've highlighted in green.

Gentex Corporation vs                      Videotaped                      Nicholas Shewchenko
Galvion LTD., et al.                                                       December 03, 2021

204

1             So if you were to shorten the left-hand
2      side to be equal to the right-hand side of the
3      shroud framework, that's what I would call the
4      component.
5  BY MR. BALICH:
6          Q.     Let me see if I can do that.  Here we
7      go.  Do you see a different green highlight now?
8          A.     Right.
9          Q.     All right.  And so -- go ahead.
10         A.     So, in fact, your blue box should
11     probably extend down between the gap of the front.
12         Q.     All right, let me see if I can do that.
13     All right, this is going to be a little bit
14     imperfect, because all I can do is draw boxes.
15     Hold on.
16             So excluding the overlap of the blue
17     box and the green box, is what's shown in blue the
18     shroud mount frame?
19         A.     Yes.
20         Q.     Okay.  Is the shroud mount frame part
21     of the shroud mount, as that's claimed in
22     claim 17?
23             MS. FOWLER:  Objection, form.
24         A.     Yes, as I indicated, this is one method
25     that encompasses a shroud mount.  It just happens

205

 1      to be a two-component approach that Galvion used

 2      here.  But, yes, it's all -- when you combine part

 3      A and part B, the yellow box superimposed on the

 4      blue box is your shroud mount.

 5  BY MR. BALICH:

 6          Q.    Got it.  Got it.  And so the shroud

 7      mount in Exhibit 36 is attached to what's

 8      highlighted in green by virtue of the blue box

 9      being the same plastic piece as what's highlighted

10      in green; is that right?

11          A.    Correct.  Correct.

12              MR. BALICH:  I am going to attempt to

13      mark this as a different exhibit.  Let's see how

14      successful I am.

15  (Shewchenko Exhibit 37 was marked for

16  identification.)

17  BY MR. BALICH:

18          Q.    All right, do you currently see

19      something marked as Exhibit 37?

20          A.    I see the same exhibit marked

21      Exhibit 36 and 37.

22          Q.    Okay, excellent.  And the document

23      that's marked as 37 and 36 or 36 and 37, it's got

24      the yellow box, the blue box, and the green box

25      that you were just testifying about?

Gentex Corporation vs                     Videotaped                     Nicholas Shewchenko
Galvion LTD., et al.                                                      December 03, 2021

284

1    Galvion, Inc.

2        (The deposition was concluded at 6:59 p.m.)

3            COURT REPORTER:  Could I just interrupt

4    before we all leave?  I just need to know; Karon,

5    would you like a rough draft?  There is one being

6    ordered.

7            MS. FOWLER:  Yeah, a rough would be

8    great.  Thank you.

9            COURT REPORTER:  And I have regular

10   delivery, is that okay for both of you?

11           MS. FOWLER:  What is standard

12   typically?

13           COURT REPORTER:  Ten business days.

14           MS. FOWLER:  And what would a rush be?

15           COURT REPORTER:  Anything within five

16   business days.

17           MS. FOWLER:  Yeah, we'll go ahead and

18   do rush within the five business days.

19           COURT REPORTER:  And how about you,

20   Mr. Balich, would you like yours in five days?

21           MR. BALICH:  I will defer to whatever

22   our paralegal team has ordered.

23           COURT REPORTER:  Okay, thank you.  I

24   will check with them.

25

Gentex Corporation vs              Videotaped                Nicholas Shewchenko
Galvion LTD., et al.                                         December 03, 2021

285

1    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23   Page No._____Line No._____Change to:_____

24   _____

25   SIGNATURE:_____DATE:_____

Gentex Corporation vs
Galvion LTD., et al.

Videotaped

Nicholas Shewchenko
December 03, 2021

286

1                          CERTIFICATE

2              I, Pamela J. Carle, Registered

3    Professional Reporter, do hereby certify that the

4    foregoing is a true and accurate transcript of my

5    stenographic notes of the deposition of NICHOLAS

6    SHEWCHENKO, who was first duly sworn, taken at the

7    place and on the date hereinbefore set forth, and

8    that reading and signing of the transcript was

9    requested.

