# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GENTEX CORPORATION, a Delaware Corporation,<br><br>            Plaintiff,<br><br>  v.<br><br>GALVION LTD., a Delaware corporation; and GALVION, INC., a Canadian company,<br><br>            Defendants. | Case No. 1:19-cv-00921-MN<br><br>██████████████ |

## PLAINTIFF GENTEX CORPORATION'S OPPOSITION TO <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     NATURE AND STAGE OF THE PROCEEDINGS ......................................... 2

III.    SUMMARY OF ARGUMENTS ........................................................................ 2

IV.     STATEMENT OF FACTS ................................................................................. 3

V.      ARGUMENT ...................................................................................................... 4

      A.   Under U.S. law, Gentex has a Right to Assert Patent Infringement and
             Challenge Galvion's Alleged License Defense. .................................................. 4

           1.   Gentex has the right to enforce the Asserted Patents................................ 4

           2.   Gentex has a right to challenge Galvion's license defense. ...................... 5

           3.   RAA does not prevent the assignment of the patents to Gentex............... 7

           4.   RAA refers to an assignment of "rights in this Agreement" and did
                not prohibit assignment of pre-existing patent rights under U.S.
                law............................................................................................................. 7

           5.   Gentex has a right under U.S. law to challenge the license granted
                by Artisent, the prior patent owner. ......................................................... 8

            6.   Galvion's argument has never been recognized under U.S. law. .............. 8

           7.   Gentex can assert breach of the "standalone side rails" clause. ............... 9

      B.   There is a Genuine Dispute of Material Fact Whether Gentex Obtained
             Rights to, and is a Party of, the RAA under Quebec Law ................................. 10

           1.   Interpretation of RAA Paragraph 16 under Quebec law.......................... 10

           2.   RAA Paragraph 16 is not clear and contains ambiguity. ........................ 11

           3.   RAA paragraph 16 confirms a "sale of control of either party"
                must include an asset sale. ...................................................................... 13

           4.   Galvion's narrow interpretation of the term "sale of control" is
                contrary to its broad interpretation of other terms in the RAA............... 15

           5.   Galvion's remaining arguments are misleading and inaccurate. ............. 15

      C.   There is a Genuine Dispute of Material Fact Whether Galvion Ltd. is
             Entitled to a License Under the RAA under Step One ....................................... 16

      D.   There is a Genuine Dispute of Material Fact Whether Galvion has a Valid
             License to the Asserted Patents Because Galvion Failed to Pay Royalties ........ 17

## TABLE OF CONTENTS
(continued)

**Page**

E.    There are Genuine Disputes of Material Fact Whether the Accused
Products Fall within the Scope of the License ..................................................... 17

1.    There is a genuine dispute whether the Accused Products are
"Licensed Halo Systems" or "'standalone side rails'… which are
by design and function, independent of other 'halo system'
components." ........................................................................................... 18

2.    There is a genuine dispute whether the Accused Products are
"Replacement Parts." .............................................................................. 19

3.    There is a genuine dispute whether the Accused Products are
"similar to the ACH-ARC rails sold by Ops Core." ............................... 20

VI.    CONCLUSION ............................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alltech Plastics, Inc.*,
   71 B.R. 686 (W.D. Tenn. 1987)......................................................................................6

*Au New Haven, LLC v. YKK Corp.*,
   210 F. Supp. 3d 549 (S.D.N.Y. 2016)...........................................................................8

*Bioverativ Inc. v. CSL Behring LLC*,
   2021 WL 3471688 (D. Del. Aug. 6, 2021) ...................................................................5

*Datatreasury Corp. v. Wells Fargo & Co.*,
   522 F.3d 1368 (Fed. Cir. 2008)................................................................................6, 9

*Endo Pharm., Inc. v. Actavis, Inc.*,
   746 F.3d 1371 (Fed. Cir. 2014).................................................................................17

*Gen. Talking Pictures Corp. v. Western Elec. Co.*,
   305 U.S. 124 (1938)..................................................................................................17

*Innovus Prime, LLC v. Panasonic Corp. & Panasonic Corp. of N. Am. Inc.*
   2013 WL 3354390 (N.D. Cal. July 2, 2013)................................................................6

*Intellectual Prop. Dev. ., Inc. v. TCI Cablevision of Cal., Inc.*,
   248 F.3d 1333 (Fed. Cir. 2001)...................................................................................5

*Rite–Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995).....................................................................................5

*Sky Techs. v. SAP AG*,
   576 F.3d 1374 (Fed. Cir. 2009)...................................................................................7

*Unarco Indus., Inc. v. Kelley Co.*,
   465 F.2d 1303 (7th Cir. 1972) ....................................................................................6

**Statutes**

35 U.S.C. § 100(d) ............................................................................................................5

35 U.S.C. § 261..................................................................................................................5

35 U.S.C. § 281..................................................................................................................5