10             I further certify that I am neither

11   attorney nor counsel for, nor related to or

12   employed by any of the parties to the action in

13   which this deposition was taken, and further that

14   I am not a relative or employee of any attorney or

15   counsel employed in this case nor am I financially

16   interested in this action.

17

18             THE FOREGOING CERTIFICATION OF THIS
     TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF
19   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
     CONTROL AND/OR DIRECTION OF THE CERTIFYING
20   REPORTER.

21

22                        _Pamela J. Carle_

23

24   _____

25               Pamela J. Carle, LCR, RPR, CRR

O'Brien & Levine Court Reporting Solutions                    Page 286
888.825.3376 - production@court-reporting.com

# EXHIBIT 4

# In the Matter of:

*Gentex Corporation vs*

*Galvion LTD., et al.*

---

*Duco Noordzij*

*August 02, 2021*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF DELAWARE

 3   -------------------------------x

 4   GENTEX CORPORATION,

 5                   Plaintiff,

 6       vs.                           C.A. No. 19-921-MN

 7   GALVION LTD. and GALVION INC.,

 8                   Defendants.

 9   -------------------------------x

10

11       -HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY-

12

13

14            VIDEOTAPED 30(B)(6) DEPOSITION

15        OF GENTEX CORPORATION BY DUCO NOORDZIJ

16            AND DUCO NOORDZIJ, PERSONALLY

17                 Conducted Remotely

18                237 Metropolitan Avenue

19              Roslindale, Massachusetts

20                   August 2, 2021

21               9:15 a.m. to 6:13 p.m.

22

23

24   Reporter:  Laurie J. Berg, CCR, RPR, CRR, CLR, CER
```

2

```
 1        A P P E A R A N C E S

 2

 3   Jason C. White, Esquire

 4   Karon N. Fowler, Esquire

 5   MORGAN, LEWIS & BOCKIUS, LLP

 6   110 North Wacker Drive

 7   Chicago, Illinois  60606-1511

 8   312.324.1000

 9   jason.white@morganlewis.com

10   karon.fowler@morganlewis.com

11   (Present via videoconference.)

12   COUNSEL FOR PLAINTIFF AND THE DEPONENT

13

14   Jason W. Balich, Esquire

15   Michael Albert, Esquire

16   WOLF, GREENFIELD & SACKS, P.C.

17   600 Atlantic Avenue

18   Boston, Massachusetts  02210

19   617.720.3500

20   jbalich@wolfgreenfield.com

21   malbert@wolfgreenfield.com

22   (Present via videoconference.)

23   COUNSEL FOR DEFENDANTS

24
```

Gentex Corporation vs                    30(b)(6), Videotaped                    Duco Noordzij
Galvion LTD., et al.                                                            August 02, 2021

3

1                    A P P E A R A N C E S

2                          (continued)

3

4    Also Present:

5            Couirey Eckmayer, CLVS

6            (Present via videoconference.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

```
 1                       I N D E X

 2

 3  DEPONENT:  DUCO NOORDZIJ

 4              (Present via videoconference.)

 5

 6  EXAMINATION                                        PAGE

 7  (BY ATTORNEY BALICH)                                13

 8

 9                     E X H I B I T S

10  NO.                                                PAGE

11  Exhibit 1   First Amended Notice of 30(B)(6)

12              Deposition of Gentex Corporation        11

13  Exhibit 2   E-mail Chain, Wednesday, June 9, 2021

14              5:50 PM (two pages)                      15

15  Exhibit 3   Notice of Deposition of Duco Noordsij   40

16  Exhibit 4   www.linkedin.com/in/

17              duco-noordzij-68a77b106 (LinkedIn)