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | Excerpt from Defendant's Responses to Plaintiff's Request for Admissions (No. 16), dated October 9, 2022 |
| B | Opening Expert Report of Azim Hussain on the Application of Quebec Law dated September 24, 2021 |
| C | Expert Report of Bob Sotriadis on the Application of Quebec Law dated January 28, 2022 |
| D | Rebuttal Expert Report of Azim Hussain on the Application of Quebec Law dated October 20, 2021 |
| E | Opening Expert Report of Nicholas Schewchenko on Infringement dated September 24, 2021 |
| F | Excerpts from the deposition of Stephane Lebel taken July 14, 2021 |
| G | Revision, Batlskin viper Head Protection System Instruction Guide, REVMIL0000194-210 |
| H | Excerpts from the deposition of Nicholas Shewchenko taken December 3, 2021 |
| I | Excerpts from the deposition of Christopher M. Stalzer taken December 17, 2021 |
| J | Revision Batlskin viper, REVMIL0000126 |
| K | Viper Front Mount, GENTEX00001845-850 |
| L | Revision Batlskin viper Modernization, Hugiene & MSS Sustainment Kits, REVMIL0000110 |
| M | Galvion Bill of Materials, REVMIL01414456 |
| N | Email chain, top email from E. Hounchell to J. Blanshay dated October 1, 2017, Lebel Dep. Ex. 40 |
| O | Email chain, top email from R. Coomber to D. Redpath, et al. dated January 11, 2014, REVMIL00115822-824 |
| P | Email chain, top email from S. Lebel to R. Coomber et al. dated August 23, 2019, REVMIL00076412-414 |
| Q | Email from J. Hester to J. Blanshay et al. dated March 2, 2018, REVMIL00028929-931 |
| R | Revision Project Charter, REVMIL00081167-169 |
| S | Revision Head Protection Systems, REVMIL00086307-323 |
| T | Email chain, top email from R. Coomber to A. Hennick dated August 21, 2018, REVMIL00092360-362 |
| U | Email chain, top email from R. Coomber to K. Frederick dated September 30, 2019, REVMIL00107989-992 |

| Exhibit | Description |
|---|---|
| V | Email chain, top email from E. Houchell to L. Minehan et al. dated March 25, 2014, REVMIL01339082-083 |
| W | Revision, Executive Summary, REVMIL00028300-305 |
| X | Revision Batlskin viper P4, REVMIL0000122-123 |
| Y | Revision Ballistics Ltd Newport VT, REVMIL0003201-213 |
| Z | Revision Compliance Matrix, REVMIL01145018-019 |
| AA | Galvion products web page attached as Ex. L to the Nicholas Schewchenko Opening Expert Report |
| BB | Technical Narrative, REVMIL00093136-147 |
| CC | Excerpts from the Expert Report of Andres C. Garin dated September 24, 2021 |
| DD | About Practical Law Canada attached as Ex. 2 to Azim Hussain Rebuttal Report |
| EE | Glossary Change of Control attached as Ex. 3 to Azim Hussain Rebuttal Report |
| FF | Okira Company Overview attached as Ex. 4 to Azim Hussain Rebuttal Report |
| GG | Okira Learning Hub attached as Ex. 5 to Azim Hussain Rebuttal Report |
| HH | Kira Systems, "What is change of control and how does it operate?" attached as Ex. 6 to Azim Hussain Rebuttal Report |
| II | Memorandum of Agreement between Artisent Inc. and Revision Eyewear, Inc. GENTEX00005253-257 |
| JJ | Articles of Civil Code of Quebec, attached as Ex. L to Azim Hussain Opening Report |
| KK | Excerpts from the deposition of Tommy M. Short taken August 4, 2021 |
| LL | Gentex Ground Systems, GENTEX00181890-913 |
| MM | Revision Batlskin viper Standalone Long Rails, REVMIL0000115 |
| NN | Revision Caiman Bump Helmnet, REVMIL0000124-125 |
| OO | Annex B, CSR Requirements, REVMIL00044769-776 |
| PP | Reply Expert Report of Azim Hussain on the Application of Quebec Law dated November 12, 2021 |
| QQ | Excerpts from the deposition of Andres C. Garin taken December 14, 2021 |

## I.     INTRODUCTION

After Artisent and Galvion signed the RAA, Artisent sold its assets—including the RAA and Asserted Patents[1]—to Gentex. Shortly thereafter, Galvion began making and selling the accused products. Galvion argues its products are covered by the RAA's license, but instead of complying with its obligations under the RAA, ***Galvion never paid anyone a single cent*** for the license it asserts is a complete defense to infringement, and Galvion breached other materials terms of the RAA. Galvion's failure to pay royalties is inconsistent with a party asserting a licensing defense. Galvion's infringing conduct occurred for years, and Gentex ultimately filed this lawsuit. Notwithstanding having failed to pay royalties, Galvion's litigation position that it is entitled to the benefit of the license because Gentex—the undisputed owner of the Asserted Patents—lacks "standing" to rebut Galvion's license defense. Galvion also argues Quebec law denies Gentex of its right to enforce the full scope the Asserted Patents and shifts Galvion's burden of proving the license defense to Gentex. Further, Galvion argues only the prior patent owner can challenge Galvion's license defense. Galvion's arguments are meritless because Gentex has the right to enforce its patents and determine if its patents are encumbered under U.S. law. Even if Gentex was required to be a party to the RAA to challenge the license defense, it acquired those rights when Artisent assigned its pre-existing rights and the RAA to Gentex under U.S. law. The RAA did not prohibit these assignments under Quebec law.

Galvion raises several other issues, which Gentex addresses below, but the Court does not need to address those alternative arguments if the Court denies Galvion's motion for a summary adjudication that its asserted license defense is otherwise valid.

---

[1] As Galvion admits, the '807 Patent is not licensed or otherwise affected by the RAA. *See* D.I. 186 at 1 n.1. It is not part of Galvion's motion for summary judgement.

## II.      NATURE AND STAGE OF THE PROCEEDINGS

For all the reasons discussed herein, this Court should deny Galvion's motion, and this matter should proceed to trial to resolve the liability and damages issues presented.

## III.     SUMMARY OF ARGUMENTS

Galvion's motion raises disputes related to the applicable governing law, the parties to the agreement, the burden of proof, and the scope of the purported license.

**A. U.S. Law:** As a threshold matter, U.S. law governs substantive and procedural issues intimately involved in the substance of enforcement of patent rights. Under U.S. law, a patent owner can challenge an encumbrance (*i.e.*, covenant/license) because it runs with the patent. Galvion asks this Court to deny Gentex's ability to challenge Galvion's license defense under the guise of "standing." This is contrary to U.S. law and, if adopted, would deny patent owners the ability to determine and enforce the full scope of their patents. Because this is an issue of U.S. law, this Court can deny Galvion's entire motion on this basis alone without analyzing Quebec law.