18              (one page)                              41

19  Exhibit 5   Gentex Corporation, Integrated Helmet

20              Program, Power, Data Sensor, Accessory

21              Integration in Ballistic Helmet, 4 Jan

22              2018, Version:  1.0, GENTEX00013057 to

23              GENTEX00013072, Highly Confidential -

24              Attorneys' Eyes Only - Prosecution Bar  48
```

Gentex Corporation vs                30(b)(6), Videotaped                Duco Noordzij
Galvion LTD., et al.                                                    August 02, 2021

5

1                        E X H I B I T S

2                          (continued)

3  NO.                                                          PAGE

4  Exhibit 6   Artisent, FFW, Relating Head

5              Measurements to Fit and Comfort of

6              Helmets, ISSC Conference,

7              December 15, 2004 (Document Produced

8              in Native Format), REVMIL0000597           55

9  Exhibit 7   Conceptual Ideas to be Considered for

10             Future Warfighter Head Protection,

11             December 21, 2004, REVMIL01414795 to

12             REVMIL01414800, Confidential

13             Information - Proprietary to

14             Artisent, Inc.                             59

15 Exhibit 8   Hand Sketches, GENTEX0018946 to

16             GENTEX00182009, Highly Confidential -

17             Attorneys' Eyes Only - Prosecution Bar  73

18 Exhibit 9   Photographs, REVMIL01399292 to

19             REVMIL01399295, REVMIL01399454,

20             REVMIL01399312, REVMIL01399385 and

21             REVMIL01399265                            81

22 Exhibit 10  Photographs, REVMIL0004530 to

23             REVMIL0004531                             91

24

6

```
 1                      E X H I B I T S

 2                       (continued)

 3  NO.                                             PAGE

 4  Exhibit 11  E-mail Chain, 3/28/2018 7:43:53 AM,

 5              GENTEX00131534, Highly Confidential -

 6              Attorneys' Eyes Only - Prosecution Bar  96

 7  Exhibit 12  U.S. Provisional Application for

 8              Patent 60/691307, GENTEX00005112 to

 9              GENTEX00005129                          99

10  Exhibit 13  United States Patent and Trademark

11              Office Certification, September 11,

12              2019, and United States Patent No.:

13              US 7,849,517 B2, *Dec. 14, 2010,

14              GENTEX00001755 to GENTEX00001767      111

15  Exhibit 14  United States Patent and Trademark

16              Office Certification, September 11,

17              2019, and United States Patent No.:

18              US 7,908,667 B2, *Mar. 22, 2011,

19              GENTEX00001809 to GENTEX00001821      120

20  Exhibit 15  United States Patent and Trademark

21              Office Certification, September 11,

22              2019, and United States Patent No.:

23              US 9,717,294 B2, Aug. 1, 2017,

24              GENTEX00001768 to GENTEX00001797      125
```

Gentex Corporation vs                    30(b)(6), Videotaped                    Duco Noordzij
Galvion LTD., et al.                                                            August 02, 2021

                                                                                          7

```
 1                    E X H I B I T S
 2                      (continued)
 3   NO.                                                    PAGE
 4   Exhibit 16  United States Design Patent No.:
 5              US D750,846 S, Mar. 1, 2016,
 6              GENTEX00202702 to GENTEX00202707            127
 7   Exhibit 17  United States Design Patent No.:
 8              US D750,847 S, Mar. 1, 2016,
 9              GENTEX00202755 to GENTEX00202760            132
10   Exhibit 18  E-mail, 1/17/2019 11:52:14 AM and
11              2019011711521.pdf, GENTEX00098201 to
12              GENTEX00098237, Highly Confidential -
13              Attorneys' Eyes Only - Prosecution Bar 144
14   Exhibit 19  Ops-Core 2013 Product Catalog (Document
15              Produced in Native Format),
16              REVMIL00002775                              159
17   Exhibit 20  United States Patent and Trademark
18              Office Certification, September 11,
19              2019, and United States Design Patent
20              No.:  US D788,378 S, May 30, 2017,
21              GENTEX00001687 to GENTEX00001695            164
22
23
24
```

Gentex Corporation vs              30(b)(6), Videotaped              Duco Noordzij
Galvion LTD., et al.                                                 August 02, 2021

8