**B. Quebec Law:** Even if Quebec law is applied, Galvion's motion should be denied. Quebec law requires a two-step process for analyzing a contract. Under step one, if the words of the contract are clear, the court applies the contract language to the facts at hand. Under step two, if the words are ambiguous, the fact-finder must determine the contract's meaning by considering the parties' common intention. Galvion argues the words of the RAA are clear, so there is no need to interpret the meaning of any word or consider the parties' intentions. This is wrong because the wording of the contract is far from clear. Galvion argues the Court only needs to construe one word in isolation, but the language at the center of the dispute is an entire paragraph and requires context to understand it. Asking this Court to adopt one of many competing definitions from the extrinsic evidence confirms the language is not clear. Further, Galvion's share sale interpretation is contrary to the RAA. Galvion's motion should be denied under Quebec law.

**C.  Galvion Ltd.:** Galvion argues that Galvion Ltd. is licensed, but this is not clear from the RAA, which granted a license to "Revision" and defines Revision as "Revision Eyewear, Inc." The RAA does not extend the definition of "Revision Eyewear, Inc." to affiliates or Galvion Ltd.

**D.  Burden of Proof:** Galvion argues it has a valid license. But it is Galvion's burden to prove it is entitled to this defense and Galvion cannot meet this burden because Galvion admits it never paid a royalty, which is a material breach of the RAA.

**E.  Non-Licensed Products:** Galvion argues the Accused Products are covered by the license, but Galvion attempts to obscure the fact that certain Accused Products are "standalone side rails," which it never had a license to sell. Galvion's sale of standalone side rails is a separate act of infringement and material breach of the RAA.

## IV.    STATEMENT OF FACTS

On February 9, 2006, Artisent filed the application that became the '517 patent. D.I. 188, Ex. 1 at A002. In June 2009, Artisent and Revision signed a purchase order, which includes recognition of Artisent's pre-existing patent rights. Ex. II at GENTEX00005256-5257. In October 2009, Artisent and Revision signed the Revision Artisent Agreement ("the RAA"). D.I. 188, Ex. 5 at A041. The RAA defines each party; Revision means "Revision Eyewear Inc." *Id.* at A035. The RAA granted a license to "Revision." *Id.* at A036. The RAA required Revision to pay a royalty in exchange for this license grant. *Id.* at A037. The RAA prohibited Revision from selling or marketing "standalone side rails" similar to rails sold by Ops Core (Artisent's affiliate). *Id.* These were depicted in Schedule B. *Id.* at A036, A042. The RAA has a non-assignment clause, which states:



*Id.* at A039 (RAA Paragraph 16).

On December 19, 2011, Artisent and Gentex signed the Asset Purchase Agreement ("APA"). D.I. 164-2 at 4582-83. The APA assigned all of Artisent's patents to Gentex. *Id.* at 4596. The APA assigned the RAA to Gentex. *Id.* at 4596, 4687. Artisent warranted in the APA that it did not need anyone's consent to assign the APA to Gentex. *Id.* at 4595, 4605-07, 4615-4616; Ex. PP ¶¶ 31-35. The APA assigned the name "Artisent" to Gentex, so Artisent had to change its name to Six Axis, Inc. and it ceased operating its prior business. *Id.* at 4596. Artisent' s employees, including its owners, worked for Gentex after signing the APA. Gentex's SOF ¶ 21. The APA assigned all of Artisent' s assets to Gentex, except a few minor assets. *Id.* at 4596-97. Gentex recorded all patent assignments with the USPTO. D.I. 164-1.

By at least 2014, Galvion was selling allegedly licensed products. Revision failed to pay royalties then and has never paid. Ex. A (RFA No. 16).

D.I. 164-3 at REVMIL00113508[2] ; D.I. 188, Ex. 5 at A041.

Gentex's SOF ¶ 6.[3]

## V.   ARGUMENT

### A.   Under U.S. law, Gentex has a Right to Assert Patent Infringement and Challenge Galvion's Alleged License Defense.

#### 1.   Gentex has the right to enforce the Asserted Patents.

As patent owner, Gentex has standing to sue for patent infringement. This right derives

---

[2] Emphasis added unless otherwise noted.
[3] Gentex's Statement of Disputed Material Facts is filed concurrently with this Opposition.

from the Patent Act, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995). A "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). The parties agree Artisent assigned the Asserted Patents to Gentex in the APA. *See* D.I. 164-2 at GENTEX00004582; D.I. 164-1. This "confer[ed] constitutional standing on the assignee to sue another for patent infringement in its own name." *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1345 (Fed. Cir. 2001); 35 U.S.C. § 261.[4] As such, Gentex has standing to sue for patent infringement.

## 2. Gentex has a right to challenge Galvion's license defense.

Galvion has asserted a license defense. Under U.S. law, Gentex has the right to challenge this defense because it is the owner of the patents and holds the inherent right to enforce the patents, subject to any encumbrances. *Bioverativ Inc. v. CSL Behring LLC*, 2021 WL 3471688, at *3 (D. Del. Aug. 6, 2021) ("Legal encumbrances on the 'right to use' a patent run with the patent."). Galvion asks this Court to reject this bedrock principle, and instead find that only the original parties to the RAA can challenge the purported encumbrance (Galvion's license defense). Galvion argues the encumbrance does not run with the patents, but instead runs with the parties to the RAA.