```
 1                    E X H I B I T S
 2                      (continued)
 3  NO.                                                    PAGE
 4  Exhibit 21  United States Patent and Trademark
 5              Office Certification, September 11,
 6              2019, and United States Design Patent
 7              No.:  US D794,256 S, Aug. 8, 2017,
 8              GENTEX00001799 to GENTEX00001807         166
 9  Exhibit 22  Four Images (one page)                   166
10  Exhibit 23  Four Images (one page)                   171
11  Exhibit 24  Four Images (one page)                   174
12  Exhibit 25  Four Images (one page)                   177
13  Exhibit 26  E-mail Chain, 5/17/2016 3:33:27 PM and
14              revision_cobra_competitive_overview.pdf,
15              GENTEX00189236 to GENTEX00189245,
16              Highly Confidential - Attorneys' Eyes
17              Only - Prosecution Bar                   182
18  Exhibit 27  E-mail Chain, 5/17/2016 10:30:29 AM and
19              team-wendy_exfil_ballistic_competitive_
20              overview.pdf, GENTEX00189246 to
21              GENTEX00189265, Highly Confidential -
22              Attorneys' Eyes Only - Prosecution Bar 188
23
24
```

Gentex Corporation vs                  30(b)(6), Videotaped                    Duco Noordzij
Galvion LTD., et al.                                                          August 02, 2021

9

```
 1                    E X H I B I T S

 2                      (continued)

 3   NO.                                              PAGE

 4   Exhibit 28   Gentex Corporation Competitive Analysis,

 5                August 2016, GENTEX00189142 to

 6                GENTEX00189168, Highly Confidential -

 7                Attorneys' Eyes Only - Prosecution Bar 191

 8   Exhibit 29   E-mail, 4/11/2017 9:57:57 AM and Black

 9                Hat.zip, 20170417 FTHS Black Hat

10                Review.pptx; FTHS Bidder Comparison

11                Charts 20Apr2017.xlsx, GENTEX00189299 to

12                GENTEX00189372, Highly Confidential -

13                Attorneys' Eyes Only - Prosecution Bar

14                (last page not Bates numbered, marked

15                Confidential)                          194

16   Exhibit 30   E-mail Chain, 3/22/2018 2:20:30 PM,

17                GENTEX00010805 to GENTEX00010808,

18                Highly Confidential - Attorneys' Eyes

19                Only - Prosecution Bar                 196

20   Exhibit 31   E-mail, 10/17/2017 11:34:11 AM,

21                GENTEX00098948, Highly Confidential -

22                Attorneys' Eyes Only - Prosecution Bar 200

23

24
```

Gentex Corporation vs                  30(b)(6), Videotaped                Duco Noordzij
Galvion LTD., et al.                                                       August 02, 2021

10

1                        E X H I B I T S

2                          (continued)

3      NO.                                                      PAGE

4      Exhibit 32   E-mail, 10/19/2015 1:35:56 PM,

5                   GENTEX00095841, Highly Confidential -

6                   Attorneys' Eyes Only - Prosecution Bar 203

7      Exhibit 33   E-mail Chain, 2/28/2018 7:59:18 AM,

8                   GENTEX00097324 to GENTEX00097325,

9                   Highly Confidential - Attorneys' Eyes

10                  Only - Prosecution Bar                      205

11     Exhibit 34   E-mail Chain, 5/3/2017 7:55:39 AM,

12                  GENTEX00097740 to GENTEX00097741,

13                  Highly Confidential - Attorneys' Eyes

14                  Only - Prosecution Bar                      212

15

16        (Original exhibits marked electronically

17          and retained with the transcript.)

18

19

20

21

22

23

24

11

1              P R O C E E D I N G S

2

3              (Exhibit 1 premarked for identification.)

4

5              THE VIDEOGRAPHER:  We are going on the

6    record on 2021, August 2nd, at approximately 9:15 a.m.

7    Eastern Daylight Time.

8              This is the video-recorded deposition of Duco

9    Noordzij in the matter of Gentex Corporation,

10   Plaintiff, versus Galvion Ltd. and Galvion Inc.,

11   Defendants, filed in the United States District Court

12   for the District of Delaware, Case Number 19-921-MN.

13             This deposition is being taken remotely.

14   This witness is appearing remotely from 237

15   Metropolitan Avenue, Boston, Massachusetts 02131.

16             My name is Couirey Eckmayer with O'Brien &

17   Levine Court Reporting Solutions, and I'm the legal

18   video specialist.  I will be recording the proceedings

19   remotely.  The court reporter today is Laurie Berg

20   with O'Brien & Levine Court Reporting Solutions, and

21   she will be reporting this proceeding remotely and is

22   a notary public in the Commonwealth of Massachusetts.

23   Neither of us is physically present with the witness.

24             Will counsel please state their appearances

12

1  and who they represent for the record and acknowledge

2  that, in lieu of an oath administered in person, the

3  witness will verbally declare his testimony in this

4  matter under the pains and penalties of perjury and

5  also that counsel consent to this arrangement and

6  waive any objections to this manner of proceeding,

7  after which our court reporter will swear in the

8  witness and we may begin.

9            MR. BALICH:  Jason Balich of Wolf,

10  Greenfield representing the Galvion Defendants, and

11  Galvion has no objection to the form of this

12  deposition.

13            MR. WHITE:  This is Jason White from

14  Morgan Lewis representing the plaintiffs and also the

15  witness today, and my colleague Karon Fowler's going

16  to join us for at least part of the deposition.  And

17  we have no objection to the proceedings as well.

18            (Deponent sworn, as requested.)

19            MADAM COURT REPORTER:  Thank you very

20  much.  You may proceed.

21

22

23

24

13