Galvion's argument should be rejected because it is contrary to U.S. law. Under U.S. law, a license is a right **held by the licensee**, and a purported license is also an encumbrance **on the patent** and operates as a covenant to not sue **on the patent owner**. *See, e.g.*, *Bioverativ*, 2021 WL 3471688, at *3. An assignment by the original patent owner does not change these facts. U.S. law governs this issue because an encumbrance on a U.S. patent and the associated right held by the licensee "is a creature of federal common law as is the right of the licensee to have the license

---

[4] The assignments were recorded. *See* D.I. 164-1.

construed," and "it follows that questions regarding the assignability of patent licenses are controlled by federal law." *In re Alltech Plastics, Inc.*, 71 B.R. 686, 689 (W.D. Tenn. 1987). All issues "intimately involved in the substance of enforcement of the patent right" are governed by U.S. law. *Arma*, 172 F.3d at 855; *Unarco Indus., Inc. v. Kelley Co.*, 465 F.2d 1303, 1306 (7th Cir. 1972) ("[T]he question of assignability of a patent license is a specific policy of federal patent law dealing with federal patent law. Therefore, we hold federal law applies to the question of the assignability of the patent license in question."), *cert. denied*, 410 U.S. 929 (1973).

In this case, when Artisent and Galvion signed the RAA, Artisent's patents (*i.e.*, property rights) became subject to this encumbrance **and** Galvion obtained a license (*i.e.*, personal defense). The RAA created this link between the patents (owned by Artisent) and the licensee (Galvion). When Artisent assigned the patents to Gentex, the encumbrance **remained on the patents** and did not stay with Artisent. *Datatreasury Corp. v. Wells Fargo & Co.*, 522 F.3d 1368, 1372 (Fed. Cir. 2008) (patent assignee takes ownership "subject to the legal encumbrances thereon" because encumbrances "run with the patent."). If the license was valid, Gentex would now be bound by the encumbrance, which created a relationship between Gentex (owner of the encumbered patents) and Galvion (licensee of those patents). As patent owner, Gentex has the right to assert infringement. As license holder, Galvion can assert its alleged license defense, but only if it can prove that it still holds a valid license, which requires compliance with the material terms (*i.e.*, paying the royalty). As patent owner, Gentex has the right to challenge whether the alleged license encumbrance on its patents remains valid. *See, e.g.*, *Innovus Prime, LLC v. Panasonic Corp. & Panasonic Corp. of N. Am. Inc.*, 2013 WL 3354390, at *9 (N.D. Cal. July 2, 2013) (question of whether covenant not to sue affects assignee's patent rights is "an issue unique to patent law" and "governed by United States federal law"). Thus, under U.S. law, Gentex has a right to enforce its

patents and determine if those patents are encumbered, which means it can challenge Galvion's alleged license defense.

### 3.    RAA does not prevent the assignment of the patents to Gentex.

Galvion argues the RAA deprived Gentex of "standing" to challenge its license defense, but the RAA does not impact the assignment of the patents. The RAA states Artisent owned the patents. D.I. 188, Ex. 5 ¶ 1 (████████████████████████████████████████ ████████████); Ex. II at 5256-57 (██████████████████████"). No provision of the RAA prevented Artisent from assigning its pre-existing rights or patents to Gentex, and Galvion agrees. *See* Ex. QQ at 32:15-19, 33:3-12. Artisent assigned patents to Gentex and gave Gentex constitutional standing to sue and to challenge encumbrances. The RAA does not change this fact. *Supra* at Section V(B).

Because U.S. law controls the issue of assignment of a U.S. patent, this Court need not determine the scope of the RAA or whether some or all of the RAA was assigned to Gentex under Quebec law. The RAA includes numerous terms, many of which are not related to the Asserted Patents or the license, and this Court does not need to resolve all of those disputes. To deny Galvion's motion, the Court need only determine that Gentex owns the encumbered patents under U.S. law, a fact that is not and cannot be disputed. *Sky Techs. v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009) (U.S. "federal law is used to determine the validity and terms of an assignment").

### 4.    RAA refers to an assignment of "rights in this Agreement" and did not prohibit assignment of pre-existing patent rights under U.S. law.

Prohibiting assignment of an agreement is different than prohibiting assignment of a pre-existing patent. The portion of the RAA that Galvion rests its argument on states: ████████ ████████████████████████████████████████████████████████████████████████ absent certain conditions being met. D.I. 188, Ex. 5 at A039 (¶ 16). Nothing in the RAA restricted

Artisent's ownership rights in its pre-existing patents or its ability to assign those patents.

Ownership of the patents is not defined, addressed, or tied to Artisent's "respective rights" in its agreement with Revision. The patents were issued by the U.S. government and were pre-existing rights that Artisent held before it entered into the RAA with Revision. Artisent could—and did assign these patents—under U.S. law to Gentex, the new patent owner.

Artisent's right to exclude others did not arise from the RAA. Artisent received those rights under U.S. law when the patents issued. The RAA only created a new license right for *Galvion*. D.I. 188, Ex. 5 ¶ 4. While RAA paragraph 16 limited each party's ability to assign rights ***created by the RAA***, it did not prohibit the assignment of any pre-existing rights created under U.S. law. In short, the RAA did not prevent Artisent from assigning its pre-existing patent rights to Gentex under U.S. law. *See supra; see also Au New Haven, LLC v. YKK Corp.*, 210 F. Supp. 3d 549 (S.D.N.Y. 2016) (confirming that patent rights are distinct from license agreement rights).

### 5. Gentex has a right under U.S. law to challenge the license granted by Artisent, the prior patent owner.

Under U.S. law, patent owners can challenge a license granted by a prior patent owner. For example, in *Intel v. Future Link*, Philips and Intel signed a license agreement. No. CV 14-377-LPS, 2016 WL 6089746, at *1 (D. Del. Sept. 28, 2016). Philips's patents were subsequently assigned to Future Link, which then accused Intel of infringement. *Id*. One contested issue involved the meaning of the non-assignment clause in the original Intel-Philips agreement. *Id*. Future Link was not a party to the agreement, but it was the current patent owner. As patent owner, Future Link had the right to challenge the scope and applicability of the Intel-Philips agreement and argue it should be deemed terminated. *Id*. Similarly, while Gentex was not an original party to the RAA, it is the current patent owner and can challenge the scope and applicability of the RAA.