```
 1                         DUCO NOORDZIJ

 2

 3          having been satisfactorily identified and

 4   duly sworn remotely by the Notary Public, was examined

 5   and testified as follows:

 6                    DIRECT EXAMINATION

 7          BY MR. BALICH:

 8     Q.   Good morning, Mr. Noordzij.

 9          Could you please state your name and business

10   address for the record?

11     A.   Duco Noordzij.

12          I'm having trouble hearing, Jason.  Everyone

13   else is coming through clearly.

14          Which address did you ask me for?

15     Q.   Your business address.

16     A.   12 Channel Street, Boston, Massachusetts

17   02210.

18     Q.   Have you ever been deposed before?

19     A.   No.

20     Q.   Have you ever attended a deposition before?

21     A.   No.

22     Q.   Have you ever testified in court before?

23     A.   No.

24     Q.   My name is Jason Balich, and as I have
```

167

1  reproduced Figure 2 of the '846 patent in the top

2  left.  I've reproduced Figure 2 of the '847 patent in

3  the top right.  And I've reproduced Figure 5 of

4  the '256 patent in the bottom left.  In the bottom

5  right, there is a color image of a helmet rail.

6          Do you recognize the helmet rail that's in

7  the bottom right?

8      A.  (Deponent viewing exhibit.)  I think it's a

9  Revision rail.

10     Q.  And what are the differences between the rail

11 design of the four -- strike that.

12         What are the differences between the rail

13 design of the '846 patent and the rail in the bottom

14 right of Exhibit 22?

15             MR. WHITE:  Object to the form of the

16 question.

17     A.  (Deponent viewing exhibit.)  The rear track,

18 the dimples, the slot holes in the bottom of the

19 channel, O2 clip and something -- something going on

20 the front.  I'm not really sure what that is.

21     Q.  Okay.  So, just to go through those, the rail

22 in the bottom right has a rear track, whereas the

23 design of the '846 rail in the rear portion is smooth?

24             MR. WHITE:  Object to the form of the

168

1   question.

2       A.   (Deponent viewing exhibit.)  Yes.

3       Q.   And the rail in the bottom right has dimples

4   on the top and bottom of -- of both tracks, whereas

5   the rail design of the '846 patent does not show

6   dimples?

7               MR. WHITE:  Object to the form of the

8   question.

9       A.   (Deponent viewing exhibit.)  Right.  Correct.

10      Q.   The rail in the bottom right has an O2 clip,

11  whereas the rail design of the '846 does not have that

12  O2 clip?

13              MR. WHITE:  Object to the form of the

14  question.

15      A.   (Deponent viewing exhibit.)  That's right.

16      Q.   And the design of the front portion of the

17  rail in the bottom right is different than the design

18  of the front portion of the rail from the '846 patent?

19              MR. WHITE:  Object to the form of the

20  question.

21      A.   (Deponent viewing exhibit.)  It does look

22  different.

23      Q.   What about the angle between the top portion

24  of the rail and the rear portion of the rail; are

172

1      A.   (Deponent viewing exhibit.)  That looks like

2  a Revision rail to me.

3      Q.   What are the differences between the rail

4  design of the '846 patent and the rail in the bottom

5  right?

6                MR. WHITE:  Object to the form of the

7  question.

8      A.   (Deponent viewing exhibit.)  There's an

9  opening in the front, above the bolt hole slot, there

10 are dimples, O2 buckle, receiver, and there are hole

11 slots in the bottom of the channel.

12     Q.   And is the shape of the front-most part of

13 the two rails different as well?

14                MR. WHITE:  Object to the form of the

15 question.

16     A.   (Deponent viewing exhibit.)  A little bit.

17 Not much.

18     Q.   What about the shape of the rear-most,

19 bottom-most part of the rear portion between the '846

20 rail and the rail in the bottom right, are those

21 different?

22                MR. WHITE:  Object to the form of the

23 question.

24     A.   (Deponent viewing exhibit.)  The bottom right

174

1              MR. WHITE:  Object to the form of the

2    question.

3       A.    (Deponent viewing exhibit.)  The lower right

4    rail has a sharp corner in the lower air -- lower

5    portion of it.

6       Q.    Anything else?

7              MR. WHITE:  Object to the form of the

8    question.

9       A.    (Deponent viewing exhibit.)  That's it.

10      Q.    Okay.

11             (Exhibit 24 marked for identification.)

12      BY MR. BALICH:

13      Q.    I'm showing you a document marked as

14   Exhibit 24.  Again, like Exhibit 24, I've reproduced

15   Figure 2 of the '846 patent in the top left.  I've

16   reproduced Figure 2 of the '847 patent in the top

17   right and reproduced Figure 5 of the '256 patent in

18   the bottom left.  And then there's a color image of a

19   helmet with a rail in the bottom right.

20             Do you recognize the helmet or rail that's

21   shown in color in the bottom right?

22      A.    (Deponent viewing exhibit.)  That's a

23   Revision Caiman.

24      Q.    And what are the differences between the rail

175