### 6. Galvion's argument has never been recognized under U.S. law.

Galvion does not cite any case supporting its position that only the grantor of a license (*i.e.*, Artisent) can challenge the validity of a license, or that the current owner of an encumbered patent (*i.e.*, Gentex) has no right to challenge a license defense. Instead, Galvion cites inapplicable breach of contract cases. *See* D.I. 186 at 10. Accepting Galvion's theory would fundamentally alter the property rights of an encumbered patent as it would deny patent owners the ability to challenge the scope and applicability of alleged encumbrances.

Galvion is seeking a ruling that would allow it the benefits of the license (*i.e.*, personal defense), without the obligations of the license (*i.e.*, royalty payments and other restrictions). Preventing a patent owner from challenging any purported encumbrances would fundamentally undermine the nature of U.S. patent rights, and is inconsistent with the aims of federal patent policy. *Datatreasury*, 522 F.3d at 1372 (patent assignee takes ownership "subject to the legal encumbrances thereon" because encumbrances "run with the patent.").[5]

### 7.    Gentex can assert breach of the "standalone side rails" clause.

Even if, *arguendo*, Gentex needs "standing" to challenge Galvion's alleged license defense, Gentex acquired from Artisent the necessary rights. Artisent's pre-existing patent rights allowed it to exclude others from making certain products. The license granted Galvion the right to make those products without being sued for patent infringement. However, the license was not absolute because it includes one exception: ██████████████████████████████████ ██████████████████████████████████████████████████████████████████ D.I. 188, Ex. 5 at A036-37 (¶ 5). This is similar to a geographic or field-of-use restriction. When Artisent assigned its patents to Gentex, the rights to exclude these rails also transferred to Gentex. Thus, regardless of whether the entire RAA was assigned to Gentex, Artisent assigned its pre-existing

---

[5] Even under Galvion's theory, it cannot prevail. If Galvion's license is unique to the grantor of the license, Galvion can present its license defense to Artisent in a separate proceeding.

right to exclude these rails to Gentex. Galvion's sale of standalone rails is a separate material breach of the RAA that Gentex has the right to raise. This breach undercuts Galvion's license defense. This is a separate and independent basis for this Court to deny Galvion's motion.

**B.      There is a Genuine Dispute of Material Fact Whether Gentex Obtained Rights to, and is a Party of, the RAA under Quebec Law**

Galvion argues only a party to the RAA can challenge its license defense. As explained above, this is fundamentally incorrect and at odds with U.S. patent law. But even if its theory is correct, this Court should still deny Galvion's motion because there are disputes of material fact about whether Gentex is a party to the RAA. Artisent assigned the RAA to Gentex, and this is undisputed. D.I. 164-2. Galvion argues the assignment is ineffective because of the non-assignment clause in the RAA. D.I. 188, Ex. 5 at A039 (¶ 16). The non-assignment clause has several exceptions and the parties dispute the meanings of those clauses. *Id*. These are genuine disputes of material fact, and for at least this reason, Galvion's motion should be denied.

**1.      Interpretation of RAA Paragraph 16 under Quebec law.**

RAA paragraph 16 includes a non-assignment clause and exceptions to that clause:



The first sentence is the restriction: a party ███████████████████████████████████
████████████████████ *Id*. It also includes an exception if there is ███████████████████
█████████████████ and a clarification that this clause does not impact either parties' ability to license its patents (*i.e.*, it is not a restriction on pre-existing right). *Id*. The second sentence is

another exception: if a ███████████████████ occurs, then that action ████████████ ████████████████████████ *Id*. The dispute is the scope of the second sentence.

Under Quebec law, contract analysis is a two-step process. *Uniprix inc. v. Gestion Gosselin et Bérubé inc.*, 2017 SCC 43 at 60 (D.I. 189, Ex. E); *see also* Ex. B ¶¶ 25-27. *First*, the court must determine if the words are clear or ambiguous. *Uniprix*, 2017 SCC 43 at 60. If the words are clear, "the court's role is limited to applying them to the facts before it." In short, if the words are clear, the court does not construe or interpret the words. *Id*. *Second*, if the court identifies some ***ambiguity*** in the words, it must proceed to the second step to resolve the ambiguity by interpreting the meaning of those words. *Id*. "The cardinal principle that guides the second step is that '[t]he common intention of the parties rather than adherence to the literal meaning of the words shall be sought' (art. 1425 C.C.Q.)." *Id*. In short, the second step always involves analyzing and resolving factual disputes. In its motion, Galvion only argues RAA paragraph 16 is clear under step one. If the Court finds RAA paragraph 16 contains any ambiguity, Galvion's motion should be denied because it does not present any argument under step two.[6] Further, each step of "[c]ontractual interpretation involves the consideration of a multitude of facts . . . and is a ***question of mixed fact and law***." *Uniprix*, 2017 SCC 43 at 61. For this additional reason, this Court should deny Galvion's motion because there are multiple disputes of material fact.[7]

### 2.    RAA Paragraph 16 is not clear and contains ambiguity.

Paragraph 16 contains an inherent ambiguity, and the common intention of the parties must be determined under the second step. *First*, it is undisputed that the RAA does not define the term ████████████████████████ or any related term. Moreover, the term ████████████ is

---

[6] Even if the Court considers step two, numerous facts support Gentex. Gentex SOF ¶¶ 1, 13-20.
[7] In Quebec, a jury does not resolve contract disputes; all disputes are resolved by the judge. Here, the jury will resolve factual disputes, and this Court applies those facts to Quebec law.

not defined in any cited Quebec case or authority by either Quebec law expert. In fact, the only expert with significant patent licensing experience is "not aware of a single patent license (or license for any other IP right for that matter) that used the phrase 'sale of control.'" Ex. C ¶ 15. Put simply, this term is undefined in the RAA, is unusual in patent licenses, and has no common meaning. Thses facts alone renders paragraph 16 ambiguous under step one.