```
 1   design of the '846 patent and the rail shown in the
 2   Revision Caiman Helmet on the bottom right?
 3               MR. WHITE:  Object to the form of the
 4   question.
 5       A.   (Deponent viewing exhibit.)  The Revision has
 6   a bungee attachment system.  It has a rear track, O2
 7   buckle, receiver.  It has dimples.  It has openings in
 8   the bottom of the channels.
 9       Q.   Anything else?
10               MR. WHITE:  Object to the form of the
11   question.
12       A.   (Deponent viewing exhibit.)  That's it.
13       Q.   Okay.  And what are the differences between
14   the '847 helmet mount design and the helmet mount
15   shown in the Revision Caiman Helmet on the bottom
16   right?
17               MR. WHITE:  Object to the form of the
18   question.
19       A.   (Deponent viewing exhibit.)  '847 has the
20   portion that connects the shroud to the rail.
21       Q.   Anything else?
22               MR. WHITE:  Object to the form of the
23   question.
24       A.   (Deponent viewing exhibit.)  The Revision has
```

Gentex Corporation vs        30(b)(6), Videotaped        Duco Noordzij
Galvion LTD., et al.                                                      August 02, 2021

217

1            MADAM COURT REPORTER:  And this is Laurie

2 Berg, the court reporter.  I'm just going to do orders

3 on the record and then I have a couple spellings.

4         I just want confirm with Attorney Balich that

5 you're going to be getting your usual order in the

6 form that you usually receive it in and I will have

7 transcript to you by next Tuesday.

8         Is that correct?

9            MR. BALICH:  Well, whatever we've ordered

10 is fine with me.

11            MADAM COURT REPORTER:  Okay.  And

12 Attorney White, I know that you also wanted a rough,

13 which I'll have that also to you tonight.

14         Do you need your transcript expedited or do

15 you want it the regular ten-day business turnaround

16 time?

17            MR. WHITE:  What's the regular?

18            MADAM COURT REPORTER:  The regular is ten

19 business days.

20            MR. WHITE:  I think we can do that for

21 now and we'll let you know if we need it sooner.

22          (VIDEOTAPED 30(B)(6) DEPOSITION

23 OF GENTEX CORPORATION BY DUCO NOORDZIJ AND DUCO

24 NOORDZIJ, PERSONALLY, concluded at 6:13 p.m.)

Gentex Corporation vs      30(b)(6), Videotaped      Duco Noordzij
Galvion LTD., et al.                                          August 02, 2021

218

1  COMMONWEALTH OF MASSACHUSETTS

2  MIDDLESEX, SS.

3

4         I, Laurie J. Berg, Certified Court Reporter,

5  Registered Professional Reporter, Certified Realtime

6  Reporter, Certified LiveNote Reporter, Certified

7  eDepoze Reporter and Notary Public, in and for the

8  Commonwealth of Massachusetts, do hereby certify that

9  pursuant to appropriate notice of taking deposition,

10  there remotely appeared before me the following named

11  person, to wit:  DUCO NOORDZIJ, who was by me duly