*Second*, the parties' Quebec law experts dispute the meaning of the phrase ████████████ ████████████ as covering (i) the sale of the party's shares, (ii) the sale of its assets, or (iii) both. Ex. B ¶¶ 22-24. Galvion argues this term only applies to a share sale. However, the RAA does not refer to a share sale. Gentex's expert disagrees and explains that this term must cover an asset sale based on the context of the RAA. Ex. B ¶ 24; Ex. C ¶ 16, 20-21. This factual dispute also renders this term ambiguous under step one.

*Third*, Galvion attempts to avoid the inherent ambiguity in RAA paragraph 16 by arguing the Court need only construe a single word: "control." Br. at 8-9. However, focusing on a single word—while ignoring the remainder of the RAA and the context of that single word—is also insufficient to render the entire paragraph clear. In fact, Galvion's argument is prohibited by Quebec Civil Code ("CCQ"), which requires a court to interpret the contract as a whole. Ex. JJ (CCQ 1427). Additionally, Galvion's argument confirms this word contains ambiguity.

Galvion is not merely applying this word to the facts, but also asking this Court to adopt its ***proposed interpretation*** of this word. This is improper under step one. *Uniprix*, 2017 SCC 43 at 60 ("If the words of the contract are clear, the court's role is limited to applying them to the facts before it."). Furthermore, Galvion's proposed interpretation relies on extrinsic evidence. Specifically, Galvion argues the Business Corporations Act defines the word "control," and that meaning must also be the clear meaning of this term in the RAA. However, the RAA does not

explicitly or implicitly adopt that definition, and Quebec law does not force that definition on all contracts governed by Quebec law. Instead, it is merely one of many extrinsic evidence definitions for the word "control," including definitions that encompass an asset sale. *See* Ex. D ¶¶ 22-32. Even if the Court focuses on this single word—to the exclusion of the context—and relies on extrinsic evidence to determine its meaning, there is still a dispute of material fact because the word "control" can mean a share sale, asset sale, or other events depending on the context.  Ex. QQ at 41:11-21, 75:25-76:15.

In sum, RAA paragraph 16—and the phrase ██████████████ in particular—is not clear. It is not defined in the RAA and is unusual in patent licenses. Paragraph 16 cannot be reduced to the single word "control," and there are disputes of material fact about the meaning of the word "control" (and the entire paragraph). Resolving those disputes requires analyzing competing definitions from extrinsic evidence. Thus, under the step one, RAA paragraph 16 is not entirely clear, it contains ambiguity, and Galvion's motion should be denied.[8]

### 3.   RAA paragraph 16 confirms a ██████████████ must include an asset sale.

Analyzing the entire RAA further undermines Galvion's argument that paragraph 16 is clear and limited to a share sale. Paragraph 16 refers to an assignment. As explained below, an asset sale (Gentex's interpretation) can assign a contract, but a share sale never assigns a contract.

Paragraph 16 permits assignment if a transaction with a third party qualifies as a ██████



██████ D.I. 188, Ex. 5 at A039 (███████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████). The disputed ███████████ clause limits the types of

---

[8] Instead, the Court needs to proceed to the second step of contract interpretation, which requires resolving factual disputes about the common intention of the parties. Ex. B ¶ 28; *see also* Ex. JJ (1425 CCQ); *Uniprix*, 2017 SCC 43 at 60. This requires a jury trial.

permitted transactions to assign the RAA to a third party. Paragraph 16's focus on the "assignment" of the RAA ███████████████████ confirms the meaning of the term ███████████ must also refer to a type of assignment. Further, the second sentence of Paragraph 16 gave both parties a benefit: the ability to assign their respective rights in the RAA to a third party in certain circumstances. Ex. C ¶ 17. At the time of signing the RAA, neither party could have known if they would take advantage of this benefit in the future. *Id.* ¶ 18. In short, the parties granted each other the benefit of being able to assign the RAA to a third party, so long as it was subject to some restrictions. An asset sale is a well-known way to assign a contract to a third party, and this is exactly how Artisent assigned the RAA to Gentex.

Ignoring this context, Galvion argues the term ███████████ cannot include an asset sale, and only narrowly refers to a share sale. This is wrong because a share sale ***never*** assigns a contract a third party and ***never*** changes the co-contracting party to a contract. Both Quebec law experts agree. Ex. C ¶20 (citing Second Garin Report at page 8 ("the sale of a controlling shareholding in either party does not constitute an assignment requiring consent as, pursuant to the principle of corporate separateness, there is no change in the identity of the co-contracting party."). A share sale changes who owns an entity, but does not transfer a contract to another entity. Thus, Galvion's argument that the only way to ***assign*** the RAA to a third party is to engage in a share sale is wrong because there is no dispute that a ***share sale never assigns an agreement*** and never changes the co-contracting party. This interpretation would be improper. *See* Ex. JJ (CCQ 1428) ("A clause is given a meaning that gives it some effect rather than one that gives it no effect.").

In sum, this term must include an assignment (an asset sale), and under step one it cannot be interpreted as a share sale because that would not even result in an assignment of the RAA.