12  sworn; that he was thereupon examined upon his oath

13  and his examination reduced to writing by me; and that

14  the deposition is a true record of the testimony given

15  by the witness.

16         IN WITNESS WHEREOF, I have hereunto set my

17  hand and seal this 11th day of August, 2021.

18

19  My commission expires:

20  September 14, 2023

21

22

23  _____

24           Notary Public

Gentex Corporation vs                30(b)(6), Videotaped                    Duco Noordzij
Galvion LTD., et al.                                                        August 02, 2021

                                                                                       219

1    ERRATA SHEET DISTRIBUTION INFORMATION

2    DEPONENT'S ERRATA AND SIGNATURE INFORMATION

3

4    ERRATA SHEET DISTRIBUTION INFORMATION

5          The original of the errata sheet has been

6    delivered to Jason C. White, Esquire.

7          When the errata sheet has been completed by

8    the deponent and signed, a copy thereof should be

9    delivered to each party of record and the ORIGINAL

10   delivered to Jason W. Balich, Esquire, to whom the

11   original deposition transcript was delivered.

12

13   INSTRUCTIONS TO DEPONENT:

14         After reading this volume of your deposition,

15   indicate any corrections or changes to your testimony

16   and the reasons therefor on the errata sheet supplied

17   to you and sign it.  DO NOT make marks or notations on

18   the transcript volume itself.  Add additional sheets

19   if necessary.  Please refer to the above instructions

20   for errata sheet distribution information.

21

22

23

24

Gentex Corporation vs                    30(b)(6), Videotaped              Duco Noordzij
Galvion LTD., et al.                                                       August 02, 2021

220

```
 1   PLEASE ATTACH TO THE VIDEOTAPED 30(B)(6) DEPOSITION

 2        OF GENTEX CORPORATION BY DUCO NOORDZIJ

 3             AND DUCO NOORDZIJ, PERSONALLY

 4      CASE:  Gentex Corporation V. Galvion Ltd.

 5             and Galvion Inc.

 6   DATE TAKEN:  August 2, 2021

 7                      ERRATA SHEET

 8   Please refer to Page 219 for errata sheet instructions

 9   and distribution instructions.

10   PAGE  LINE  CHANGE/REASON

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____
```

Gentex Corporation vs
Galvion LTD., et al.

30(b)(6), Videotaped

Duco Noordzij
August 02, 2021

221

1                           ERRATA SHEET

2                           (continued)

3    PAGE   LINE   CHANGE/REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13

14   I have read the foregoing transcript of my deposition

15   and except for any corrections or changes noted above,

16   I hereby subscribe to the transcript as an accurate

17   record of the statements made by me.

18   Executed this _____ day of _____, 2021.

19

20

21                      _____

22                           DUCO NOORDZIJ

23

24