**4.      Galvion's narrow interpretation of the term ██████████ is contrary to its broad interpretation of other terms in the RAA.**

Galvion argues the undefined word "control" (in the undefined term ██████████) has one clear and narrow meaning—a share sale—but, at the same time, argues other terms should be interpreted broader than their definition in the RAA. Specifically, RAA paragraph 4 states ████████████████████████████████████████████████ D.I. 188, Ex. 5 at A036. Galvion argues this license grant, presumably under step one of contract interpretation, has a clear meaning: ***Revision and its affiliates***. Br. 6 (stating it is "undisputed that Artisent, the original owner of the applications that issued as the Artisent Patents, granted Galvion Inc. and its affiliates a license."). In support of this broad construction, Galvion relies on other portions of the RAA. However, the RAA explicitly defines the term "Revision" as "Revision Eyewear, Inc." *Id.* at A035. Critically, this definition does not include Revision Eyewear, Inc.'s ***affiliates or Galvion Ltd***. Galvion's broad interpretation of this term is both contrary to its definition in the RAA and contrary to its argument that the undefined term "control" (in the undefined phrase ██████████) should be construed narrowly and without considering the entire RAA. Under a step one analysis, the Court should not construe the undefined term "sale of control" narrowly, yet construe "Revision" broadly and contrary to its definition.

**5.      Galvion's remaining arguments are misleading and inaccurate.**

Galvion's motion is full of misleading statements and inaccuracies that also warrant its denial, in particular the following two key issues. *First*, Galvion implies the dispute involves the term "change of control." Galvion states "Gentex's expert expressly contradicted Gentex's own theory that an asset sale can be a ***change of control***." Br. at 9. However, "change of control" is not the term in the RAA. The disputed term is ██████████ Even if the Court considers the meaning of "change of control," it undermines Galvion. Change of control is also undefined in the

RAA. It is commonly used in license agreements, but subject to a wide variety of meanings, including an asset sale. Ex. D ¶¶ 25-32. Thus, even if the term ███████████ is relevant, it confirms the RAA is ambiguous and is another basis to deny the motion.

*Second*, Galvion attempts to misleads the Court by stating "the Supreme Court of Canada has confirmed, the phrase ██████████ when used with regard to a corporation, has a specific, well-established legal meaning that requires the sale of 'a number of shares as carries with it the right to a majority of the votes in the election of the board of directors.'" Br. at 9. This is not true. The Supreme Court of Canada has not construed the term ███████████ D.I. 189, Ex. D at B075-B120. *Duha Printers* refers to the meaning of the word "control." *Id.* at B087, B095. Moreover, *Duha Printers* confirms Gentex's position that the word "control" is not clear and is subject to a variety of meanings.[9] Galvion's cite to *Duha Printers* is misleading, and it actually undermines Galvion's argument that the word "control" is clear. For this additional reason, Galvion's motion should be denied.

### C.   There is a Genuine Dispute of Material Fact Whether Galvion Ltd. is Entitled to a License Under the RAA under Step One

RAA Paragraph 4 includes a license to "Revision." D.I. 188, Ex. 5 at A036 (¶ 4). The scope of this license is governed by Quebec law, and the meaning of this term is not clear under step one. The RAA defines "Revision" as "Revision Eyewear, Inc." *Id.* at A035. It does not include affiliates or other entities. Despite this definition, Galvion argues the license should be interpreted broadly to cover Galvion Ltd. based on other terms in the RAA, like the recitals. *Id.* At best, these other terms render the scope of the license unclear. As such, the meaning of this term is ambiguous and

---

[9] *Duha Printers* actually states: "[m]any approaches might conceivably be adopted in the word 'control'" it "might, for example, refer to control by 'management,' where management and the board of directors are separate, or it might refer to control by the board of directors" and "'control' might conceivably refer to de facto control by one or more shareholders whether or not they hold a majority of shares." D.I. 189, Ex. D at B095.

it must be interpreted under the step two. *Uniprix*, 2017 SCC 43 at 60. Galvion agrees.  Ex. QQ at 23:1-12.  Galvion does not present any analysis under step two, and resolving this disputed material fact is not possible on summary judgment. Galvion's motion should be denied.

> **D.      There is a Genuine Dispute of Material Fact Whether Galvion has a Valid License to the Asserted Patents Because Galvion Failed to Pay Royalties**

Galvion has the burden of proving its affirmative license defense. *Endo Pharm., Inc. v. Actavis, Inc*., 746 F.3d 1371, 1374 (Fed. Cir. 2014). It cannot meet its burden or shift it to Gentex. Galvion admits it sells licensed products (Br. 15-18) and admits it has not paid royalties. Ex. A (RFA No. 16). As such, Galvion materially breached the RAA. Ex. B ¶¶ 56-79. Under Quebec law, a material breach results in the loss of corresponding rights. *Id.* Here, Galvion's failure to pay royalties means Galvion lost the corresponding right to a patent license. Additionally, Galvion's material breach results in resiliation of the RAA, which is the Quebec law term for termination. *Id.* Thus, no matter how this Court rules on the scope of Gentex's rights under U.S. and Quebec law, there is at least a dispute of material fact about whether Galvion can meet its burden of proving that it is entitled to a license defense as a result of its material breaches.

> **E.      There are Genuine Disputes of Material Fact Whether the Accused Products Fall within the Scope of the License**

Even if Galvion has a license, there remain genuine disputes of material fact whether all of Galvion products are covered by the license. This analysis requires contract interpretation. Because the terms are not clear under a step one analysis, this Court must proceed to a step two analysis. Galvion does not present a step two analysis, and any such analysis would involve disputes of material fact. For at least this reason, Galvion's motion should be denied.  Further, the RAA permits sale of ████████████ but Galvion has no right to sell ████████████ Galvion argues all of its products are licensed by categorizing all of its products as ████████████ ████████████████████████████████████████████████████ D.I. 186 at

13. Based on this inaccurate characterization, Galvion argues all of its products are licensed. However, many Accused Products are not ████████ and Galvion's license defense is inapplicable. *Gen. Talking Pictures Corp. v. Western Elec. Co.*, 305 U.S. 124, 126–27 (1938) ("Any use beyond the valid terms of a license is, of course, an infringement of a patent.").

### 1.   There is a genuine dispute whether the Accused Products are ████████

Paragraph 4 of the RAA grants a license for ████████████████████████ ██████████████████████████████████████ ██████ D.I. 188, Ex. 5 at A036. Paragraph 5, in turn, defines ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ *Id.* Paragraph 5 also states: ████████████████████████████████████ ████████████████████████████████████████ ████████████████ *Id.* D.I. 188, Ex. 5.

Galvion's Viper Standalone Long Rails, Caiman SLR, and PDxT Rails are not ████ ████████████████ under the RAA because they are only applied to the helmet's sides, and do not surround other parts of the helmet, and are not applied to other parts of the helmet. Ex. E ¶¶ 760-762; D.I. 188, Ex. 16 at A098-104 (¶¶ 18-26); Ex. F at 97:11-19, 119:3-12, 119:22-24, 195:17-20, 307:12-308:3, 307:2-6. They are ████████████████████████████ ████████████████ Ex. F at 97:11-19, 195:17-20. Even Galvion admits that Viper Standalone Long Rails and Caiman SLRs are ***not*** part of a ████████ Ex. F at 307:12-308:3. In fact, Galvion considered developing a ████████████ in hopes of converting its standalone

rails ███████████████████████████████ *See* Gentex SOF at ¶ 6.[10] There

is a dispute of material fact about whether they are ████████████ similar to Schedule B.

In contrast, the Viper ILR with Front Mount is a ███████████████████

████████████████████████████████████. *See* Ex. I

at 297:13-298:1; Ex. J; Ex. K at 1845-46. The Viper ILR is dependent on the Front Mount for

attachment to the helmet and to accept accessories. Ex. G at 197; Ex. F at 97:11-15, 119:3-12,

119:22-24, 307:2-6; Ex. H at 211:22-212:20, 277:12-278:14.[11]

The "standalone side rails" from the RAA and two of Galvion's products are below.

| | Viper Standalone Long Rails (*i.e.*, standalone side rail) | Viper ILR Front Mount (*i.e.*, halo system) |
|---|---|---|
| Ex. A042 | Ex. MM (REVMIL0000115) | Ex. G, at 197, 201 |

**2.    There is a genuine dispute whether the Accused Products are ██████████**

Paragraph 5 of the RAA also permits Galvion to sell replacement parts if they are

████████████████████████████████████

████████████████████████████████████

████████████████     D.I. 188, Ex. 5 at A036. Galvion argues that its "rail kits"

are replacement parts. *See* D.I. 186 at 16-17. However, a reasonable jury could conclude the

---

[10] Including a front mount, bungee cord, or Velcro with the rails guts the distinction between licensed "halo systems" and "standalone side rails." *Compare* D.I. 186 at 15, *with* D.I. 188, Ex. 16 at A100-A102 (¶¶ 22-24), *and* Ex. E ¶ 762. This is, at least, a dispute of material fact.
[11] Galvion argues Gentex admitted "that so long as a product included a front shroud mount in addition to side rails, it would be covered under the RAA." D.I. 186 at 16. Gentex was referring to rails with a mount in "a kit."  Ex. KK at 122:14 - 126:2; D.I. 188, Ex. 16 at A103-A104 (¶ 26).

accused Viper Standalone Long Rails, Caiman SLR, and PDxT Rails are not ███████████ as discussed above. Further, there is evidence the "rail kits" are not only sold to replace old rails, but also sold as "new rails" and ████████████████████████████████████ ██████████████████████ *See* Gentex SOF Rebuttal at ¶ 18.

      **3.**      **There is a genuine dispute whether the Accused Products are ███████** **███████████████████████**

There is also a genuine dispute whether the Viper Standalone Long Rails, Caiman SLR, and PDxT Rails are ██████████████████████████████████████████ and thus excluded from the license. *See* D.I. 188, Ex. 5 at A036. As shown in the side-by-side comparison below, each of the Viper Standalone Long Rails, Caiman Skeleton Lon Rails, and PDxT Rails are ███████████████████████████████████████████

| Ops Core "ACH-ARC" Rails | Viper Standalone Long Rails | Caiman SLR | PDxT Rails |
|---|---|---|---|
|  |  |  |  |
| Ex. LL, at 181911. | Ex. MM, at 115 | Ex. NN, at 124 | Ex. OO, at 44769 |

Galvion argues a standalone side rail must fit on an ACH helmet. D.I. 186 at 19.[12] But Paragraph 5 does not state this. D.I. 188, Ex. 5 at A036-A037; D.I. 188, Ex. 16 at A101 (¶ 23). There is sufficient evidence from which a reasonable jury could find each of Galvion's standalone side rails are ████████████████████████████████ *See* Gentex SOF Rebuttal at ¶ 17.

For all of these reasons, there are disputes about the interpretation of the RAA and disputes of material fact about whether all of Galvion's products are covered by the license in the RAA.

---

[12] Galvion's cites about ACH helmets are irrelevant, or lead to ambiguity. *See* D.I. 186 at 18.

## VI.     CONCLUSION

For all the reasons discussed herein, this Court should deny Galvion's motion and this matter should proceed to trial to resolve the liability and damages issues presented.

Dated: March 15, 2022

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

*/s/ Amy M. Dudash*
John V. Gorman (#6599)
Amy M. Dudash (#5741)
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Tel: (302) 574-3000
john.gorman@morganlewis.com
amy.dudash@morganlewis.com

Jason C. White (admitted *pro hac vice*)
Scott D. Sherwin (admitted *pro hac vice*)
Kenneth M. Kliebard (admitted *pro hac vice*)
Maria E. Doukas (admitted *pro hac vice*)
Karon N. Fowler (admitted *pro hac vice*)
110 N. Wacker Drive, Suite 2800
Chicago, Illinois  60606
Tel:  (312) 324-1000
jason.white@morganlewis.com
scott.sherwin@morganlewis.com
kenneth.kliebard@morganlewis.com
maria.doukas@morganlewis.com
karon.fowler@morganlewis.com

*Counsel for Plaintiff Gentex Corporation*